# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

```
JUDY O'NEIL, individually    )
and as successor-in-interest )
to Decedent KEITA O'NEIL,    )
                             )
              Plaintiff,     )
                             )
         vs.                 )CASE NO.: 3:17-cv-07190-JCS
                             )
CITY AND COUNTY OF SAN       )
FRANCISCO, a municipal       )
corporation, et al.          )
                             )
              Defendants.    )
_____ )  CERTIFIED COPY
```

VIDEOTAPED VIDEOCONFERENCE

DEPOSITION OF OFFICER EDRIC TALUSAN

THURSDAY, JANUARY 7, 2021

10:06 a.m. - 1:13 p.m.

(Page 15, Line 6 through Page 24, Line 17;
Page 100, Line 17 through Page 103, Line 3
are SEALED and BOUND SEPARATELY)

REPORTED BY:  CHRISTY CURRY, CSR No. 13982

1

INDEX OF EXAMINATION

WITNESS:  OFFICER EDRIC TALUSAN

EXAMINATION                                            PAGE

By Mr. Buelna                                            7

By Mr. Sims                                            111


--o0o--


Appearance Page                                         3

Exhibit Page                                            4

Location                                                5

Declaration of Witness                                114

Reporter's Certificate                                115

Disposition                                           116

Witness Letter                                        117

Deposition Errata Sheet                               118

Attorney's Notes                                      119

--o0o--

2

```
 1                    APPEARANCES OF COUNSEL

 2

 3    For the Plaintiff:

 4         BY:  Patrick Buelna, Attorney At Law
           POINTER & BUELNA, LLP
 5         Lawyers for the People
           Wells Fargo Center
 6         1901 Harrison Street, Suite 1140
           Oakland, California 94612
 7         (510)929-5400
           (Videoconference appearance.)

 8

 9

      For the Defendants:
10
           BY:  Hunter Sims, Deputy City Attorney
11         OFFICE OF THE CITY ATTORNEY
           1390 Market Street, Sixth Floor
12         San Francisco, California 94102
           (415)554-4259
13         (Videoconference appearance.)

14

15    Also Present:  Sean McAleer, Videographer
                      April Green, Plaintiff
16

17

18                      --oOo--

19

20

21

22

23

24

25

                                                    3
```



1                    INDEX TO EXHIBITS

2

3            (No Exhibits Marked.)

4

5                   --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    BE IT REMEMBERED that pursuant to Notice of Taking

2  Deposition, and on Thursday, January 7, 2021, commencing

3  at the hour of 10:06 a.m., Via Zoom Meetings, before me,

4  CHRISTY CURRY, CSR No. 13982, a Certified Shorthand

5  Reporter in and for the State of California, personally

6  appeared

7                    EDRIC TALUSAN,

8  produced as a witness in the above-entitled action,

9  who being by me first duly sworn, was thereupon examined

10  as a witness in said action.

11

12                    --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          5

1    Thursday, January 7, 2021                    10:06 a.m.

2                        ---o0o---

3

4        THE VIDEOGRAPHER:  My name is Sean McAleer, and

5    I'm the videographer.  I will be recording this

6    proceeding on behalf of Sacramento Legal Video Center,

7    LLC, located at 3550 Watt Avenue, Suite 140, in

8    Sacramento, California.  The date is January 7th, 2021.

9    The time on the video monitor is 10:06 a.m.

10        This deposition is being held virtually by video

11    conference with the witness appearing remotely.  We are

12    here in the matter of O'Neil versus the City and County

13    of San Francisco, et al., filed in the United States

14    District Court for the Northern the District of

15    California, case No. 3:17-cv-07190-JCS.

16        This is the deposition of Edric Talusan.  The

17    noticing attorney is Patrick Buelna.  The court reporter

18    is Christy Curry of Barbara J. Butler and Associates.

19    This is a single track recording.  Overlapping voices

20    cannot be separated.  Private discussions on the record

21    will also be recorded.

22        Will counsel please identify yourselves, your

23    firms, and those you represent.

24        MR. BUELNA:  Yes.  My name is Patrick Buelna

25    from Pointer and Buelna, and I represent the plaintiff

                                                        6

```
1    in this matter.
2              MR. SIMS:  Hunter Sims for defendant Edric
3    Talusan, Christopher Samayoa, and City and County of
4    San Francisco.
5              THE VIDEOGRAPHER:  Will the reporter please
6    swear in the witness?
7
8                    OFFICER EDRIC TALUSAN,
9                    sworn as a witness by
10              the Certified Shorthand Reporter
11                 testified as follows:
12
13                 EXAMINATION BY MR. BUELNA
14   BY MR. BUELNA:
15   Q.       All right.  Good morning, Mr. Talusan.
16   A.       Good morning.
17   Q.       Could you do me a favor and just spell your name
18   for the record real quick?
19   A.       EDRIC TALUSAN.  E-D-R-I-C, T-A-L-U-S-A-N.
20             MR. BUELNA:  Okay.  And before we get started, I
21   stipulate to the remote swearing in of the witness.  You
22   also stipulate, correct, Hunter?
23             MR. SIMS:  Correct.
24             MR. BUELNA:  Okay.  Great.
25   ///
```

7

```
 1   BY MR. BUELNA:

 2   Q.      Mr. Talusan, have you ever had your deposition

 3   taken before?

 4   A.      I'm sorry.  You broke up there.

 5   Q.      Yes.  Have you ever had your deposition taken

 6   before?

 7   A.      Yes.

 8   Q.      You say that with some -- how many times?

 9   A.      I think once.

10   Q.      Okay.  Do you recall approximately how long ago?

11   A.      Close to when the incident occurred.

12   Q.      So about four years ago now?

13   A.      I believe so.

14   Q.      All right.  I think it's actually technically --

15   about three -- three to four.  Well, obviously if you

16   have only had it once three years ago, I'm going to go

17   through a couple of, kind of, the rules, or we call

18   admonitions in having your deposition taken.  But first

19   off, you understand that the oath that you took was made

20   under penalty of perjury, correct?

21   A.      Yes.

22   Q.      Okay.  And you're familiar with giving oaths

23   under -- under penalty of perjury, correct?

24   A.      Yes.

25   Q.      Okay.  So I want you to understand that even
```

8

1    though we are not in the courtroom today, it has the

2    exact same effect as if you had just sworn in to the --

3    sworn in in the court.  Does that make sense?

4    A.      Yes.

5    Q.      And you understand you're here today as a named

6    defendant in a wrongful death in a civil rights case

7    against yourself and your fellow former officer,

8    Samayoa, correct -- Samayoa?

9    A.      Yes.

10   Q.      Okay.  All right.  So today we actually have a

11   videographer.  And you might see him in your screen.

12   I'm not sure.  You're probably looking at a TV, right?

13   A.      I am.

14   Q.      Okay.  And you might see a small screen with our

15   videographer as well as with our court reporter.  The

16   videographer is recording only what appears on your TV

17   screen that you see of your image is what he is

18   recording.  Does that make sense?

19   A.      Yes.

20   Q.      He is also recording your video and your

21   movements.  But we also have a court reporter, which you

22   may be familiar with from testifying in court, who is

23   transcribing everything we say into a written document

24   today.  Does that make sense?

25   A.      Yes.

9

1  Q.      So although we do have the videographer who is

2  recording audio and video, we still need to accommodate

3  and be kind to the court reporter by taking turns

4  speaking because it's difficult for her to write down

5  what we are both saying if we are speaking at the same

6  time.  Does that make sense?

7  A.      Yes.

8  Q.      I'd also ask you to verbalize any of your nods

9  or shakes of the head.  You can do them, obviously, but

10  the court reporter has a difficult time, as you can

11  imagine, documenting whether or not you're nodding or

12  shaking your head.  Does that make sense?

13  A.      Yes.

14  Q.      Okay.  Trying to -- okay.  Now, this deposition

15  is not a marathon, although it might feel like it at

16  some points today.  So if at any point you wish to take

17  a break, we can do that.  The only thing I ask is if I

18  have a question pending, that you answer the question

19  and then we take the break.  Does that make sense?

20  A.      Yes.

21  Q.      Okay.  Also, during this deposition it's going

22  to be essentially a very, very long series of questions

23  and answers.  Between my questions and your answers, I

24  ask that you leave a pause.  And there is a dual purpose

25  for that.  One is that it allows for the court reporter

10

1    to accurately transcribe what we are saying.  It also

2    provides an opportunity for your -- for your counsel to

3    lodge objections, legal objections.

4        Now, those legal objections you can basically

5    ignore because they are not for you.  They are for a

6    judge later at trial to rule upon, but your counsel is

7    entitled to make them, and it preserves that objection

8    for later at trial.  However, if he were to specifically

9    instruct you not to answer a question, then of course

10   don't answer.  But otherwise, I'm still entitled to an

11   answer even if he is objecting.  Does that make sense?

12   A.      Yes.

13   Q.      Okay.  Now, you haven't taken any medications or

14   drugs that would affect your ability to testify today,

15   correct?

16   A.      No.

17   Q.      Okay.  Is there any reason you can't give your

18   best testimony today?

19   A.      No.

20   Q.      Now, before we get started into kind of the

21   background, you had an opportunity, right, to meet with

22   your counsel?

23   A.      Yes.

24   Q.      And I'm going to ask you a couple of background

25   questions about that, but I don't want you to reveal any

                                                    11

 1    conversations you have had with this counsel or any

 2    other counsel you've had.  Does that make sense?

 3    A.      Yes.

 4    Q.      Okay.  So without revealing any conversations,

 5    can you tell me how long ago was it that you met with

 6    your counsel today?

 7    A.      (Audio distortion) prior to this meeting.

 8    Q.      Yeah.  So a better way to put it is, obviously

 9    you met with your counsel in order to prepare for a

10    deposition today, right?

11    A.      Yes.

12    Q.      Okay.  How long ago was that?

13    A.      A couple weeks ago.

14    Q.      Couple weeks ago.  Okay.

15    A.      I don't know the exact date.

16    Q.      All right.  And what documents did you review in

17    preparation for your deposition today?

18    A.      I've gone over the transcripts as well as the

19    CAD.

20    Q.      And when you say you have gone over the

21    transcripts, do you mean the transcripts of your

22    interview with homicide?

23    A.      Correct.

24    Q.      Okay.  And was that a single interview or

25    multiple interviews?

                                                          12

1    A.      The homicide interview was a single interview.

2    The DPA interview was a single interview.  And the IA

3    interview was a -- also a single interview.

4    Q.      Okay.  So sounds like you had three different

5    interview transcripts that you went over.

6    A.      Correct.

7    Q.      Okay.  When you went over those transcripts --

8    sorry.  Other than those transcripts, and I heard the

9    CAD, is there anything else that you reviewed?

10    A.      No.

11    Q.      Did you watch -- well, strike that.

12           So you didn't go over any audio or video files?

13    A.      Not since shortly after the incident occurred.

14    Q.      Okay.  And I think you're referring to during

15    your homicide interview the following day of the -- of

16    the incident, you had an opportunity to look at the body

17    camera footage, right?

18    A.      Correct.

19    Q.      As well as surveillance camera footage, correct?

20    A.      Correct.

21    Q.      Since that day have you watched the body camera

22    footage or the surveillance camera footage?

23    A.      I have seen it on the -- the video that the

24    department has released.

25    Q.      Okay.  Other -- and how long ago was the last

13

1    time you saw the body camera footage or surveillance

2    footage?

3    A.      Over a year ago.

4    Q.      Okay.  Have you looked at any -- and this might

5    be -- have you looked at any kind of frame-by-frame

6    photographs of the body camera footage?  Do you

7    understand that question?

8    A.      I do.

9    Q.      Okay.  Have you looked at any of those frames

10   from the body camera footage?

11   A.      Not since the incident.

12   Q.      Okay.  All right.  Okay.  What is your current

13   position with the San Francisco Police Department?

14   A.      I am employed as a police officer with the

15   San Francisco Police Department.

16   Q.      And what is your rank?

17   A.      Police officer.

18   Q.      Okay.  And what was your rank at the time of the

19   incident?

20   A.      Police officer.

21   Q.      Now, other than being a police officer, or a

22   normal police officer, did you have any other

23   responsibilities at the time of the incident?

24   A.      My responsibility that day was as a field

25   training officer.

14

1  Q.      Are you still a field training officer?

2  A.      I am not.

3  Q.      When did you stop being a field training

4  officer?

5  A.      Shortly after the incident.

6          (The testimony from Page 15, Line 6 to Page

7  24, Line 17 was marked confidential, excerpted and bound

8  separately.)

9                          --o0o--

10

11

12

13

14

15              (LEFT BLANK INTENTIONALLY)

16

17

18

19

20

21

22

23

24

25

                                                      15

1

2

3

4

5

6

7

8          (LEFT BLANK INTENTIONALLY)

9

10

11

12

13

14

15

16

17          (WHEREUPON, nonconfidential proceedings resumed.)

18          MR. BUELNA:  All right.  So I'm going to go back

19   out from under seal at this point.  I think I'm going to

20   turn more to general.  All right, Madam Court Reporter.

21          THE COURT REPORTER:  (Nods head.)

22          MR. BUELNA:  So we are going out of seal.  We

23   are back on the record -- well, we are still on the

24   record, but we are not under seal.

25   ///

24

1    BY MR. BUELNA:

2    Q.       So, Mr. Talusan, when -- where did you attend

3    police academy?

4    A.       With the San Francisco Police Department.

5    Q.       Okay.  And approximately what year was that?

6    A.       2006.

7    Q.       All right.  Had you worked for any other or

8    attended any other lawn enforcement-related academies

9    prior to the San Francisco Police Department academy?

10   A.       No.

11   Q.       Okay.  Have you had any other law enforcement

12   occupations prior to becoming a police officer for

13   San Francisco?

14   A.       No.

15   Q.       Did you -- how old were you when you attended

16   academy in 2006?

17   A.       I believe I was 30.

18   Q.       Okay.  What were your occupation- -- what was

19   your occupation prior to becoming a police officer?

20   A.       I was a nurse's aid.  I was a waiter in a

21   restaurant prior to my entrance into the academy.

22   Q.       Okay.  Did you attend college prior to going to

23   the academy?

24   A.       I went to junior college for several years.

25   Q.       Did you -- did you -- how do you say it? --

                                                          25

1    complete any degrees?

2    A.       No.

3    Q.       Okay.  And what was your major area of study

4    when you went to junior college?

5    A.       Just general education.

6    Q.       General education.  Okay.  And where did you

7    attend junior college at?

8    A.       Went to College of San Mateo, Skyline College,

9    and City College.

10   Q.       Okay.  All right.  And you -- presumably you

11   graduated from the San Francisco police academy?

12   A.       Yes.

13   Q.       Okay.  And in order to graduate from the police

14   academy -- strike that.

15           Are you familiar with the term POST?

16   A.       Yes.

17   Q.       Okay.  And what is the -- what does that acronym

18   mean to you?

19   A.       I believe it's the state accreditation.  I

20   believe it stands for police officer standards and -- I

21   can't remember.

22   Q.       Would it be -- would it be fair or would you

23   agree that it stands for peace officer standards and

24   training?

25   A.       Yes.

26

1   Q.      Okay.  And you're required to -- sorry.  My back

2   is -- I might have to stand up throughout this.

3           In order to pass academy, is it fair to say that

4   you had to demonstrate a competency in the POST

5   training?

6   A.      Yes.

7   Q.      Okay.  And you recall that POST is broken down

8   essentially into learning domains?

9   A.      Yes.

10  Q.      Okay.  Now, obviously in order to graduate the

11  academy you had to demonstrate a competency in POST, but

12  it's also true that your department provides you annual

13  training that encompasses POST updates, correct?

14  A.      Yes.

15  Q.      Now, if you recall, the very first learning

16  domain is -- of POST is on leadership, professionalism,

17  and ethics.  Do you recall that?

18  A.      I don't recall the exact domain number.  I

19  recall something of that sense.

20  Q.      You recall being trained on those subject areas,

21  though; is that fair to say?

22  A.      Yes.

23  Q.      Now, part of that training that POST teaches you

24  in that learning domain is that -- well, strike that.

25          You're trained as an officer to stand up and do

                                                        27

1    the right thing, correct?

2    A.      Yes.

3    Q.      You're trained to act professional, correct?

4    A.      Yes.

5    Q.      You're trained to behave with integrity,

6    honesty, and tolerance, correct?

7    A.      Yes.

8    Q.      You're trained to be reliable and truthful,

9    correct?

10   A.      Yes.

11   Q.      You're trained to be accountable for your

12   actions, correct?

13   A.      Yes.

14   Q.      You're trained to exercise self-control at all

15   times, correct?

16   A.      Yes.

17   Q.      You're trained that you're prohibited from

18   engaging in unethical conduct, correct?

19   A.      Yes.

20   Q.      You're trained that using excessive force is

21   unethical conduct, correct?

22   A.      Yes.

23   Q.      You're trained that failing to intervene if

24   you're witnessing another officer using excessive force

25   is also unethical, correct?

                                                            28

1   A.      Yes.

2   Q.      You're trained that you can be held civilly and

3   even criminally liable for unethical conduct, correct?

4   A.      Yes.

5   Q.      And you're trained that unethical conduct can

6   cause you to lose your job, compromise officer safety,

7   and erodes the image of your profession, correct?

8   A.      Yes.

9   Q.      You're trained that you are to uphold the law no

10  matter who is breaking it including a fellow officer,

11  correct?

12  A.      Yes.

13  Q.      You're trained that you're obligated -- strike

14  that.  Strike that.

15          You're trained that -- and we had gone over just

16  before, but you're trained that you're obligated to

17  intervene if you see unethical conduct from another

18  officer, correct?

19  A.      Yes.

20  Q.      You're also trained that there's different

21  interventions you can use to intervene including verbal

22  and physical interventions, correct?

23  A.      Yes.

24  Q.      As an example, you can use verbal intervention

25  to remind an officer to remain professional.  For

                                                        29

1    example, you can tell them to stop or to calm down,

2    correct?

3    A.      Yes.

4    Q.      And in regards to physical intervention, you're

5    trained that you can even grab or pull an officer away

6    if they are committing excessive force, correct?

7    A.      Yes.

8    Q.      All right.  Now, another learning domain that

9    you're trained on is use of force.  Do you recall that

10   one?

11   A.      Yes.

12   Q.      You're trained that there are levels of force

13   that you are permitted to use, correct?

14   A.      Yes.

15   Q.      You're trained that the highest level of force

16   is deadly force, correct?

17   A.      Correct.

18   Q.      All right.  You're also trained that using your

19   firearm is considered deadly force, correct?

20   A.      Correct.

21   Q.      You're also trained that -- that in dire

22   circumstances, that you can also use your vehicle as

23   force, correct?

24   A.      Yes.

25   Q.      And that -- and the use of your vehicle is

30

1   considered deadly force as well, correct?

2   A.      Yes.

3   Q.      Now, you're also trained that the -- that there

4   is less serious levels of force than deadly force,

5   correct?

6   A.      Correct.

7   Q.      For example, there is such -- there is something

8   called intermediate force.  Do you recall that?

9   A.      I don't know what you mean by intermediate

10  force.  But I know the use of force ladder so --

11  Q.      So for example --

12          (Simultaneous speaking.)

13  BY MR. BUELNA:

14  Q.      For example, the situation in which you're

15  permitted to use a baton or pepper spray is different

16  than a situation that you're permitted to use your

17  firearm, right?

18  A.      Correct.

19  Q.      All right.  Essentially that the different

20  levels of force you're permitted to use have to be

21  balanced against the resistance you are presented,

22  correct?

23  A.      Yes.

24  Q.      And these levels of force and balancing against

25  levels of resistance that are presented is something

31

1    that you learned in academy, correct?

2    A.      Yes.

3    Q.      You're also trained on it through your

4    department as well, correct?

5    A.      Correct.

6    Q.      Now, in regards to the levels of resistance,

7    those also essentially have a ladder as well.  Do you

8    recall that?

9    A.      The levels of resistance.  Yes.

10   Q.      For example, the least or -- the least serious

11   is cooperation, which is no resistance at all.  Do you

12   recall that term?

13   A.      Are you stating that if a subject is not

14   cooperating that they are not resisting?

15   Q.      No.  I'm stating that the lowest level of

16   resistance, which is no resistance at all, is

17   cooperation, meaning someone is cooperating with the

18   officer orders --

19   A.      Oh.  I'm sorry.  Yeah.

20   Q.      Okay.  The next level up would be passive

21   non-compliance.  Are you familiar with passive

22   non-compliance?

23   A.      Yes.

24   Q.      For example, that would be where an officer

25   is -- orders -- lawfully orders a subject to sit down on

                                                          32

1    a curb, and the subject hears the officer but they

2    remain standing.  That would be passive non-compliance,

3    correct?

4    A.        Yes.

5    Q.        And you would -- and the next level up would be

6    called active resistance.  Are you familiar with that

7    term?

8    A.        Yes.

9    Q.        So active resistance would be, for example, if

10   you were lawfully walking over and putting their hands

11   behind their back to arrest them for a crime and the

12   subject began pulling their hands away and trying to run

13   away, correct?

14   A.        Correct.

15   Q.        And then the next step up from that is

16   assaultive resistance.  Are you familiar with that term?

17   A.        Yes.

18   Q.        And that would be, for example, instead of just

19   pulling their hands away, the person turns around and

20   punches the officer, correct?  That would be an example

21   of assaultive resistance?

22   A.        Yes.

23   Q.        And then the next most serious one is sometimes

24   called either life threatening resistance or deadly

25   resistance.  Are you familiar with those terms?

                                                          33

1    A.      Yes.

2    Q.      And that would be, for example, instead of

3    turning around and punching an officer, they turned

4    around and pulled out a knife or a gun and threatened to

5    kill the officer, right?

6    A.      Yes.

7    Q.      And each one of those levels of resistance has a

8    maximum level of force that is permitted to be used

9    against the subject, correct?  Does that make sense?

10         And I can kind of break that down a little bit.

11   For example, meaning that -- let's say someone starts

12   striking the officer.  They can only use -- they can't

13   pull out or -- let me do it a more clear example.  One

14   second.

15         Let's say the person is trying to run away.  An

16   officer could use control holds or possibly even tackle

17   the person down, but they wouldn't pull out their gun

18   and shoot them, correct?

19   A.      That would be correct.

20   Q.      All right.  So there is a maximum level of force

21   that is permitted to use against a person that is

22   actively resisting, right?

23   A.      In some circumstances.  Yes.

24   Q.      And, for example, in passive non-compliance, if

25   a person is just simply refusing to sit down on a curb,

34

1   an officer is permitted maybe to use a control hold to

2   bring -- to guide them to the ground, but they are not

3   permitted to take out their baton and just start hitting

4   the person, right?

5          MR. SIMS:  Incomplete hypothetical.

6          (Simultaneous speaking.)

7          MR. SIMS:  Go ahead.

8          THE WITNESS:  You can use your example, if the

9   subject is actively running away from me and has a

10  weapon and is still a threat to the public, then you may

11  or may not be -- it may or may not be necessary to use a

12  firearm.  So it is dependent on the circumstances.

13  BY MR. BUELNA:

14  Q.      Fair enough.  Each set of circumstances, though,

15  you would agree, has a maximum level of force that an

16  officer may use?

17  A.      Yes.

18  Q.      Correct?  Okay.

19         Obviously there is a maximum, but there is

20  really no minimum.  Is that fair to say?  Meaning,

21  although you may use a baton in a certain situation, if

22  you're able to accomplish the same goal of cooperation

23  through verbal commands, there is no -- there is no

24  violation of your training for using verbal commands

25  rather than your baton, right?

                                                          35

1    A.      Correct.

2    Q.      And we kind of went through this, but you're

3    trained that you must constantly re-evaluate the

4    person's level of resistance in order to ensure you are

5    using the appropriate level of force, correct?

6    A.      Yes.

7    Q.      For example, sometimes a situation develops

8    where other force may be merited at one point, it's no

9    longer appropriate to use any force at all during an

10   incident, right?

11   A.      Yes.

12   Q.      For example, if a person has a gun in their

13   hands, at that point you may be able to use some force.

14   But if you were to tell them, Hey, drop the gun, and

15   they drop the gun and begin cooperating, then the amount

16   of force you're allowed to use at that moment has

17   changed, right?

18   A.      Correct.

19   Q.      Now, we kind of went through a little bit

20   before, but you're also trained when using force that

21   communication is an important tool to use in order to

22   avoid having to use force, right?

23   A.      Yes.

24   Q.      You're trained a major goal of law enforcement

25   is to gain voluntary compliance without resorting to any

                                                        36

1   physical force at all, right?

2   A.      Yes.

3   Q.      You're even trained that effective communication

4   is a basic element of the use of force, right?

5   A.      That's correct.

6   Q.      But you're also trained to manage your fear and

7   anger when using force so that the use of force does not

8   become a result of unreasonable fear or anger, correct?

9   A.      Yes.

10  Q.      You're trained that -- you're trained on the

11  difference between reasonable and unreasonable fear,

12  right?

13  A.      Yes.

14  Q.      You're trained that you may act on only

15  reasonable fear when using force, not unreasonable fear,

16  correct?

17  A.      Yes.

18  Q.      You're also trained on how to document uses of

19  force, correct?

20  A.      Yes.

21  Q.      In fact, you're actually trained on how to

22  testify in court, correct?

23  A.      Yes.

24  Q.      You're also trained on how to write reports,

25  correct?

                                                    37

1    A.      Correct.

2    Q.      You're trained that you must never falsify any

3    portion of information in any report you write, correct?

4    A.      That's correct.

5    Q.      You're also trained that you may not falsify any

6    information that you provide in an interview related to

7    a use of force incident, correct?

8    A.      That's correct.

9    Q.      You're trained to objectively document every

10   fact or piece of evidence known to you that could prove

11   or disprove the event you're reporting, correct?

12   A.      Yes.

13   Q.      You're trained that your reports and

14   documentations must include critical information to

15   ensure that the chronology, specifics of event, and the

16   people involved are properly documented, right?

17   A.      Yes.

18   Q.      You're trained in law enforcements's ability --

19   officer's ability to clearly document the facts and

20   activities of a use of force incident not only reflects

21   on the officer's own professionalism, but also on the

22   ability of the justice system to prosecute the case,

23   correct?

24   A.      Yes.

25   Q.      You're trained that it's imperative that each

                                                          38

1  one of your reports be thorough, comprehensive, and

2  documents all aspects of the use of force based on your

3  recollection, correct?

4  A.     Yes.

5  Q.     You're trained it's important to provide full

6  facts and recollection of a use of force incident

7  because memories may fade, evidence may be destroyed,

8  and witnesses may later become unlocatable, correct?

9  A.     Yes.

10  Q.     You're trained that -- as an officer that it is

11  your -- it is your responsibility to protect life as

12  best as you can in every situation, correct?

13  A.     Yes.

14  Q.     You're trained that -- that -- sorry.  Lost my

15  train of thought.

16        You're trained that even when there is a suspect

17  with a deadly weapon, that your responsibility is to

18  bring them into custody as safely as possible, right?

19  A.     Yes.

20  Q.     Okay.  All right.  Now, kind of going a little

21  bit back to where we had left off before, when -- you

22  were -- you were certified to be a field training

23  officer at the time of the incident, right?

24  A.     Yes.

25  Q.     Okay.  And how long had you been a field

39

1   training officer prior to the incident?

2   A.      I believe my first certification was January of

3   2013.

4   Q.      So about four years?

5   A.      Yes.

6   Q.      Okay.  And what did you do -- what did you have

7   to do to be certified as a field training officer?

8   A.      Attend a 40-hour field training officer

9   certification course.

10  Q.      Okay.  And what do you learn in that course?

11  A.      How to be a field training officer, how to

12  document training and the DOR which is D- -- I can't

13  remember what the acronym stands for, but grading

14  sheets, daily grading sheets for the recruit.  And also

15  different types of instructive development to help you

16  teach the recruit.

17  Q.      What are you trained are your responsibilities

18  when you have a recruit out in the field?

19  A.      The responsibility is to show them, instruct

20  them on patrol practices, and also to document their

21  activities during the day.

22  Q.      Are you also obligated to supervise them and

23  ensure that their actions are within policy?

24  A.      Yes.

25  Q.      And you're also trained that you're supposed to

40

1   give them constructive criticism following events or

2   even during events to help them develop, correct?

3   A.      Correct.

4   Q.      For example, you're also expected to supervise

5   their uses of force, correct?

6   A.      Yes.

7   Q.      You're also expected to supervise their conduct

8   when interacting with suspects or the public, correct?

9   A.      Yes.

10  Q.      You're also expected to supervise their use of

11  weapons, correct?

12  A.      Yes.

13  Q.      You're also expected to converse and instruct

14  them before, during, and after incidents, correct?

15  A.      Correct.

16  Q.      Is there a different level of responsibility you

17  have for recruits that are at different phases of

18  their -- how do you call it? -- their field training?

19  A.      Yes.

20  Q.      Okay.  Can you explain to me what the different

21  phases are of field training?

22  A.      Yeah.  The first phase -- I don't know exactly

23  how long the phases are anymore.  We have three phases.

24  You have first, second, and third.  And if they need

25  additional training, then you have an extension phase.

41

1  Q.      Does it -- does the field training phases

2  approximately -- supposed to last approximately nine

3  months?

4  A.      I can't recall.  I don't remember.

5  Q.      Is it fair to say that it's supposed to be less

6  than a year?

7  A.      Yes.

8  Q.      Okay.  And what -- you said it's three phases.

9  Can you describe each phase to me, what it consists of?

10  A.      So the first phase is immediately after they

11  graduate from the academy.  You have a recruit for one

12  FTO.  And then once they complete the first phase, then

13  the recruit goes to the second FTO.  Once the second

14  phase is over, then you -- then the recruit moves onto a

15  third FTO.

16  Q.      What is a recruit expected to show in the first

17  phase?

18  A.      I -- that answer is too -- it would be too

19  vague.  It's just -- you go through daily patrol

20  activities.  So whatever comes up that day or during the

21  day, during your shift, you check off whatever reports

22  they take, whatever activities they conduct.

23  Q.      I guess -- well, how do you graduate to the

24  second phase?  Is it just a time thing, or do you have

25  to actually demonstrate some sort of competency in

42

1    police officer work?

2    A.       You display competency in what you're doing

3    during that day, during that phase.  I can't be exact on

4    what would occur because we are faced with different

5    scenarios every day.  So I can't pinpoint what we would

6    actually be doing during that phase, but some competency

7    in what they are doing during that phase, and then it's

8    a time.

9           You go day by day, week by week.  Like I said, I

10   don't remember how long each phase is, but once that

11   time is over, you move on to your next phase.

12   Q.       Are there any activities they are prohibited

13   from doing during their first phase?

14   A.       I would assume anything that is against the law.

15   Q.       Well, I mean -- yeah.  Hopefully you're

16   prohibited from doing anything against the law through

17   your entirety of your career.

18   A.       Yeah.

19   Q.       But I mean specifically is there any, for

20   example, they are not allowed to document evidence, they

21   are not allowed to respond to calls involving a gun?

22   There is not a lot -- do you understand what I'm getting

23   at here?

24   A.       Sure.  There isn't anything that is prohibited.

25   Q.       Okay.  Are the -- what -- are they permitted to

43

1  respond to calls alone while they are in field training?

2  A.    No.

3  Q.    Okay.  Is there any other prohibitions that a

4  person that is under field training has other than not

5  responding to a call solo?

6  A.    No.

7  Q.    So when you're in phase two, when you graduate

8  to phase two, is there any substantive difference

9  between phase one and phase two?

10 A.    No.

11 Q.    Is there any substantive difference between

12 phase two and phase three other than the passage of

13 time?

14 A.    No.

15 Q.    Okay.  So essentially if -- and I'm going to

16 kind of say this crassly.  Essentially if you don't mess

17 up in any of the three phases you graduate; is that fair

18 to say?

19     MR. SIMS:  Objection.  Vague and ambiguous.

20     Go ahead.

21     THE WITNESS:  My understanding of the three

22 different phases is, ideally we want the recruit to work

23 three different shifts with three different partners to

24 simulate different styles of police work, of patrols

25 techniques.  That is my understanding of the three

44

1    different phases.

2    BY MR. BUELNA:

3    Q.      Are they expected to -- well, you were -- you

4    were assigned at the time to the Bayview district; is

5    that true?

6    A.      Correct.

7    Q.      Okay.  How long had you been at the Bayview

8    district leading up to the incident?

9    A.      Approximately eight years.

10   Q.      Did you do your field training at the Bayview

11   district?

12   A.      I did not.

13   Q.      Where did you do your field training?

14   A.      Northern station.

15   Q.      And what portions of San Francisco does the

16   Northern district encompass roughly?

17   A.      The Fillmore area, Marina, parts of the Haight.

18   Q.      So then once you were done with your field

19   training in the Northern district, it sounds like you

20   were -- you were assigned to the Bayview district?

21   A.      No.

22   Q.      Okay.  What happened after you finished your

23   field training in the Northern district?

24   A.      I conducted my probationary period at Central

25   station.

                                                          45

1    Q.      And when you say your probationary period, what

2    do you mean by that?

3    A.      After FTO you go to your probationary station

4    which is possibly, I think, a year long probation and --

5    yeah.

6    Q.      And what's the significance of the probationary

7    period?

8    A.      I don't know.  Just know -- I just know it's a

9    probationary period.  You go to a probationary station.

10   Q.      When you graduate from your -- I don't know --

11   is there -- when you finish your probationary period

12   or -- strike that.

13          When you finished your probationary period, is

14   that when you went to the Bayview district?

15   A.      No.

16   Q.      Okay.  What happened after you finished your

17   probationary period?

18   A.      After I completed my probationary period at

19   Central, I went to my permanent station at Richmond.

20   Q.      Okay.  And how long were you at Richmond?

21   A.      A little less than a year, I believe.

22   Q.      And then where did you go after Richmond?

23   A.      Then I went to Bayview.

24   Q.      Okay.  Were you assigned to Bayview, or you

25   chose Bayview?

46

1    A.      I requested Bayview.

2    Q.      Why did you request Bayview?

3    A.      I grew up in the Bayview.  I wanted to work

4    where I grew up.

5    Q.      Beyond growing up there, does the Bayview --

6    which is a lot, but was there any other significance to

7    you about working in the Bayview?

8    A.      No.

9    Q.      Is the Bayview considered one of the more

10   dangerous districts to work in?

11   A.      It could be.  Yes.

12   Q.      Do you feel -- but you felt comfortable going to

13   the Bayview district because you grew up there?

14   A.      Yes.

15   Q.      You weren't scared of patrolling the streets of

16   the Bayview district, right?

17   A.      I think there is always some -- some kind of

18   fear when you start your shift off, you hope that you go

19   home at the end of your shift.  But nothing outrageous.

20   Q.      Well, you -- I guess the point I'm getting at

21   is, you requested to go there.  You could've remained at

22   Richmond district, right?

23   A.      Correct.

24   Q.      And you said you started doing the field

25   training in 2013, right?

47

1   A.      I believe that was the date.  Yes.

2   Q.      And approximately how many officers or recruits

3   have you trained prior to Defendant Samayoa?

4   A.      According to my notes which I started taking

5   electronic notes on my phone since 2015, I've had about

6   20 recruits.  Prior to that I would say probably double

7   or a little less than double that.  About 30 to 40,

8   maybe.  I don't know the exact number.  The -- the FTO

9   office would know.

10  Q.      Have you ever fired your weapon before?

11  A.      I have.

12  Q.      How many times?

13  A.      Are we talking about --

14  Q.      Not trigger pulls, but --

15          (Simultaneous speaking.)

16          THE WITNESS:  -- are we talking about --

17          MR. SIMS:  Yeah.  That is overbroad.  Vague and

18  ambiguous.

19  BY MR. BUELNA:

20  Q.      I'm not talking about how many trigger pulls.

21  I'm saying how many different officer-involved shootings

22  have you been in?

23  A.      One other.

24  Q.      And when was that?

25          MR. SIMS:  If we are going to -- if we are going

                                                        48

1   into this other shooting, I'd ask that it be marked as

2   confidential at this time.

3           MR. BUELNA:  Right now I'm just asking if he was

4   involved in one and when it was.

5           MR. SIMS:  All right.  We will see what he says.

6           THE WITNESS:  I believe it was 2012, but I can't

7   be exact- -- exactly sure.

8   BY MR. BUELNA:

9   Q.      Do you recall the name of the -- well, did

10  you -- did you -- 2012.  Do you recall the name of the

11  individual you shot at?

12  A.      Unfortunately I don't.

13  Q.      Okay.  We can -- have you -- other than this

14  incident have you ever had a recruit that you were field

15  training shoot during an incident?

16  A.      No.

17  Q.      At the time of the incident you were in full

18  uniform, right?

19  A.      Yes.

20          MR. SIMS:  Hold on.  We are talking about the

21  subject incident now, right, not the other shooting?

22          MR. BUELNA:  Yeah.  Talking about the subject

23  incident.

24          THE WITNESS:  Yes.

25  ///

49

```
 1    BY MR. BUELNA:

 2    Q.      What sort of equipment does your uniform consist

 3    of?  Kind of a weird question, but obviously you have

 4    equipment that you go out on patrol with, right?

 5    A.      Yes.  We have --

 6    Q.      Like a duty belt?

 7            (Simultaneous speaking.)

 8            THE WITNESS:  Pants, bulletproof vest, gun belt,

 9    gun, handcuffs, extra mags, OC, baton, radio.

10    BY MR. BUELNA:

11    Q.      And then you also have a baton, right?

12    A.      Yes.

13    Q.      Did you have the baton on you the day of the

14    incident?

15    A.      Yes.

16    Q.      Okay.  What about in your car?  Is there --

17    other than obviously the weapons you carry on your

18    person, is there any equipment in your car that would be

19    considered a weapon?

20    A.      Yes.

21    Q.      What weapons do you have in your car?

22    A.      We would have a department issued rifle,

23    department issued shotgun, and a department issued ERIW.

24    Q.      And where is the department issued shotgun

25    located in the car?
```

                                                            50

1    A.      So if we check out a rifle, then we would just

2    have the rifle.  If we just have the shotgun, we would

3    have the shotgun due to the fact you -- the car is only

4    able to hold either a rifle or a shotgun and the ERIW.

5    Q.      And where are those kept, the ER- -- not the

6    ERIW.  Just the shotgun or the rifle that you select?

7    A.      In the passenger compartment of the vehicle.

8    Q.      Okay.  And where in the passenger compartment of

9    the vehicle?

10   A.      In the rifle rack, I believe.  The rack.

11   Q.      Is that -- is that something that kind of sits

12   between yourself and the passenger seat or the driver

13   and the passenger seat?

14   A.      Correct.

15   Q.      All right.  What about the ERIW?

16   A.      In the rifle rack as well, in the passenger

17   compartment.

18   Q.      And on the day of the incident do you recall

19   whether or not you had checked out a rifle or a shotgun?

20   A.      I don't remember.

21   Q.      Okay.  But it would have been one or the other,

22   correct?

23   A.      Correct.

24   Q.      As well as the ERIW, correct?

25   A.      Correct.

51

1    MR. BUELNA:  All right.  We are at about an

2    hour.  This is -- I typically take a break every hour.

3    So what I'm going do is, we will break for five minutes,

4    and then come back.  So right now it's 11:06.  So

5    probably just make it 11:15.  Okay?

6         MR. SIMS:  Sounds good.  Okay.

7         MR. BUELNA:  We are going off the record, and we

8    will be back on at 11:15.

9         THE VIDEOGRAPHER:  We are going off the record

10   at 11:06 a.m.

11        (Recess taken.)

12        THE VIDEOGRAPHER:  We are back on the record at

13   11:18 a.m.

14   BY MR. BUELNA:

15   Q.    All right.  Back on the record.  Mr. Talusan,

16   going back to your training as a -- as a field training

17   officer, you understand that you're expected to be a

18   role model for your trainee, correct?

19   A.    Yes.

20   Q.    You're also expected to be able to recognize

21   situations that have heightened liability and danger,

22   correct?

23   A.    Yes.

24   Q.    You're also trained that you're responsible for

25   the performance of your trainee, correct?

52

1    A.      You're breaking up.  I'm sorry.

2    Q.      Sure.  You're also expected to be responsible

3    for the performance of your trainee and his conduct?

4    A.      Yes.

5    Q.      And it's my understanding that you would --

6    that -- strike that.

7            Do you recall how many days prior to the

8    incident Mr. Samayoa had been assigned to you?

9    A.      This would have been our fourth day.

10   Q.      Did you know Mr. Samayoa outside of the police

11   department?

12   A.      No.

13   Q.      Okay.  When -- other than obviously you met him

14   the first day, right?

15   A.      Correct.

16   Q.      Did you receive any other information about him

17   other than, you know, obviously meeting him in person?

18   A.      No.

19   Q.      Okay.  Did you know anything -- or by the fourth

20   day did you have any understanding about his background

21   in law enforcement?

22   A.      No.

23   Q.      Okay.  You knew where he grew up or why he

24   wanted to become a police officer?

25           MR. BUELNA:  It's compound.

53

```
 1            THE WITNESS:  Prior --
 2            MR. SIMS:  Go ahead.
 3            THE WITNESS:  Sorry.  Prior to meeting him?
 4  BY MR. BUELNA:
 5  Q.    No.  After meeting him.
 6  A.    Yes.  I -- we had a discussion about where he
 7  grew up.
 8  Q.    In regards to his training as a police officer,
 9  you knew that he had just left the academy, right?
10  A.    Yes.
11  Q.    Can you -- do you recall where Mr. Samayoa grew
12  up?
13  A.    I believe he grew up in the Mission district.
14  Q.    And he was assigned for his field training to
15  the Bayview district, correct?
16  A.    Yes.
17  Q.    Do you know why he was assigned to the Bayview
18  district?
19  A.    No.
20  Q.    Do you have any familiarity with the term "radio
21  ear"?
22  A.    Yes.
23  Q.    What does that mean?
24  A.    For myself that means that a person is trying to
25  get used to listening to their radio.
```

54

1  Q.      And in part because the -- the sort of things

2  that are said over the radio are typically signs and

3  signals and abbreviated, right?

4  A.      Typically because as -- as prior to police work,

5  a person isn't talking on a radio.  They are not used to

6  having to listen to a microphone, also to the -- the low

7  band in the car, and speaking to another person all at

8  the same time.

9  Q.      And also that -- there is coded language in

10 police transmissions, right?  Like, code three, and

11 using the first names or the names of people to indicate

12 the letters and such as that?

13 A.      Correct.

14 Q.      That takes time to develop sort of an ear for --

15 to be able to listen to that while going about your day

16 and doing other functions, right?

17 A.      Yes.

18 Q.      And you had an understanding that on his fourth

19 day Mr. Samayoa was still developing his radio ear, so

20 to speak?

21 A.      Yes.

22 Q.      And you also had an understanding that

23 Mr. Samayoa was not very familiar with the Bayview

24 district yet, correct?

25         MR. SIMS:  Sorry.  I'm sorry.  I don't mean to

                                                         55

1    interrupt, Patrick, but you're kind of cutting in and

2    out a little bit.  I don't know if anybody else is

3    having that problem, but it's hard to hear you.

4         MR. BUELNA:  Okay.  Yeah.  I'll move the phone

5    closer to me.  Is that better?

6         MR. SIMS:  It's a little bit robotic, but it is

7    a little better.  Yeah.

8         MR. BUELNA:  They don't come with phone jacks

9    anymore, the new phones, so I can't plug in a phone to

10   it.  And when I use the other one -- let me see.  Hold

11   on.  Let's go off the record super quick and see if I

12   can fix this.

13        THE VIDEOGRAPHER:  We are going off the record

14   at 11:23 a.m.

15        (Recess taken.)

16        THE VIDEOGRAPHER:  We are back on the record at

17   11:27 a.m.

18        MR. BUELNA:  Okay.  Can you read back my last

19   question?  I don't recall where I was.

20        (Whereupon, the record was read back.)

21        MR. BUELNA:  And then what was the answer?  Was

22   there an answer or no, not yet?

23        THE COURT REPORTER:  There was no answer yet.

24        MR. BUELNA:  Okay.

25        THE WITNESS:  I did not know his familiarity

56

1    with the Bayview district.

2    BY MR. BUELNA:

3    Q.       But you did -- you did know that he had only

4    been essentially in field training for four days, right?

5    A.       Yes.

6    Q.       Now, turning to the date of the incident, do you

7    recall what it was that first brought your attention to

8    responding to the incident, whether it was a comment

9    from another officer or something you heard over the

10   radio?

11   A.       I heard an A priority call come out on the

12   radio.

13   Q.       And what does that mean, A priority call?

14   A.       It is dispatch -- dispatch's -- calls for

15   service by priority A, B, and C, A being the highest

16   rated, I would assume.

17   Q.       Okay.  And what did you do -- what was the -- so

18   you learned about an A priority call.  Did you learn

19   anything else?

20   A.       That the call for service was regarding a

21   carjacking.

22   Q.       And what does that mean, carjacking?

23   A.       Carjacking is when a vehicle is taken by force

24   or fear.

25   Q.       Other than knowing that it was a carjacking, did

                                                              57

1  you -- were you aware of any other facts regarding the

2  carjacking?

3  A.      I'm sorry.  Any other what?

4  Q.      Sure.  Facts, or, like, how it happened.  Was it

5  by gun?  Was it by hand?

6  A.      The call originated from 23rd and Arkansas.  It

7  involved a white van described as a state lottery van,

8  and that the victim or somebody was calling for the

9  victim, and that the suspect had presumably left the

10  scene already with the vehicle.

11  Q.      Did you learn through dispatch on your way to --

12  did you learn from dispatch at all that the person had

13  taken the keys from the person's pocket?

14  A.      No.

15  Q.      So you just knew -- it sounds like what you knew

16  was that they had taken the vehicle, but you didn't know

17  how?

18  A.      Correct.

19  Q.      Okay.  And there was no weapons reported as

20  well, correct?

21  A.      Not that I can recall.  No.

22          MR. SIMS:  Hold on.  Strike that -- I'm sorry.

23  Not strike that.  But belatedly, that is ambiguous as

24  far as whether or not he knew that when he -- I thought

25  the questions were about what he heard from dispatch at

58

1    the initial point.  So it's vague and ambiguous as to

2    that.

3    BY MR. BUELNA:

4    Q.    Sure.  Did you ever learn prior to making

5    contact with the subject that -- through dispatch or any

6    other way that he had weapons?

7    A.    I did not hear dispatch say that there was a

8    weapon involved.

9    Q.    And prior to a shot being fired, you never saw a

10   weapon, right?

11   A.    No.

12   Q.    And prior to the shot being fired, you never

13   learned through dispatch how the vehicle was taken,

14   correct?

15   A.    Correct.

16   Q.    I mean, you didn't know if the vehicle -- if the

17   person had set the keys down on the counter and the

18   person -- the suspect grabbed the keys and ran into the

19   van, right?

20          MR. SIMS:  Incomplete hypothetical.

21          Go ahead.

22          THE WITNESS:  No.  I did not know.

23   BY MR. BUELNA:

24   Q.    Okay.  And is it fair to say that -- or is it

25   safe to say that since you were listening to the radio,

                                                      59

1    that -- strike that.

2            Where were you when you heard the call for

3    service, first heard the call for service?

4    A.      Bayview station.

5    Q.      Were you with Defendant Samayoa at that point?

6    A.      No.

7    Q.      And do you know where he was?

8    A.      Somewhere around the station.

9    Q.      How did you get into contact with Defendant

10   Samayoa?

11   A.      I saw him earlier, prior to the call being

12   dispatched.  I believe he was already dressed, so I saw

13   him at the station.

14   Q.      And this happened at the start of your shift,

15   right?

16   A.      Correct.

17   Q.      What was your shift that day, if you can recall?

18   A.      11:00 to --

19   Q.      Meaning the hours.

20   A.      The time on my shift?

21   Q.      Yeah.

22   A.      11:00 a.m. to 9:00 p.m.

23   Q.      Do you know what Defendant Samayoa's shift was?

24   A.      The same.

25   Q.      I'm sorry.  I couldn't hear you.  What did you

                                                           60

1  say?

2  A.       The same.

3  Q.       Okay.  So once you got the call, what did you --

4  or you heard the call on the radio, what did you do?

5  A.       I went to the sergeant's office.  I asked my

6  sergeant if I could go out to that call with my recruit.

7  Q.       What did your sergeant say?

8  A.       He said yes.  He either nodded yes or he said

9  yes.  I can't recall which one.

10  Q.       Do you recall which sergeant it was?

11  A.       Sergeant Merris Goldsworth (phonetic).

12  Q.       And when you asked for permission to take your

13  recruit out to the -- did you tell them that you were

14  going to go to take him to do a report on the carjacking

15  or to respond to the actual pursuit of the carjacker?

16  A.       I just asked if we could go out to the call.

17  Q.       What was your intention when you left to respond

18  to the call?  Was it -- was it to pursue the suspect, or

19  was it to collect evidence?

20  A.       My initial intention when the call came out was

21  to respond to 23rd and Arkansas to the victim, to meet

22  with the victim and get information and to take the

23  report.

24  Q.       Why did -- why did you want to take your recruit

25  to do that?

                                                        61

1  A.       I considered it a great training experience for

2  him, taking an active carjacking robbery call.

3  Q.       To take the report, right?

4  A.       Correct.

5  Q.       Do you know if he had taken a report before

6  that?

7  A.       For that particular incident, no.

8  Q.       So it would be his first time taking a report

9  from someone, right?

10 A.       I don't remember if he took a report prior to

11 that, but if it was, it wasn't a carjacking report.

12 Q.       It would be fair to say that it was one -- it

13 would still be one of his very first reports, right,

14 among the very -- since he had only been on the job for

15 four days, right?

16 A.       Yes.

17 Q.       All right.  So -- and then obviously -- how did

18 you get to your car?  Did he -- did he get it for you,

19 or you went and got the car?

20 A.       I got the car.

21 Q.       And do you recall what car that it -- that it

22 was you got?

23 A.       Black and white 081.

24 Q.       And when you got the car, you understood that it

25 was equipped and ready to go on patrol, right?

62

1    A.      I can't remember.

2    Q.      Do you remember if that car had any issues?

3            MR. SIMS:  Vague.

4            Go ahead, Edric.

5            THE WITNESS:  Oh.  It did have some prior

6    issues.  Yes.

7    BY MR. BUELNA:

8    Q.      What issues were those?

9    A.      The car had just returned from the preparation

10   yard for a faulty driver side window.  Also, the

11   passenger side door due to the continuous times to -- by

12   officers to close the door had kind of dislodged off the

13   hinges and track, so it would rub against the front

14   quarter panel of the -- of the vehicle.

15   Q.      Is it fair to say it made sort of a pop noise

16   when you opened or closed the door?

17   A.      Yes.

18   Q.      And that is on the front passenger side of the

19   door, correct?

20   A.      Correct.

21   Q.      Once you got the car, did you pick up or -- your

22   recruit, or did your recruit go with you to get the car?

23   A.      I don't remember.

24   Q.      Okay.  Obviously you guys both made it into the

25   car, though, right?

                                                          63

1  A.    Yes.

2  Q.    Okay.  And where were you heading when you got

3  into the car and started driving with your recruit?

4  A.    Away from the station.

5  Q.    And where was your destination?

6  A.    To 23rd and Arkansas.

7  Q.    And did you have any discussions with your

8  recruit on your way to Arkansas?  And by Arkansas I mean

9  Arkansas Street.

10  A.    Yeah.  I might have told him that we were going

11  to a carjacking call.

12  Q.    Did you tell him anything else?

13  A.    I can't remember.

14  Q.    All right.  And then what happened next?

15  A.    While en route to the call for service, I heard

16  the units imply that they were following a suspect

17  vehicle that matched the description of the vehicle

18  taken in the carjacking.

19  Q.    And what did -- did that information that you

20  learned cause you to do anything different than what you

21  were doing before?

22  A.    Yeah.  At that point we had a location of the

23  suspect vehicle being followed by a unit.  So now we had

24  a positive location.  So I made a decision to reroute

25  and try to catch up to that unit to help apprehend the

64

1   vehicle.

2   Q.      Did you tell your recruit that you had decided

3   rather than taking him to take down the report to

4   respond to a carjacking suspect?

5   A.      I don't remember.

6   Q.      Would -- is that something you typically would

7   tell a recruit?

8   A.      Not necessarily.

9   Q.      Okay.

10  A.      I just don't remember what -- if I said anything

11  to him about it at that time.

12  Q.      Was it your practice to tell your recruits when

13  they were in your car with you on a way to a destination

14  if you reroute, meaning if you were going to a different

15  destination?

16  A.      Sometimes I would, I guess.

17  Q.      Well, I mean, if it's -- it was your recruit's

18  fourth day on the job, right?

19  A.      Yes.

20  Q.      And you're initially taking him to take down a

21  report from a victim, right?

22  A.      Yes.

23  Q.      That's a fairly low risk task.  Would that be

24  fair to say?  Right?

25  A.      Yes.

65

1    Q.       It's a much higher risk to respond to a felony

2    carjacking, right?

3    A.       Yes.

4    Q.       Okay.  So it would be important probably as a

5    field training officer to sort of begin giving him some

6    instruction and some context, right?

7                 MR. SIMS:  Argumentative.  And vague.

8                 Go ahead.

9                 THE WITNESS:  Like I said, I don't recall if I

10   did or did not tell him.  I may or may not have told him

11   so...

12   BY MR. BUELNA:

13   Q.       All right.  So once you rerouted, what happened?

14   Did you try to debrief him at all?

15   A.       No.

16   Q.       What happened next?

17   A.       The unit following the vehicle gave updated

18   location, direction of travel, description of the

19   vehicle, stated that the vehicle was going southbound on

20   101.  At that point judging where the vehicle was, I

21   thought that the vehicle may either continue south on

22   101 or take an exit and go either to the Ingalls side or

23   back into the Bayview.

24   Q.       We had talked a little bit earlier about your

25   uniform.  Did you also have a body camera on your

                                                          66

1    uniform?

2    A.      I did.

3    Q.      And you had that the day of the incident as

4    well, correct?

5    A.      Yes.

6    Q.      Where do you wear your body camera?  Is it on

7    your shoulder?  Is it in the center of your chest?

8    A.      Center of chest.

9    Q.      And is that an Axon Body camera?

10   A.      Yes.

11   Q.      And did your recruit have an Axon Body camera as

12   well, to your knowledge?

13   A.      He did.

14   Q.      When did you -- it's my understanding that

15   San Francisco hasn't always had Axon Body cameras.  Do

16   you recall when you first got yours approximately?

17   A.      I don't.

18   Q.      Do you recall the year?

19   A.      I don't.

20   Q.      Is it fair to say it was much prior to this

21   incident?

22   A.      Yes.

23   Q.      Okay.  And you received training on how to

24   operate your body camera, correct?

25   A.      Correct.

                                                    67

1    Q.      And you received training on when you're

2    expected to turn on your body camera, correct?

3    A.      Yes.

4    Q.      Now, is this the kind of body camera where

5    essentially you can turn it on and it remains in

6    buffering mode, and then you click it and it turns into

7    recording mode?  Are you familiar with kind of what I'm

8    describing?

9    A.      Yes.

10   Q.      Are you required to turn on your body camera in

11   the buffering mode at the start of your shift?

12   A.      Yes.

13   Q.      Okay.  Did you turn on your body camera into

14   buffering mode at the start of your shift that day?

15   A.      I believe I did.

16   Q.      Okay.  All right.  So you're driving, you have

17   your body camera, you're with your recruit, and you're

18   responding to where you believe -- or you're trying to

19   anticipate where the suspect might go; is that fair to

20   say?

21   A.      Yes.

22   Q.      Okay.  And what happened next?

23   A.      The unit that was following the vehicle stated

24   that the suspect vehicle had taken the, I believe,

25   Candlestick Point exit.  And from there he could still

68

1    either go into the Ingalls side or into the Bayview, so

2    we continued in that direction.

3    Q.      Okay.  What happened next?

4    A.      Then the unit following the vehicle stated that

5    the vehicle was passing Candlestick Park, Candlestick

6    Point.  So now we had a direction of travel back into

7    San Francisco, back into Bayview.  So we -- so I drove

8    towards that direction.

9    Q.      And at this point did you debrief or have any

10   conversations with your recruit to get him ready for the

11   pursuit of this -- this suspect?

12   A.      No.

13   Q.      Did you have your lights and sirens on at this

14   point?

15   A.      I don't believe so.  I can't recall.

16   Q.      Okay.  Do you recall if you were driving above

17   the speed limit, or were you still following the traffic

18   laws?

19   A.      I believe I was still following the traffic

20   laws.

21   Q.      Does it -- at some point if you're responding

22   code three, it's fair to say that there are times when

23   you turn on your lights and sirens and will drive kind

24   of beyond the speed limit, right?

25   A.      When you're driving code three.  Yes.

                                                              69

1  Q.      So at this point do you recall if you were

2  driving code three?

3  A.      I can't recall.

4  Q.      Do you believe you were following the speed,

5  though, laws?

6  A.      I -- I believe so, but I can't be sure.

7  Q.      All right.  What happened next?

8  A.      So we -- I traveled -- I was traveling

9  southbound on Bayshore.  Then I ended up at Gilman and

10 Ingalls.  I heard that the suspect vehicle was traveling

11 westbound on Gilman.  I observed a vehicle matching the

12 description traveling westbound on Gilman approaching my

13 location traveling at a high rate of speed on the

14 opposite side of the roadway going counterflow in

15 oncoming traffic being followed by another police

16 vehicle.

17 Q.      And what happened next?

18 A.      The suspect vehicle passed my location.  I fell

19 in behind the suspect vehicle activating my lights and

20 siren and began pursuing the suspect vehicle.

21 Q.      At this point were you driving code three,

22 meaning you're essentially pursuing and not following

23 traffic laws?

24 A.      Yes.

25 Q.      At this point did you brief -- debrief or

70

1  converse with your recruit?

2  A.      No.

3  Q.      What happened next?

4  A.      So after we initiated our pursuit of the

5  vehicle, I told my recruit to put it out on the radio,

6  meaning advise dispatch that we were now in pursuit of

7  the vehicle.

8  Q.      And did you at this point stop and debrief or

9  converse with your recruit?

10  A.      No.

11      MR. SIMS:  Beyond what he just said?

12      MR. BUELNA:  Well, I -- did you -- did -- it

13  sounded like he updated dispatch.

14  BY MR. BUELNA:

15  Q.      I didn't -- did -- is that correct?  Did you

16  update -- you put it over the radio, right?

17  A.      I asked Officer Samayoa to let dispatch know

18  that we were in pursuit of the vehicle.

19  Q.      But you didn't converse with him about what you

20  guys were doing or what you expected to happen, right?

21  A.      No.

22  Q.      Okay.  Do you know if he put it over the radio?

23  A.      He did not.

24  Q.      Okay.  And why -- is that something you knew at

25  the time, or is that something you learned afterwards?

71

1    A.        At the time.

2    Q.        Do you know why he didn't put it over the radio?

3    A.        I do not.

4    Q.        Did you have any understanding as to whether or

5    not Officer -- or Defendant Samayoa knew how to operate

6    a police radio?

7    A.        My understanding that he received training at

8    the police academy.  Part of that training is how to

9    operate a radio, how to use a radio, how to use radio

10   codes.  In the previous days he was using a radio,

11   transmitting and listening to a radio.

12   Q.        What happened next?

13   A.        The suspect then turned eastbound from Ingalls

14   onto Fitzgerald failing to stop at numerous stop signs.

15   We continued to pursue the vehicle.

16   Q.        So at that -- at that point you said you

17   witnessed him run several stop signs; is that right?

18   A.        Correct.

19   Q.        Okay.  So at this point you suspected whoever

20   was in the van of violating traffic laws and possibly a

21   carjacking, right?

22   A.        Correct.

23   Q.        Did you have any other information or any other

24   crime that you suspected him of at this point?

25   A.        No.

72

1   Q.     Okay.  What happened next?

2   A.     The suspect vehicle continued west- -- I'm sorry

3   eastbound on Fitzgerald, ran another stop sign, I

4   believe it was at Fitzgerald and Hawes, and entered

5   through the gates of Alice Griffith housing project also

6   known as Doublerock.

7   Q.     Okay.  And we will call it Doublerock because

8   it's easier.  And are you familiar with the Doublerock

9   area?

10   A.     I am.

11   Q.     Okay.  And you understand that essentially as a

12   one way entrance and exit?

13   A.     For vehicles.  Yes.

14   Q.     And have you patrolled in Doublerock before?

15   A.     I'm sorry.  What was the question?

16   Q.     Sure.  Have you patrolled in Doublerock before?

17   A.     I have.

18   Q.     Okay.  What about your recruit?  Do you know if

19   he's ever patrolled in Doublerock?

20   A.     I can't recall if I ever brought him there prior

21   to this day.

22   Q.     And when you entered Doublerock you knew that

23   vehicle wasn't able to get back out without essentially

24   going the opposite way again, right?

25   A.     Correct.

73

1    Q.      And you followed him into Doublerock, right?

2    A.      I did.

3    Q.      Do you know if there was any other patrol cars

4    behind you?

5    A.      I knew that there was at least one patrol car

6    that was behind me during the pursuit.

7    Q.      Okay.  What happened next?

8    A.      The suspect vehicle continued westbound on

9    Fitzgerald, swerved to the right, hit a parked vehicle,

10   and then moved and made a right turn.  I can't remember

11   what street that is, but towards a -- essentially a dead

12   end because there is a closed and locked gate at the end

13   of that street.

14   Q.      And so you knew that this vehicle was -- the

15   vehicle pursuit was about to come to an end in some

16   form, right?

17   A.      At that point my thought was that he was going

18   to go wide and -- to navigate that sharp left turn.  At

19   some point I felt that this would result in a foot

20   pursuit.

21   Q.      And that's sometime before he actually stopped

22   and got out of his car, right?

23   A.      I'm sorry.  Repeat the question.

24   Q.      Yeah.  Sure.  You felt that it would end in a

25   foot pursuit at some time -- sometime before he actually

74

1    ever stopped and got out of his car, right?

2    A.      I felt that it could end in a foot pursuit, but

3    I didn't know when, or if and when it would.

4    Q.      Fair enough.  At that -- at this point when

5    you're in Doublerock and thinking that it might end in a

6    foot pursuit, did you converse or debrief your recruit?

7    A.      I believe I told him that this might end up in a

8    foot pursuit.  I believe I also advised dispatch that

9    this might end up in a foot pursuit.

10   Q.      Did you tell -- did you tell your recruit other

11   than that it might be -- end up in a foot pursuit how to

12   handle it, whether or not he should follow the person,

13   or stay behind you, or anything like that?

14   A.      No.

15   Q.      Why not?

16   A.      For myself it is very -- it's very difficult to

17   dictate telling a person what they should and shouldn't

18   do when you are reacting to another subject's actions.

19   There is nothing set in stone about what tactics you can

20   use when you're reacting to another person's actions.

21   So I think that is why I didn't tell Chris what he

22   should or should not do.

23   Q.      You did know, though, when you were in

24   Doublerock that you had another patrol car behind you,

25   correct?

75

1    A.      I knew there was one behind me.  I didn't know

2    how far they were.

3    Q.      Okay.  What happened next?

4    A.      As the vehicle swerved to the right, I

5    observed -- the subject jumped out of the vehicle as the

6    vehicle was moving, turned left towards us, and began

7    running towards us.

8    Q.      And where did the -- where did you see the car

9    kind of stop or where they jumped out at?  Was it that

10   gate that you had mentioned?

11   A.      Yes, several feet before the gate.  I don't know

12   the exact distance.

13   Q.      Okay.  And up to the point where the person

14   jumped out, up to that point you didn't have any

15   information that this subject had any weapons, right?

16   A.      Yeah.  I didn't hear dispatch state whether the

17   subject had weapons or did not have weapons.

18   Q.      All you knew was that a carjacking occurred.

19   You didn't know how it occurred, right?

20   A.      Correct.

21   Q.      When you saw the subject get out of the vehicle

22   or -- strike that.

23           When you saw the subject get out of the vehicle,

24   did you draw your firearm?

25   A.      I did not.

1    Q.      Why not?

2    A.      Because I didn't -- still in control of the

3    vehicle.  I had both hands on the steering wheel.  I

4    could not get my hand on my gun.

5    Q.      Okay.  If you had been in the passenger seat --

6    strike that.

7            Did you instruct your recruit to pull out his

8    gun?

9    A.      I did not.

10   Q.      Why not?

11   A.      Like I said, it's -- we are reacting to what the

12   subject does.  I -- my field of view is different from

13   his field of view, so he may see something I might not

14   see.  So I expect him to react to what he sees, what he

15   perceives as a threat.

16   Q.      When he got out of the car did you -- you're

17   trained that you can only use deadly force when there is

18   a serious and immediate threat of bodily harm to you or

19   another person, right?

20   A.      Yes.

21   Q.      When he got out of the car did you perceive a

22   serious threat of bodily harm to either you or anyone

23   else?

24           MR. SIMS:  Vague as to who got out of the car.

25   ///

77

1    BY MR. BUELNA:

2    Q.      As soon as Mr. O'Neil got out of the car.

3    A.      Yes.

4    Q.      You perceived a serious and immediate threat of

5    bodily harm when he got out of the car?

6    A.      Yes.

7    Q.      So you thought you could -- if you hadn't been

8    driving you could use deadly force at him for getting

9    out of a car?

10          MR. SIMS:  Objection.  It calls for speculation.

11   But you asked him about how he felt.  So yeah.

12          Go ahead.  Answer.

13          THE WITNESS:  Not necessarily elevate it to the

14   use of deadly force, but any time somebody is fleeing

15   from the police and they are already exhibiting

16   resistance, and now you have somebody jumping out of a

17   vehicle who may or may not have a weapon that -- I would

18   consider that a threat.  Yes.

19   BY MR. BUELNA:

20   Q.      So far the only thing you saw from -- that you

21   witnessed was flight, correct, from Mr. O'Neil?

22          MR. SIMS:  Vague as to time.

23          MR. BUELNA:  Sure.

24   BY MR. BUELNA:

25   Q.      Up to the point that he jumped out of the car,

                                                          78

1   including jumping out of the car, the only thing you

2   witnessed Mr. O'Neil do was flee, correct?

3   A.      Yes.

4   Q.      And when he got out of the car, you perceived

5   that as an attempt to flee as well, correct?

6   A.      That was one of the possibilities.  Yes.

7   Q.      And that was consistent with what he had been

8   doing up to that point, correct, is fleeing?

9   A.      Up to that point he was fleeing.  Yes.

10  Q.      At that point when he gets out of the car and is

11  still fleeing, is it your training that you're permitted

12  to use deadly force in that circumstance?

13          MR. SIMS:  That is an incomplete hypothetical.

14  Misstates his testimony.

15          Go ahead if you can answer it.

16          THE WTINESS:  Can you repeat the question,

17  please?

18  BY MR. BUELNA:

19  Q.      Sure.  When he was fleeing in the car and then

20  got out and continued to flee on foot, is it your

21  understanding that you're permitted to use deadly force

22  in that situation?

23          MR. SIMS:  Same objections.  It's also compound.

24          THE WITNESS:  At that point he is not longer

25  fleeing away from us.  He is running towards us.  So now

                                                    79

1   he is -- in my mind he is a threat.

2   BY MR. BUELNA:

3   Q.      And do you believe per your training that at

4   that point that he is running towards you, you are

5   permitted to use deadly force?

6           MR. SIMS:  Incomplete hypothetical.  Vague.

7           THE WITNESS:  It is dependent on his actions

8   after that, from that point forward.

9   BY MR. BUELNA:

10  Q.      No, but I'm asking you, when you saw him running

11  towards you, did you believe at that point you were

12  permitted to use deadly force?

13  A.      Myself, no.

14  Q.      And in fact you told investigators that you saw

15  Mr. O'Neil's hands down, right, at his side?

16  A.      I believe I said they were down by his waist --

17  by his waist area.

18  Q.      Your waist is -- waist and your side.  Was it

19  the front waist area, back waist area, or the side?

20  A.      Are you asking what I told investigators, or

21  what I did -- what I saw?

22  Q.      What you recall.

23  A.      They were by his waist pants -- by his waist

24  area.  I can't remember side or just -- they were just

25  down by his waist.

80

1   Q.      Can you -- okay.  Can you stand up and show me

2   what you recall him doing?

3   A.      As far as my recollection, they were down in

4   this area (indicating).

5   Q.      Were they moving at all, or were they just

6   static?

7   A.      He was moving so they -- as a result, his whole

8   body was moving.

9   Q.      Okay.  But you didn't see any weapons, correct?

10   A.      Not from my point of view.

11   Q.      And was he walking or running or stumbling?

12   A.      Initially when he came out of the car he was

13   stumbling, and then he began running towards our

14   vehicle.

15   A.      Okay.  A full on sprint, a jog, or a brisk walk?

16         MR. SIMS:  I'm sorry.  What was the -- what was

17   the last one you said?

18         MR. BUELNA:  A brisk walk.

19         MR. SIMS:  Oh.  I heard bird squawk.  Sorry.

20         If you can answer, Edric, go ahead.

21         THE WITNESS:  Looked like it was the beginning

22   of a sprint, like when you're just starting out to run

23   fast.

24   BY MR. BUELNA:

25   Q.      Okay.  At that point -- and at this point

81

1    you're -- are you -- that he is coming into the start of

2    his sprint, are you still -- are you braking, or are you

3    completely stopped?

4    A.      At some point we are completely stopped.

5    Q.      Okay.  So you're completely stopped.  He is at

6    the start of a sprint; is that fair to say?

7              MR. SIMS:  That misstates his testimony.

8    BY MR. BUELNA:

9    Q.      Okay.  Yeah.  You can correct me if I'm wrong.

10   A.      At some point because it happened so fast, him

11   jumping out of the car, him turning towards us, us

12   stopping our vehicle, we came to a complete stop.

13   Q.      Okay.  And he is running towards you.  And did

14   he ever reach what you thought -- what you consider a

15   full sprint?  Or was -- or by the time that he was shot

16   he hadn't yet reached that full sprint?

17   A.      I don't know what his capability of sprinting

18   is, so I don't know.

19   Q.      Well, did you consider it sprinting just prior

20   to him getting shot?

21   A.      I considered him running quickly towards us.

22   Q.      Okay.  With his hands in the fashion that you

23   demonstrated, correct?

24   A.      Yes.

25   Q.      Okay.  And still you hadn't seen or heard -- did

                                                            82

1    your recruit say, Hey, I saw -- I see a gun?

2    A.     No.

3    Q.     Okay.  Did he say, Hey, I think he is reaching

4    for a gun?

5    A.     Not that I recall.

6    Q.     Do you remember him saying anything prior to

7    shooting Mr. O'Neil?

8    A.     I don't believe he did.

9    Q.     At the point that he was running -- at some

10    point -- strike that.

11          At some point you heard a bump; is that fair to

12    say?

13    A.     Yes.

14    Q.     Now, we say it's a bump or hearing a bump -- you

15    can't really hear a bump or say -- what was the noise

16    you heard?  Was it metallic?  What was it -- what was

17    the sound?  A thud?  Can you describe it?

18    A.     To me it sounded like a person or body colliding

19    with a vehicle.

20    Q.     With the car?

21    A.     Yes.  My car.

22    Q.     Did you think that you had hit Mr. O'Neil?

23    A.     No, because I was stopped at the time.

24    Q.     Okay.

25    A.     So it sounded like he struck my vehicle.

83

1  Q.      On that front passenger quarter panel?

2  A.      Front right -- front right quarter.  Correct.

3  Q.      Okay.  So -- that he had -- you believe -- or it

4  sounded like that he had run or bumped into the front

5  right quarter panel.  Did you also see him bump into the

6  front right quarter panel?

7  A.      Yes.  His body was adjacent to the front right

8  quarter panel.

9  Q.      Okay.  And he's still running, correct?

10  A.      Yes.

11  Q.      And then when you heard the shot from Defendant

12  Samayoa, what did do you see Mr. O'Neil doing?

13  A.      Running.

14  Q.      Running?

15  A.      Yes.

16  Q.      Okay.  Prior to him getting -- or prior to

17  Mr. O'Neil being shot by Defendant Samayoa, did you tell

18  your recruit anything like, Hey, grab him, tackle him,

19  anything like that?

20  A.      No.

21  Q.      Why not?

22  A.      Everything happened within milliseconds.  It was

23  quickly.  There wasn't enough time to give any

24  direction.

25  Q.      Was it your plan to get out of the car and chase

84

1    him if he had continued running on?

2    A.      Yes.

3    Q.      Okay.  Now, obviously you had come to a stop by

4    the time Mr. O'Neil bumped into your front right quarter

5    panel, right?

6    A.      Yes.

7    Q.      Did you click on your body camera at that point?

8    A.      I -- at some point I attempted to activate my

9    body camera.  I don't remember when.

10   Q.      Had you ever seen your body camera footage?

11   A.      Have I seen my body camera footage?  I have not,

12   because it was not activated.

13   Q.      Okay.  Now, it was your practice to turn your

14   body camera on to buffer mode at the start of your

15   shift, right?

16   A.      Correct.

17   Q.      So that means if you had pressed the button at

18   the center of your Axon camera, it should've began a

19   recording including 30 seconds prior to when you pushed

20   the button, correct?

21   A.      Ideally.  Yes.

22   Q.      But although you recall at some point during the

23   incident clicking that button, it's your understanding

24   that no body camera footage was actually recorded,

25   correct?

85

1     MR. SIMS:  Well, I think that misstates

2  testimony.

3     But you can answer the question, Edric.

4     THE WITNESS:  Yes.  I attempted to activate my

5  body camera; however, it did not activate

6  BY MR. BUELNA:

7  Q.     And you attempted by clicking that button on the

8  center of the camera, right?

9  A.     Correct.

10 Q.     Do you recall what -- if you attempted to click

11 that button prior to the shot being fired or after the

12 shot being fired?

13 A.     Prior.  I believe I attempted at the beginning

14 of the pursuit.

15 Q.     And when you say the beginning of the pursuit do

16 you mean when you were first driving after the white

17 van, or do you mean when you first stopped?

18 A.     When I first started driving after the white

19 van.

20 Q.     Is that because that would be in accordance with

21 your body worn camera policy department general order?

22 A.     Yes.  At the beginning of the pursuit I believe

23 it states, You shall activate your body worn camera.

24 Q.     When you attempted to click on your body worn

25 camera, did you instruct your recruit to turn on his?

86

1    A.      No.

2    Q.      Why not?

3    A.      I was at the time focused on the pursuit.  I

4    knew that he was trained extensively with body cam as

5    they are in the academy, so I assumed that he activated

6    his own body camera.

7    Q.      Would you call the situation or describe the

8    situation that you encountered with a person who had

9    just jumped out of a car -- carjacking suspect running

10   past you a high risk situation?

11   A.      Yes.

12   Q.      And you had mentioned before that you considered

13   him a threat to the extent that he may or may not have a

14   weapon, right?

15   A.      Correct.

16   Q.      So is it fair to say that you kept your eyes on

17   him as he ran towards your car?

18   A.      That would be fair.

19   Q.      Okay.  You wouldn't -- you didn't take your eyes

20   off of him as he ran past your car, right?

21   A.      I can't remember.  As far as I -- as far as I

22   remember, I tried to keep my eyes on him as much as

23   possible.

24   Q.      And you didn't see him do anything that would

25   cause you to pull out your gun and shoot him, right?

87

1    A.      No.

2    Q.      You didn't perceive a serious threat of

3    bodily -- immediate bodily harm to you or anyone else at

4    the time, correct?

5            MR. SIMS:  That misstates his testimony.  It's

6    been asked and answered.

7            You can answer it, Edric.

8            THE WITNESS:  I still considered him a threat.

9    Yes.

10   BY MR. BUELNA:

11   Q.      I didn't ask that.  What I asked -- what I --

12   what I asked before and you answered, and you can

13   correct me if I'm wrong, I asked if at the time that he

14   was running past your car, if you saw him do anything

15   that would cause you to use deadly force.  And you said

16   no, correct?

17   A.      And I believe your follow-up question was, was

18   he -- you might have to correct me, but was he -- my

19   understanding, was he still a threat to us.  And I --

20   Q.      No --

21           (Simultaneous speaking.)

22   BY MR. BUELNA:

23   Q.      So there is where we had a misunderstanding.

24   A.      Okay.

25   Q.      Let me clarify.

                                                          88

1   A.      Can you restate your question, please?

2   Q.      Sure.  At the time you heard the shot, you

3   didn't perceive individually a threat of serious and

4   immediate bodily harm to yourself or another person,

5   correct?

6   A.      At that time, no.

7           MR. BUELNA:  All right.  We are going to -- we

8   are about at another hour and I need to go to the

9   bathroom, so we are going to take another -- we will

10  take a 15 minute break here or -- I don't -- I probably

11  have another hour.  So, you know, I'll leave it up to

12  you if you want to take a break and eat --

13          MR. SIMS:  Why don't we go off the record.  Why

14  don't we go off the record.

15          MR. BUELNA:  Yeah.

16          THE VIDEOGRAPHER:  We are off the record at

17  12:14 p.m.

18          (Recess taken.)

19          THE VIDEOGRAPHER:  We are back on the record at

20  2:35 p.m.  Excuse me.  12:35 p.m.

21          MR. SIMS:  Okay.  Thanks.

22          MR. BUELNA:  (Inaudible.)

23          THE WITNESS:  Am I not hearing him?  Am I the

24  only one?

25          MR. BUELNA:  Can you hear me now?

89

```
 1              THE WITNESS:  Yes.

 2              MR. SIMS:  Yes.

 3   BY MR. BUELNA:

 4   Q.      All right.  I'm going to go back to the incident

 5   and prior to the -- hearing the shot fire.  I believe

 6   you told investigators that you actually saw your

 7   recruit pull out his weapon prior to him firing the

 8   weapon, right?

 9              MR. SIMS:  Misstates testimony.

10              THE WITNESS:  No.

11              (Simultaneous speaking.)

12   BY MR. BUELNA:

13   Q.      What was that?

14   A.      I did not.

15   Q.      You never saw him pull out his weapon --

16   A.      That's correct.

17   Q.      -- prior to the shot?

18   A.      I never saw him pull out his weapon prior to the

19   shooting.

20   Q.      If you had known he pulled out his weapon prior

21   to you braking or stopping the car, would you have told

22   him -- would you have instructed him to put it away?

23              MR. SIMS:  Calls for speculation.  Incomplete

24   hypothetical.

25              Go ahead.
```

90

1       THE WITNESS:  I did not see him pull out his

2  weapon prior to his shot being fired.

3  BY MR. BUELNA:

4  Q.      Okay.  And it is a hypothetical.  So -- and the

5  hypothetical is that had you known that he had pulled

6  out his weapon as you were braking the car, would you

7  have instructed him to put it away?

8       MR. SIMS:  Incomplete hypothetical.  Calls for

9  speculation.  Lacks foundation.

10       Go ahead.

11       THE WITNESS:  I don't believe I would have.

12  BY MR. BUELNA:

13  Q.      Why is that?

14  A.      Like I said, we are reacting to whatever the

15  subject is doing.  He has a different field of view than

16  I do.  He is going to react differently than I would.  I

17  cannot see what he sees.  So it would be detrimental to

18  him if I instruct him to do something that would

19  jeopardize his safety.  If he saw --

20       (Simultaneous speaking.)

21       THE WITNESS:  -- I ordered him to put his weapon

22  away and he suddenly sees a weapon, then that would be

23  on me telling him, Hey, put your gun away, and

24  essentially not being able to protect himself.

25  ///

91

1    BY MR. BUELNA:

2    Q.      Got you.  Would it be fair to say once you do

3    draw your firearm it limits the -- what force options

4    you have?

5    A.      No.

6    Q.      You wouldn't agree that, for example, once you

7    pull out your firearm it's much more difficult to then

8    pull out your OC spay and use it, or a baton?

9    A.      No.  Because you can always put your weapon back

10   in its holster.

11   Q.      But you would agree that you would have to put

12   your weapon back in your holster and pull out your

13   baton, correct?

14   A.      Yes.  I would say that you would have to

15   reholster.  But for me that difficulty level isn't high.

16   For myself it isn't high.

17   Q.      Okay.  Well, you're -- officers are trained

18   within your department that, for example, you're not

19   supposed to hold the baton in your left hand while

20   you're holding your gun in your right, correct?

21   A.      Correct.

22   Q.      Okay.  Essentially you're supposed to have

23   complete, kind of, control of your firearm when it's

24   pulled out or whatever force option you're using.  It

25   should be used one at a time?

92

1    A.       Correct.

2    Q.       Correct?  Okay.

3    A.       Correct.

4    Q.       Now, would it be fair to say this was a -- you

5    were in pursuit of a felony carjacking, right?

6    A.       Yes.  We were in pursuit of a suspect -- suspect

7    vehicle, yes, of a carjacking.

8    Q.       And you were conducting a felony stop when you

9    were braking, right, and you saw the car stop?

10   A.       At that moment we were not conducting a felony

11   stop.

12   Q.       But it was your intent to conduct one, correct?

13   A.       It was -- like I said, it was dependent on the

14   actions of the -- of the suspect.

15   Q.       So at this point you're -- he's suspected of a

16   felony, right?

17   A.       Correct.

18   Q.       Okay.  And there is a certain protocol for

19   conducting a felony stop, right?

20   A.       Correct.

21   Q.       All right.  What is the protocol for conducting

22   a felony stop?

23   A.       Protocol for conducting a felony stop is to --

24   once the suspect vehicle has stopped, you place your

25   vehicle in a tactical position, you order the subject to

                                                              93

1    turn off the vehicle, use their hand to remove the key

2    from the vehicle, drop the key outside the driver's side

3    window, using their hand open the door from the outside,

4    exit the vehicle with their hands facing the air --

5    facing away from you, and while facing away from us to

6    walk backwards towards us at a safe distance, then have

7    that person kneel on the ground, then lay prone on the

8    ground on their stomach, and then take them into

9    custody.

10   Q.       And when you stop your vehicle you're supposed

11   to -- do you have any training in regards to how far

12   away from the vehicle you're supposed to stop it?

13   A.       I don't believe there is a set distance.

14   Q.       You're supposed to not stop right up behind

15   their bumper, right?  There should be some significant

16   distance between yourself and the car so you have a full

17   view, correct?

18   A.       Ideally.  Yes.

19           MR. SIMS:  Vague and ambiguous.

20   BY MR. BUELNA:

21   Q.       And you're also supposed to use your car as

22   cover while you conduct that stop, right?

23   A.       Ideally.  Yes.

24   Q.       Now, after -- all right.  We had already kind of

25   went over, you never saw up to the point you heard the

94

```
 1   gun shot, you never saw Mr. O'Neil with a weapon, right?
 2   A.      Right.
 3           MR. SIMS:  Asked and answered.
 4           MR. BUELNA:  I'm sorry?
 5           THE WITNESS:  Correct
 6   BY MR. BUELNA:
 7   Q.      Okay.  And afterwards did you ever -- you never
 8   discovered a weapon on Mr. O'Neil, correct?
 9   A.      No.
10   Q.      While you were on scene -- did you ever learn
11   while you were on scene -- did you learn the basis why
12   your recruit had fired?
13   A.      No.
14   Q.      And your homicide interview happened the
15   following day; is that correct?
16   A.      Yes.
17   Q.      Why did it happen the following day, if you
18   know?
19   A.      I don't know.
20   Q.      Now, during your homicide interview you actually
21   provided a full statement prior to ever watching the
22   body camera and surveillance camera, correct?
23   A.      I gave an initial statement.  Yes.
24   Q.      Why didn't you watch the body camera before
25   giving an initial statement?
```

95

1      MR. SIMS:  Edric, limit your answer to any

2  information that was not given to you by an attorney.

3      MR. BUELNA:  Sure.

4      MR. SIMS:  In other words, if an attorney

5  advised you as to what you should say or what -- you

6  know, how you should handle the interview, don't include

7  that in your answer.

8  BY MR. BUELNA:

9  Q.     Well, yeah.  I mean, if your attorney advised

10  you you can just say, My attorney advised me.

11  A.     Yeah.  My attorney advised me.

12  Q.     And you have an understanding that -- well,

13  since the -- since you -- strike that.

14      After Mr. Samayoa fired, did you have any

15  conversation with him about this incident?

16      MR. SIMS:  Vague as to time.

17      THE WITNESS:  Do you have a time frame?  Like,

18  since --

19  BY MR. BUELNA:

20  Q.     From --

21  A.     Since the day?

22  Q.     From today --

23  A.     Immediately after?

24  Q.     No, no.  I'll tell you the time frame.  From the

25  time that you heard that shot go off to today, have you

96

1   ever spoken with Mr. Samayoa regarding this incident?

2   A.       I just asked him how he was doing.

3   Q.       And what was his response?

4   A.       He said that he was doing okay.

5   Q.       Okay.  How long ago was the -- what was the last

6   time you spoke with him?

7   A.       Prior to him getting booked at county jail.

8   Q.       All right.  Have you been -- to your knowledge

9   do you plan to testify in his trial, in his criminal

10  trial?

11  A.       I believe that I will be subpoenaed.  Yes.

12  Q.       Have you been subpoenaed yet for his preliminary

13  hearing?

14  A.       I was, but then it was cancelled.

15  Q.       Have you received a new date yet?

16  A.       I have not.

17  Q.       And what I'm asking you, too, I guess is, do you

18  plan to testify after being subpoenaed?

19  A.       Yes.

20  Q.       What is your current -- right now you're

21  currently a police officer for San Francisco, correct?

22  A.       Yes.

23  Q.       What is your current assignment?  Are you still

24  in the Bayview on patrol?

25  A.       No.

97

1   Q.     What is your current assignment?

2   A.     Traffic company.

3   Q.     I'm sorry?

4   A.     Traffic company.

5   Q.     What's that?

6   A.     Traffic enforcement.

7   Q.     And where do you do that?

8   A.     We are based out of 850 Bryant.

9   Q.     So are you doing -- for example, you're doing

10  traffic enforcement of -- I'm not really sure

11  completely.  Are you on patrol, or do you strictly do

12  parking and that sort of a thing?

13  A.     So my unit is the commercial vehicle unit.  We

14  deal with commercial vehicles such as trucks.  We do

15  inspections.  We do tow truck inspections.  We are also

16  part of -- we also assist the traffic collision

17  investigation unit with mapping scenes of fatal

18  collisions.

19  Q.     All right.  And when did you receive that

20  assignment?

21  A.     Sometime in 2018.

22  Q.     Do you have any -- strike that.

23        Turning back to when you heard the shot fired,

24  what -- could you stand up and show me what you saw

25  Mr. O'Neil doing right as you heard the shot fire?

1    A.       He was running past our vehicle.

2    Q.       Can you stand up and show me what you saw?  You

3    don't have to run, but the position.

4    A.       I just -- I saw a blur.  So I don't know how you

5    want me to describe or show how he was positioned.  I

6    just saw a blur of a body going by our vehicle.  So I

7    can't -- I can't demonstrate how he was positioned.  So

8    I don't think I can do that.

9    Q.       Okay.  But you didn't see him reaching for a gun

10   at all or what -- you didn't see any conduct that would

11   make you infer that he was reaching for a gun, right?

12           MR. SIMS:  That misstates his prior testimony.

13   It's argumentative.

14           Go ahead.

15           THE WITNESS:  His hands were by his waistband as

16   I demonstrated earlier.  A common place for a person to

17   have a weapon is around their waistband.  So he could

18   have possibly had a weapon.  But at that time I did not

19   see a weapon.

20   BY MR. BUELNA:

21   Q.       Okay.  And you didn't see him reaching for one,

22   meaning you didn't see his hand disappear into his

23   waistband, right?

24   A.       They were by his waistband.  So I didn't see

25   him -- I didn't see -- it was all -- it was all a blur.

                                                      99

1    It happened very quickly.  So it was a blur of

2    movements.  I couldn't positively identify where his

3    hands were at a specific portion of his body, but it was

4    by his waistband.

5        So I couldn't tell if he was reaching into his

6    waistband.  I couldn't tell if he was reaching into his

7    crotch area or what, but they were right by his

8    waistband.

9    Q.    And that's in the way that you had demonstrated

10   earlier, correct?

11   A.    Correct.

12       MR. BUELNA:  Okay.  Let's go -- let's go

13   under -- back under seal.  All right?  Madam Court

14   Reporter, we are going to go under seal for this

15   portion.

16       THE COURT REPORTER:  (Nods head.)

17       (The testimony from Page 100, Line 17 to Page

18   103, Line 3 was marked confidential, excerpted and bound

19   separately.)

20

21

22       (LEFT BLANK INTENTIONALLY)

23

24

25

                                                    100

1

2

3    (WHEREUPON, nonconfidential proceedings resumed.)

4         MR. BUELNA:  Thank you.  We are back to the

5    normal transcript.

6    BY MR. BUELNA:

7    Q.     Once you heard the shot or -- the shot, what did

8    you do?  Did you get out of your car?  Did you stay in

9    your car?

10   A.     I believe I placed the vehicle in park, and I

11   exited my vehicle.

12   Q.     Okay.  And what did you do next?

13   A.     I came around the rear of my car to go check on

14   the subject.  I think I remembered yelling, Gun down,

15   gun down, because I would have crossed into what I

16   believe was Chris's field of fire because I knew that he

17   had retreated back towards my right, and I went to go

18   check on the subject.

19   Q.     You said, Gun down, gun down.  Is that because

20   Chris or the Defendant Samayoa was still pointing his

21   gun at Mr. O'Neil?

22   A.     I don't know if he was pointing his gun at

23   Mr. O'Neil.  It was just instinctual to say, Gun down,

24   gun down, because I knew that he possibly had -- was

25   covering the subject.  So it was just instinctual to

103

1    say, Gun down, gun down.

2    Q.      And once you -- and -- so he was standing -- is

3    it fair to say, then, Defendant Samayoa was standing at

4    the rear of -- the rear passenger side of the vehicle at

5    that point?

6    A.      A little further back.  I think he retreated

7    back a little further.  And when I came around the car,

8    he was further back to my right, I believe.

9    Q.      Okay.  So --

10   A.      Yeah.

11   Q.      -- is it fair to say when you got out of your

12   car that you got out and went around your trunk, the

13   rear part of your car?

14   A.      Correct.

15   Q.      Okay.  So then Defendant Samayoa was to your

16   right.  When you came around the rear of the car did you

17   see Mr. O'Neil on the ground?

18   A.      I did.

19   Q.      And what did you see?

20   A.      I saw that he was proned out on the ground

21   pretty stubbed.  His head was away from me, his feet

22   were towards me.  I saw that he was not moving and that

23   there was blood pooling by his -- by his head.

24   Q.      Could you tell if he was still breathing?

25   A.      I could not tell.

                                                      104

1    Q.      Did he appear to be still living?

2    A.      He did not appear to be a threat to us anymore.

3    At that point my concern shifted to Chris to make sure

4    that he was not hurt.

5    Q.      When you said he wasn't a threat anymore, do you

6    mean he appeared dead?

7    A.      He didn't appear to be moving.  And he didn't

8    have a -- I didn't see a weapon.

9    Q.      He didn't appear moving, he was in a pool of his

10   own blood -- were you aware the wound -- entrance wound

11   was?

12   A.      No.  It appeared to be on the top half of his

13   body.

14   Q.      So would it be fair to say, then, that it

15   appeared that he was dead?  Or do you think he was still

16   living?

17   A.      I'm not a paramedic.  I don't -- I don't know.

18   I wouldn't be able to tell.

19   Q.      You didn't --

20   A.      At that point I didn't check for --

21           (Simultaneous speaking.)

22           THE WITNESS:  I didn't check for vitals.

23   BY MR. BUELNA:

24   Q.      Okay.  Why not?

25   A.      Like I said, my shift -- my -- my shift

                                                    105

1   concerned [sic] to Chris's wellbeing to make sure that

2   he was unhurt.  So I went to go check on Chris.

3   Q.      And had Chris already holstered his gun, or did

4   he still have his gun out?

5   A.      When I turned towards him it appeared that -- to

6   my recollection it appeared he was at the load, ready.

7   Q.      Okay.  What about your gun?  Did you have your

8   gun out?

9   A.      I did not.

10  Q.      Why not?

11  A.      As I came around the vehicle I saw the subject

12  on the ground.  He didn't appear to be a threat at the

13  time, so I didn't pull my weapon out.

14  Q.      Well, you didn't -- well -- you said you

15  didn't -- he didn't -- you didn't know if he appeared

16  dead.  He could've theoretically got up and pulled a

17  weapon out or something like that, right?

18          MR. SIMS:  That calls for speculation.

19  Incomplete hypothetical.  Argumentative.

20          Go ahead.  You can answer the question.

21          THE WITNESS:  That's correct.  But I didn't see

22  a weapon in his hand at the time.

23  BY MR. BUELNA:

24  Q.      Did you pat him down?

25  A.      I did not.

                                                        106

1    Q.       Instead, you -- and you didn't have your weapon

2    out, right?

3    A.       Correct.

4    Q.       Okay.  Did -- did Chris or Defendant Samayoa

5    appear injured?

6    A.       At that time when I was by the subject?

7    Q.       Yes.

8    A.       I didn't know.  I -- that is why I went to go

9    check on him.

10   Q.       And what did he say, if anything?

11   A.       I don't remember.  I don't remember if he said

12   anything.

13   Q.       Do you remember -- do you remember if you asked

14   him if he was hurt?

15   A.       I think I asked him if he was okay.  I don't --

16   I don't know if he responded or not.

17   Q.       Okay.  At that point did you turn to pat down

18   Mr. O'Neil to make sure that he didn't pull out a

19   weapon?

20   A.       No.

21   Q.       Why not?

22   A.       At that point I relieved Officer Samayoa of his

23   department-issued firearm.

24   Q.       Why didn't -- why didn't you pat down the

25   suspect if you didn't think he was dead?

                                                          107

1    A.       Because at that point when I was with Officer

2    Samayoa, I turned around and I saw Officer Valderrama

3    rendering aid.

4    Q.       Did you alert Valderrama that you hadn't yet

5    patted him down for weapons?

6    A.       I had not.

7    Q.       Why not?

8    A.       I just didn't.

9    Q.       Is it because you thought he was dead?

10   A.       No.  I just did not alert.  No other reason than

11   I just didn't.

12   Q.       Isn't it your practice if you haven't patted

13   down a suspect that could have a weapon to alert other

14   officers that you haven't searched for weapons yet?

15   A.       Is it common practice?  It should be.  I don't

16   know if it's done all the time.

17   Q.       Why didn't you do it that way?

18   A.       Because I was concerned with Chris.  I was

19   concerned with Chris's wellbeing.  I saw that Officer

20   Valderrama was with the subject, so I refocused my

21   concern to Chris.

22   Q.       Why did you take his firearm from him?

23   A.       Officer Samayoa had just shot somebody.  It's a

24   traumatic experience for a veteran officer, let alone

25   somebody that just started a job and is four days on.

108

1    At that point he looked like he was in shock.  I was

2    concerned for his -- not only for his physical

3    wellbeing, but for his mental wellbeing.

4         I didn't know how he would react to knowing that

5    he had just shot somebody and possibly killed somebody.

6    So I elected to take his firearm for not only our

7    safety, the safety of the people around him, but for his

8    safety as well.

9    Q.    Did he say anything to you?

10   A.    I don't remember.

11   Q.    After you took his firearm, what did you do with

12   it?

13   A.    I held onto his firearm.  I walked him over to

14   the driver side of our car.  I had him sit inside the

15   driver side.  I stayed with him until another officer

16   arrived.  I told -- I asked that officer to stay with

17   Officer Samayoa.  I can't -- I don't know the timeline

18   exactly, but either I attempted to give the firearm to

19   the supervisor on scene who was Sergeant Vallsbarrow

20   (phonetic), or I put it in a trunk first and then

21   retrieved it to give to Sergeant Vallsbarrow.  I can't

22   remember.

23   Q.    Did Defendant Samayoa express any remorse to you

24   in regards to killing Mr. O'Neil?

25   A.    Like I said, he looked like he was in shock.

109

 1    And I don't believe he said anything to me.  I think he

 2    was in too much of shock to express anything.

 3    Q.      Since he shot and killed Mr. O'Neil has he

 4    expressed any remorse to you?

 5    A.      I haven't discussed the case with him.  I just

 6    asked if he's okay.

 7    Q.      Do you have any remorse for what happened?

 8            MR. SIMS:  Argumentative.  Harassing.  Not

 9    reasonably calculated to lead to the discovery of

10    admissible evidence.

11            You may answer.

12            THE WITNESS:  Yes.  It's -- it's very tragic

13    about what happened and that Mr. O'Neil had to lose his

14    life -- or -- not had to, but that he had lost his life.

15    Yeah.  It's very sad that things turned out the way they

16    laid out and it had to end that way.

17    BY MR. BUELNA:

18    Q.      Do you believe it should've ended that way?

19            MR. SIMS:  Same objections.

20            THE WITNESS:  I don't know if it should've ended

21    that way, but it ended up that way.

22    BY MR. BUELNA:

23    Q.      Do you feel like there was anything you could've

24    done differently to have prevented it ending up that

25    way?

                                                    110

1    A.       Yeah.  Not come to work.

2    Q.       Anything else?

3    A.       I know it's all hypothetical.  It ended up the

4    way it ended up with the chain of -- chain of action

5    that occurred.  It ended very badly.

6            MR. BUELNA:  All right.  I don't have any other

7    questions.

8            MR. SIMS:  I've got just a very few number of

9    questions.

10                  EXAMINATION BY MR. SIMS

11   BY MR. SIMS:

12   Q.       Officer Talusan, you mentioned that you saw the

13   van driving in the opposite line of traffic in the -- as

14   it approached you when you were on, I think, Gilman and

15   Ingalls; is that -- is that accurate?

16   A.       Yes.

17           THE COURT REPORTER:  May we take one second

18   before we continue?  I just need to plug something in.

19           MR. SIMS:  Sure.

20           THE COURT REPORTER:  Thank you.

21           MR. SIMS:  You want to just take a break?

22           MR. BUELNA:  Okay.

23           THE VIDEOGRAPHER:  We can do that.

24           MR. SIMS:  Well, let's just let her -- I'm not

25   going to be very long.  I'm getting hungry too.  So...

                                                        111

1      THE COURT REPORTER:  Sorry about that.  I'm all

2  ready to go.

3      MR. SIMS:  Okay.  Could you just read back the

4  last question just so he's got it?

5      (Whereupon, the record was read back.)

6      THE WITNESS:  Yes.  The suspect vehicle was

7  traveling at a high rate of speed westbound in the

8  eastbound lane of Gilman approaching Ingalls.

9      MR. SIMS:  And, Madam Court Reporter, just for

10  your reference, Ingalls is spelled I-N-G-A-L-L-S.

11      THE COURT REPORTER:  (Nods head.)

12  BY MR. SIMS:

13  Q.     How many times -- from the moment you first saw

14  the van to the end of the pursuit, how many times do you

15  think you saw the van go into the opposite lane of

16  traffic?

17  A.     On Gilman and also on Fitzgerald it was either

18  in the opposite lane or straddling the middle of the

19  lane, I believe.

20  Q.     Okay.

21  A.     As far as I can recall.  Yeah, on Fitzgerald.

22  Q.     And you said the van was going at a high rate of

23  speed.  Do you have any estimate at what speed the van

24  was going at?

25  A.     I don't know exactly how fast we were going, but

112

1  it was above the speed limit.  I did not look down at my

2  speedometer, but it was beyond speed limit and

3  conditions safe for that -- the roadway.

4  Q.      And what -- what -- do you know the speed limit

5  in that area?

6  A.      I believe it's 25.

7          MR. SIMS:  Okay.  Thank you.  That's all I have.

8          MR. BUELNA:  All right.  Thank you, Madam Court

9  Reporter and Videographer.  I appreciate it.  Thank you

10  for coming in.

11          All right.  And, Hunter, if you have two seconds

12  I just want to ask you something strategic-wise.  We can

13  end the -- go off record, too, by the way.  My bad.

14          THE VIDEOGRAPHER:  We are going off the record

15  at 1:13 p.m.  This is the end of today's proceeding.

16          (The deposition was concluded at 1:13 p.m.)

17                        --oOo--

18

19

20

21

22

23

24

25

113

1    DECLARATION OF WITNESS

2

3         I, EDRIC TALUSAN, do hereby declare under

4    penalty of perjury that I have read the foregoing

5    transcript; that I have made any corrections as appear

6    noted, in ink, initialed by me, or attached hereto; that

7    my testimony as contained herein, as corrected,

8    is true and correct.

9    EXECUTED this _____ day of _____,

10   2020, at _____, _____.
               (City)                    (State)

11

12

13

14   _____

15        EDRIC TALUSAN

16

17             --o0o--

18

19

20

21

22

23

24

25

                                                    114

```
1                        CERTIFICATE OF REPORTER

2

3           I, Christy Curry, CSR No. 13982, a Certified

4      Shorthand Reporter in and for the State of California,

5      do hereby certify:

6           That prior to being examined, the witness named in

7      the foregoing deposition was by me duly sworn to testify

8      to the truth, the whole truth, and nothing but the

9      truth.

10          That said deposition was taken before me at the

11     time and place set forth and was taken down by me in

12     shorthand and thereafter reduced to computerized

13     transcription under my direction and supervision, and I

14     hereby certify the foregoing deposition is a full, true

15     and correct transcript of my shorthand notes so taken.

16          And I further certify that I am neither counsel for

17     nor related to any party to said action nor in any way

18     interested in the outcome thereof.

19          IN WITNESS WHEREOF, I have hereunto subscribed my

20     name this 18th of January, 2021.

21

22

23          _____/s/Christy Curry_____
            CHRISTY CURRY
            CSR No. 13982
24

25                      --o0o--

                                                        115
```

1        DISPOSITION

2

3        Upon completion of the foregoing transcript, the

4    witness was notified it was ready for signature, but

5    the deposition was not signed by the witness for the

6    following reason:

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   BARBARA J. BUTLER & ASSOCIATES

14

15       The sealed original will be forwarded to the

16   deposing attorney's office.

17

18                      --o0o--

19

20

21

22

23

24

25

116

```
1                          WITNESS LETTER
     TO:  Officer Edric Talusan          Date: 01.28.21
2          Attn: Hunter Sims, Deputy City Attorney
           OFFICE OF THE CITY ATTORNEY
3          1390 Market Street, 6th Floor    Depo: 01.07.21
           San Francisco, CA  94102         Ref. #21010703
4
     RE: Judy O'Neil v. City & County of San Francisco, et al
5
     Dear Officer Talusan:
6
           Please be advised that the transcript of your
7    deposition taken in the above matter has been completed
     and is now available at this office for your reading and
8    signing.
           Please contact our office between the hours of 9:30
9    a.m. and 4:30 p.m. Monday-Friday, to schedule an
     appointment.  Or, if you prefer, contact the attorney to
10   review and sign the copy of your deposition under
     penalty of perjury.
11         Read the transcript making any changes necessary.
     In making any changes, please use the following guide:
12         1. DO NOT WRITE on the original transcript.
           2. SIGN UNDER PENALTY OF PERJURY at the end of the
13            Deposition on the Declaration of Witness Page.
           3. List each change on the Deposition Errata Sheet
14            following this page. Signature is required at
              the bottom of the Errata Sheet.
15         4. Forward the signed Declaration of Witness Page
              and signed Errata Sheet in addition to a copy of
16            this letter to:
                     Barbara J. Butler & Associates
17                   Certified Court Reporters
                     P.O. Box 3508, Santa Clara, CA  95055
18                   (510) 832-8853 or (408) 248-2885.
           Upon receipt of items requested in this letter, I
19   will forward copies of same to all Counsel.
           In the event you have not reviewed your deposition
20   within 35 days or by trial date, whichever is sooner,
     the original transcript will be sealed pursuant to
21   applicable laws and thereafter mailed to the deposing
     attorney.
22
                          Sincerely,
23
                          /s/Barbara J. Butler
24                        Barbara J. Butler, CSR.

25   cc:  All Counsel
                                                        117
```