1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   MEREDITH B. OSBORN, State Bar #250467
    Chief Trial Deputy
3   HUNTER W. SIMS III, State Bar #266039
    RYAN STEVENS, State Bar #306409
4   Deputy City Attorneys
    Fox Plaza
5   1390 Market Street, Sixth Floor
    San Francisco, California 94102-5408
6   Telephone:     (415) 554-4259 (Sims)
    Telephone:     (415) 554-3975 (Stevens)
7   Facsimile:     (415) 554-3837
    E-Mail:        hunter.sims@sfcityatty.org
8   E-Mail:        ryan.stevens@sfcityatty.org

9
    Attorneys for Defendants
10  CITY AND COUNTY OF SAN FRANCISCO,
    CHRISTOPHER SAMAYOA and EDRIC TALUSAN
11

12

13                     UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15  | JUDY O'NEIL, individually and as successor-in-interest to Decedent KEITA O'NEIL, through her Guardian Ad Litem, APRIL GREEN, | Case No. 17-cv-07190 JCS |
|---|---|
16  | | **DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, OFFICER CHRISTOPHER SAMAYOA AND OFFICER EDRIC TALUSAN'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
17  | Plaintiff, | |
18  | vs. | |
19  | | |
20  | CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation; CHRISTOPHER SAMAYOA, individually and in his capacity as a City of San Francisco Police Officer; EDRIC TALUSAN, individually and in his official capacity as a San Francisco Police Officer; and DOES 1-50, inclusive, | Hearing Date:     July 2, 2021 |
21  | | Time:            9:30 a.m. |
22  | | Place:           Courtroom F, 15th Floor |
23  | | Trial Date:      October 12, 2021 |
24  | Defendants. | |

25

26

27

28

1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

NOTICE OF MOTION AND MOTION ................................................................................... 1

INTRODUCTION .................................................................................................................... 3

STATEMENT OF FACTS ....................................................................................................... 4

    I.      O'NEIL CARJACKS POLLY CHOW.............................................................. 4

    II.     O'NEIL IS SEEN DRIVING ERRATICALLY AND AT HIGH SPEEDS ON INTERSTATE 280, HIGHWAY 101 AND IN THE BAYVIEW NEIGHBORHOOD OF SAN FRANCISCO .................................................... 5

    III.    OFFICERS TALUSAN AND SAMAYOA PURSUE O'NEIL INTO DOUBLE ROCK ........................................................................................... 6

    IV.    OFFICER SAMAYOA FIRES AT O'NEIL AFTER HE SUDDENLY AND UNEXPECTEDLY JUMPS FROM HIS MOVING VEHICLE AND RUNS DIRECTLY TOWARDS OFFICER SAMAYOA, WHO IS SEATED IN A PATROL CAR ................................................................................................ 7

          A.     O'Neil Runs Directly Towards the Defendant Officers While Officer Samayoa Attempts to Open his Door but then Shoots O'Neil.................... 7

    V.     THE SPEED, TIMING, DISTANCE AND SAMAYOA'S VANTAGE OF THE EVENT .................................................................................................... 8

SUMMARY JUDGMENT STANDARD ................................................................................. 9

ARGUMENT ........................................................................................................................... 9

    I.      PLAINTIFF'S FOURTH AMENDMENT CLAIM FAILS .............................. 9

          A.     Officer Samayoa's Use of Force Was Reasonable .................................. 10

          B.     Officer Talusan Did Not Fail to Intervene ................................................ 13

          C.     The Defendant Officers are Entitled to Qualified Immunity .................... 14

              1.     Officer Samayoa is Entitled to Qualified Immunity .................... 15

              2.     Officer Talusan is Entitled to Qualified Immunity ...................... 16

    II.     PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM FAILS...................... 17

          A.     Officer Samayoa's Conduct Does Not Shock The Conscience ................ 17

          B.     Officer Talusan's Conduct Does Not Shock The Conscience ................... 18

          C.     The Defendant Officers are Entitled to Qualified Immunity .................... 18

    III.    PLAINTIFF'S *MONELL* CLAIM FAILS ........................................................ 19

              1.     The SAC Does Not Allege Facts to Establish Monell Liability Based on Permanent Custom or Practice ...................................... 20

              2.     The Evidence Does Not Show Inadequate Training..................... 20

              3.     The Evidence Does Not Show Inadequate Supervision. .............. 21

IV.     PLAINTIFF'S STATE TORT CLAIMS FAIL ....................................................23

        A.      The Negligence Claim Fails Because The Shooting Was Privileged ........23

        B.      The Officers Were Not Negligent In Their Pre-Shooting Conduct
                Because They Were Privileged To Persist In Making An Arrest And To
                Use Reasonable Force ...................................................................................24

        C.      The Officers Enjoy Statutory Immunity Under California Penal Code §
                196 And Government Code §§ 821.6 and 820.6 .........................................25

        D.      The City is Immune from the State Law Torts ...........................................26

V.      PLAINTIFF'S BANE ACT CLAIM FAILS .......................................................27

CONCLUSION............................................................................................................29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**State Cases**

*Allen v. City of Sacramento*
    234 Cal. App. 4th 41 (2015) ...................................................................28

*Amylou R. v. County of Riverside*
    28 Cal. App. 4th 1205 (1994) .................................................................26

*Asgari v. City of Los Angeles*
    15 Cal. 4th 744 (1997) ...........................................................................26

*Bender v. County of Los Angeles*
    217 Cal. App. 4th 968 (2013) .................................................................28

*Brown v. Ransweiler*
    171 Cal. App. 4th 516 (2009) ...........................................................23, 25

*Cornell v. City and County of San Francisco*
    17 Cal. App. 5th 766 (2017) ...............................................................27, 28

*County of Los Angeles v. Superior Court*
    181 Cal. App. 4th 218 (2009) .................................................................26

*Gilmore v. Superior Court*
    230 Cal. App. 3d 416 (1991) ..................................................................24

*Horwich v. Superior Court*
    21 Cal. 4th 272 (1999) ...........................................................................24

*Martinez v. Cty. of Los Angeles*
    47 Cal. App. 4th 334 (1996)) .................................................................25

*Miklosy v. Regents of the University of California*
    44 Cal. 4th 876 (2008) ...........................................................................27

*Shoyoye v. County of Los Angeles*
    203 Cal. App. 4th 947 (2012) .................................................................28

*Sipple v. City of Hayward*
    225 Cal. App. 4th 349 (2014) .................................................................27

*Venegas v. County of Los Angeles*
    32 Cal. 4th 820 (2004) ...........................................................................27

**Federal Cases**

*Anderson v. Creighton*
    483 U.S. 635 (1987).................................................................................14

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986).................................................................................9

*Ashcroft v. al–Kidd*
    131 S. Ct. 2074 (2011) ...........................................................................14

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) .............................................................................13

*Blanford v. Sacramento County*
    406 F.3d 1110 (9th Cir. 2005) ..............................................................10

*Board of County Comm'rs v. Brown*
    520 U.S. 397 (1997) ..........................................................19, 21, 22, 25

*Brown v. Contra Costa County*
    2013 WL 5422947 (N.D. Cal. Sept. 27, 2013) .....................................20

*Buckheit v. Dennis*
    2012 WL 1166077 (N.D. Cal. Apr. 6, 2012) ...................................22-23

*Canton v. Harris*
    489 U.S. 378 (1989) .........................................................................21, 22

*Carswell v. Borough of Homestead*
    381 F.3d 235 (3d Cir. 2004) .................................................................16

*Christie v. Iopa*
    176 F.3d 1231 (9th Cir. 1999) ..............................................................20

*City of Oklahoma City v. Tuttle*
    471 U.S. 808 (1985) .........................................................................20, 22

*City of South Lake Tahoe v. California Tahoe Regional Planning Agency*
    625 F.2d 231 (9th Cir. 1980) ................................................................26

*Collins v. City of San Diego*
    841 F.2d 337 (9th Cir. 1988) ................................................................20

*Connick v. Thompson,*
    563 U.S. 51 (2011) ...............................................................................21

*County of Sacramento v. Lewis*
    523 U.S. 833 (1998) .................................................................10, 17, 18

*Denman v. City of Tracy*
    2013 WL 2434707 (E.D. Cal. June 4, 2013) ........................................20

*Dougherty v. City of Covina*
    654 F.3d 892 (9th Cir. 2011) ................................................................21

*Eastburn v. Regional Fire Protection Authority*
    31 Cal. 4th 1175 (2002) .......................................................................27

*Foster v. City of Fresno*
    392 F. Supp. 2d 1140 (E.D. Cal. 2005) ...................................................................25

*Foster v. City of Indio*
    908 F.3d 1204 (9th Cir. 2018) ......................................................................17, 18

*Gausvik v. Perez*
    392 F.3d 1006 (9th Cir. 2004) ..........................................................................17

*Gomez v. Vernon*
    255 F.3d 1118 (9th Cir. 2001) ..........................................................................21

*Gonzalez v. City of Anaheim*
    *747 F.3d 789 (9th Cir. 2014)* ......................................................................18, 28

*Graham v. Connor*
    490 U.S. 386 (1989) .......................................................................9, 10, 11, 23

*Guerra v. Bellino*
    703 F. App'x 312 (5th Cir. 2017) ......................................................................16

*Hayes v. County of San Diego*
    57 Cal. 4th 622 (2013) ..............................................................................24, 25

*Hayes v. County of San Diego*
    736 F.3d 1223 (9th Cir. 2013) ..........................................................................23

*Hernandez v. City of Pomona*
    46 Cal. 4th 501 (2009) ..............................................................................23, 24

*Karam v. City of Burbank*
    352 F.3d 1188 (9th Cir. 2003) ......................................................................18, 28

*Knight v. Yarborough*
    2011 WL 4550190 (C.D. Cal. Aug. 22, 2011).....................................................22

*Long v. City & County of Honolulu*
    511 F.3d 90 (9th Cir. 2007) ...............................................................................9

*Losee v. City of Chico*
    738 F. App'x 398 (9th Cir. 2018) ...................................................................27, 28

*Menotti v. City of Seattle*
    409 F.3d 1113 (9th Cir. 2005) ..........................................................................20

*Mitchell v. Schlabach*
    864 F.3d 416 (6th Cir. 2017) .............................................................................15

*Monell v. Department of Social Services*
    436 U.S. 658 (1978).................................................................................4, 19

*Monzon v. City of Murietta*
   978 F.3d 1150 (2020)..................................................................................10, 11, 12

*Mullenix v. Luna*
   136 S. Ct. 305 ..............................................................................................14

*Orin v. Barclay*
   272 F.3d 1207 (9th Cir. 2001) ......................................................................19

*Pearson v. Callahan*
   555 U.S. 223 (2009).....................................................................................14

*Plumhoff v. Rickard*
   572 U.S. 765 (2014) .....................................................................................15

*Porter v. Osborn*
   546 F.3d 1131 (9th Cir. 2008) ......................................................................17

*Reese v. County of Sacramento*
   888 F.3d 1030 (9th Cir. 2018) ......................................................................27

*Robins v. Meecham*
   60 F.3d 1436 (9th Cir. 1995) ........................................................................13

*S.B. v. County of San Diego*
   864 F.3d 1010 (9th Cir. 2017) ......................................................................10

*Saucier v. Katz*
   533 U.S. 194 (2001)........................................................................................9

*Savage v. City of Memphis*
   620 F. App'x 425 (6th Cir. 2015) .................................................................16

*Scott v. Harris*
   550 U.S. 372 (2007)........................................................................................9

*Silva v. City of San Leandro*
   744 F. Supp. 2d 1036 (N.D. Cal. 2010) .......................................................23

*Sturgis v. Brady*
   2016 WL 924859 (N.D. Cal. March 11, 2016).............................................13

*Suit v. City of Folsom*
   2016 WL 4192437 (E.D. Cal. Aug. 8, 2016) ...............................................17

*Tennessee v. Garner*
   471 U.S. 1 (1985)..........................................................................................10

*United States v. Reese*
   2 F.3d 870 (9th Cir. 1993) ............................................................................28

*Vos v. City of Newport Beach*
　892 F.3d 1024 (9th Cir. 2018) ................................................................................14

*Wenzel v. City of Bourbon*
　899 F.3d 598 (8th Cir. 2018) ..................................................................................15

*White v. Pauly*
　137 S. Ct. 548 (2017) ..............................................................................................14

*Wilson v. City of Chicago*
　6 F.3d 1233 (7th Cir. 1993) ....................................................................................21

*Wroth v. City of Rohnert Park*
　2019 WL 1766163 (N.D. Cal. Apr. 22, 2019) ........................................................18

**State Statutes & Codes**
California Civil Code § 52.1 ..................................................................................2, 27

California Government Code § 820.6 ..............................................................2, 25, 26

California Government Code § 821.6 ..............................................................2, 25, 26

California Penal Code § 148(a) ................................................................................24

California Penal Code § 196 ..............................................................................25, 26

California Penal Code § 215 ....................................................................................12

California Penal Code § 245(a)(1) ............................................................................24

California Penal Code § 835a ....................................................................2, 23, 24, 25, 26

**Federal Statutes**
19 Federal Rule of Civil Procedure 56 ......................................................................9

42 United States Code § 1983 ..................................................................................19

**NOTICE OF MOTION AND MOTION**

**TO PLAINTIFF AND HER COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on July 2, 2021, at 9:30 a.m., in the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, Courtroom 2, 17th Floor, San Francisco, California, Defendants City and County of San Francisco (the "City"), Officer Christopher Samayoa and Officer Edric Talusan ("Defendant Officers") (collectively "Defendants") will and hereby do move the Court for summary judgment under Federal Rule of Civil Procedure 56 on all claims for relief contained in the Second Amended Complaint in this action.  Defendants base this motion on the following grounds:

1.     The First Cause of Action in Plaintiff's First Amended Complaint alleging excessive force in violation of the Fourth Amendment fails as a matter of law and undisputed fact because (1) Officer Samayoa's use of force in defending himself and others, and stopping a dangerous fleeing felon, was objectively reasonable; (2) assuming the force was excessive, Officer Talusan had no opportunity to intervene in the excessive force; and (3) the Defendant Officers are entitled to qualified immunity on this claim.

2.     The Second Cause of Action in Plaintiff's First Amended Complaint alleging a substantive due process claim in violation of the Fourteenth Amendment fails as a matter of law and undisputed fact because (1) the Defendant Officers' use of force in defending themselves and others, and stopping a fleeing felon, was objectively reasonable; (2) the Defendant Officers did not act with a purpose to harm unrelated to legitimate law enforcement objectives; and (3) the Defendant Officers are entitled to qualified immunity on this claim.

3.     The Third Cause of Action in Plaintiff's Second Amended Complaint alleging municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) fails as a matter of law and undisputed fact (1) for lack of an underlying constitutional violation; and (2) for lack of evidence of any unconstitutional custom, policy or practice that was a moving force in either depriving Keita O'Neil of his Fourth Amendment rights and/or depriving Judy O'Neil of her Fourteenth Amendment rights;

4.      The Fourth and Fifth Causes of Action in Plaintiff's Second Amended Complaint alleging state law tort claims of battery, wrongful death, and negligence against the Defendants fail as a matter of law and undisputed fact (1) for the same reason the First Cause of Action fails (objective reasonableness); (2) because Defendant Officers were privileged to make an arrest of Keita O'Neil as set forth in California Penal Code § 835a; (3) because the Defendant Officers' conduct was subject to immunity under and California Penal Code § 916 and Government Code §§ 820.6 and 821.6; and (4) Plaintiff gives no statutory basis upon which the City can be held liable; and

5.      The Sixth Cause of Action in Plaintiff's Second Amended Complaint alleging violations of California Civil Code § 52.1 against the Defendant Officers fails as a matter of law and undisputed fact (1) for the same reason the First Cause of Action fails (objective reasonableness); (2) because the Defendant Officers did not have a specific intent to deprive Keita O'Neil of his Fourth Amendment rights; (3) because Plaintiff cannot prove a separate use of threats, intimidation, and coercion not inherent in the underlying constitutional violations; and (4) because the Defendant Officers were privileged to use reasonable force to make an arrest of Keita O'Neil as set forth in California Penal Code § 835a.

Defendants base their motion on this notice of motion and motion, the memorandum of points and authorities in support thereof, the declarations, papers and other evidence submitted herewith, and such argument as may be heard.

**INTRODUCTION**

After carjacking a white minivan from a California State Lottery employee, Keita O'Neil ("O'Neil") led pursuing officers on a dangerous high-speed vehicle chase into the Bayview neighborhood of San Francisco.  San Francisco Police Officers Chris Samayoa and Edric Talusan (collectively "Defendant Officers") responded to the high alert priority call, gave chase, and pursued O'Neil into the Alice Griffith Housing project, otherwise known as Double Rock.  Once inside Double Rock, O'Neil's vehicle was boxed in by a fence blocking the road in front of him and officers pursuing him from behind.  Rather than surrender, O'Neil jumped from the van and charged directly toward the Defendant Officers while appearing to reach toward his waistband, a place on the body where officers know suspects routinely conceal weapons.  Having only seconds to react, Officer Samayoa fired one shot killing O'Neil.  While tragic, his use of lethal force was justified.

Plaintiff Judy O'Neil, the mother of Keita O'Neil, sues Officer Samayoa, Officer Talusan, and the City and County of San Francisco (the "City") (collectively "Defendants") on behalf of herself and the O'Neil Estate ("the Estate").[1]  The Estate alleges Defendants violated O'Neil's Constitutional rights under the Fourth Amendment, committed a battery against him under state law, were negligent under state law and violated his rights under California Civil Code section 52.1 (the Bane Act) by using unlawful force.  Plaintiff alleges Defendants violated her own Constitutional rights under the Fourteenth Amendment and were negligent in causing O'Neil's death.

Officer Samayoa was justified in using lethal force against O'Neil under the circumstances. His belief that O'Neil posed a threat of serious harm to himself, Officer Talusan, and bystanders was objectively reasonable as a matter of law.  Assuming Officer Samayoa's use of force was unreasonable, Officer Talusan had no opportunity to intervene.  The Fourth Amendment claims therefore fail.  The Fourteenth Amendment claim fails for the same reason, and because Plaintiff cannot prove the Defendant Officers acted with a purpose to harm O'Neil unrelated to a legitimate law enforcement objective.  Both Constitutional claims fail for the additional reason that the Defendant Officers are entitled to qualified immunity.  Plaintiff's claim against the City on a theory of municipal

---

[1]  April Green was appointed as guardian ad litem to Ms. O'Neil by the Court.

liability also fails because Plaintiff cannot prove liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Plaintiff's claims under state law are barred for the reasons the Fourth Amendment claim fails: the Defendant Officers' use of force was objectively reasonable. In addition, Plaintiff's claims under state law fail for the additional reason that the Defendants are entitled to statutory immunity from suit on those claims. Lastly, Plaintiff's Bane Act claim fails because she cannot prove that officers acted with the specific intent to deprive O'Neil of his Fourth Amendment rights.

**STATEMENT OF FACTS**

**I.     O'NEIL CARJACKS POLLY CHOW**

On December 1, 2017, Polly Chow ("Chow") was working as a district sales representative for the California State Lottery. [Declaration of Hunter W. Sims III in Support of Motion for Summary Judgment ("Sims Decl."), Ex. B, Chow Depo 12: 6-13.] As part of her job duties, she drove an official California State Lottery van to the M&M Market located at 6670 3rd Street. After Chow completed her business inside the market she returned to the van, which was parked on the street in front of the market. [Sims Decl., Ex. B, Chow Depo 15:10-21; 16: 12-22; 17: 19-22.] As Chow opened the door to the van, a man later identified as O'Neil approached her from behind, put his arms around her, and demanded money. [Sims Decl., Ex. B, Chow Depo 18:9-24; 19:22-21:9.] Chow told O'Neil that she had no money and O'Neil responded by patting her down and searching her pockets. [Sims Decl., Ex. B, Chow Depo 20:10-12.20:15-17.] O'Neil took the key to the van, got into the driver's seat, and attempted to start the van. [Sims Decl., Ex. B, Chow Depo 23:2-14; 24:1-21; 25:10-14.]

Chow followed O'Neil to the driver's side door and demanded O'Neil return her key. [Sims Decl., Ex. B, Chow Depo 25:21-26:7.] O'Neil got out of the van, grabbed Chow's phone, threw it on the ground and violently pushed Chow onto the ground. [Sims Decl., Ex. B, Chow Depo 26:8-17; 27:17-28:11.] O'Neil then walked over to an SUV that was parked nearby and, after conversing with the occupants, got back in the van and drive away. [Sims Decl., Ex. B, Chow Depo 26:8-27:8.] O'Neil left Chow, who suffered an injury to her knee as a result of this incident, lying on the ground as he sped away. [Sims Decl., Ex. B, Chow Depo 28:17-25.]

1    At approximately 10:32 a.m., the City's Department of Emergency Management dispatch

2    broadcasted an "A Priority" report of "strongarm robbery" involving a vehicle to all SFPD officers in

3    the Bayview police district. [Declaration of Kirstin Walker in Support of Motion for Summary

4    Judgment ("Walker Decl."), Exhs. A and B.] The suspect was described as a skinny, African-

5    American male, under 30 years old and wearing a black hoody. [*Id.*] Dispatch noted that no weapons

6    were seen in the commission of the carjacking. [Walker Decl., Ex. A, Audio CAD at 10:35:19.]

7    **II.    O'NEIL IS SEEN DRIVING ERRATICALLY AND AT HIGH SPEEDS ON INTERSTATE 280, HIGHWAY 101 AND IN THE BAYVIEW NEIGHBORHOOD OF**

8    **SAN FRANCISCO**

9    SFPD Officer Gary Moriyama was driving on southbound Interstate 280 in an unmarked SFPD

10    vehicle when he observed a tan GMC Suburban and a white van with a state logo approaching from

11    behind at a speed of approximately 80 miles per hours in the emergency lane of traffic. [Sims Decl.,

12    Ex. C, Moriyama Depo 10:23-12:11; 25:2-5: 10:23-12:18.] Officer Moriyama turned on his

13    emergency district channel and learned there had recently been a carjacking. [Sims Decl., Ex. C,

14    Moriyama Depo 10:23-12:11; 13:3-11.] Officer Moriyama reported his observations to dispatch and

15    began to follow the vehicles, which he now connected to the carjacking. [Sims Decl., Ex. C,

16    Moriyama Depo 17:12-18:13; 20:12-21:5; 18:10-19:6; Declaration of Kristen Walker, Ex. B, at

17    10:35:19-10:38:29.]

18    Officer Moriyama saw the vehicles were kicking up dust and debris due to their speed and the

19    fact they were in the emergency lane on the right shoulder. [Sims Decl., Ex. C, Moriyama Depo

20    18:14-19:6.] As the vehicles approached where Highway 101 splits from Interstate 280, the vehicles

21    abruptly turned from the emergency lane to the left and across two lanes of traffic so that the vans

22    were travelling on southbound Highway 101. [Sims Decl., Ex. C, Moriyama Depo 18:14-19:14.]

23    After exiting the freeway, Officer Moriyama spotted the vehicles near the Gilman Playground

24    on Gilman Street in San Francisco. [Sims Decl., Ex. C, Moriyama Depo 22:24:23:10.] Officer

25    Moriyama was able to pull behind the vehicles just as a marked SFPD patrol car coming from another

26    direction arrived in the area with its lights and sirens activated. [Sims Decl., Ex. C, Moriyama Depo

27    24:16-25:17.] At that point, the GMC suburban pulled over, but the van accelerated and turned

28    abruptly to the right onto Ingalls Street. [Sims Decl., Ex. C, Moriyama Depo 25:6-24.]

### III.    OFFICERS TALUSAN AND SAMAYOA PURSUE O'NEIL INTO DOUBLE ROCK

Officers Edric Talusan and Christopher Samayoa were in their SFPD uniforms and preparing for their shift at Bayview Station, which was scheduled to begin at 11:00 a.m.  [Sims Decl., Ex. D, Talusan Depo 49:17-19; 50:21-51:25; 60:2-24.]  They heard an "A priority" broadcast about the carjacking, which is reserved for responding to the most serious criminal activity.  [Sims Decl., Ex. D, Talusan Depo 57:6-24.]  At the time, Officer Samayoa was a recruit who recently graduated from SFPD's police academy and Officer Talusan was his field training officer.  [Sims Decl., Ex. D, Talusan Depo 14:21-25; 53:5-9; 54:8-10.]  Officer Talusan knew from the broadcast that the carjacking originated at 23rd and Arkansas Streets and involved a white lottery van.  [Sims Decl., Ex. D, Talusan Depo 58:4-10.]  He was unaware of the dispatch's report that no weapons were seen. [Sims Decl., Ex. D, Talusan Depo 58:19-59:8.]

Officer Talusan then told Officer Samayoa to meet him at their police car.  [Sims Decl., Ex. D, Talusan Depo, 61:3-62:4; Walker Decl., Ex. A, Audio CAD 10:37:20.]  Officer Talusan sat in the driver's seat and Officer Samayoa was in the passenger seat.  [Sims Decl., Ex. D, Talusan Depo 63:21-64:4; Ex. F, Samayoa BWC generally.]  When they left Bayview Station, it was Officer Talusan's intention to drive with Officer Samayoa to the M&M Market to take a report.  [Sims Decl., Ex. D, Talusan Depo 61:17-23.]

Shortly after leaving the station, the Defendant Officers heard on their radio that the van suspected in the carjacking was nearby.  [Sims Decl., Ex. D, Talusan Depo 64:14-65:1.]  Officer Talusan then drove the police car to the intersection of Gilman and Ingalls Streets because he believed that intersection would place him in position to locate the van.  [Sims Decl., Ex. D, Talusan Depo 66:16-23; 68:16-69:8.]  Shortly after, the Defendant Officers saw the white van travelling westbound on Gilman Street at a high rate of speed and in the eastbound lane of traffic.  [Sims Decl., Ex. D, Talusan Depo 70:7-16.]  The van sped past the Defendant Officers and Officer Talusan gave chase. [Sims Decl., Ex. D, Talusan Depo 70:7-20.]  Officer Talusan pulled in behind the van, activated his lights and sirens, and began pursuing the van.  [Sims Decl., Ex. D, Talusan Depo 70:7-20.]

While trailing the van, the Defendant Officers observed O'Neil driving increasingly dangerously and erratically.  O'Neil turned the van from Ingalls Street onto eastbound Fitzgerald

Street and, in doing so, failed to stop at numerous stop signs.  O'Neil was driving in the opposite lane of travel.  [Sims Decl., Ex. D, Talusan Depo 72:12-22; 111:12-112:8.]  O'Neil drove the van on Fitzgerald Street and into Double Rock.  [Sims Decl., Ex. D, Talusan Depo 73:1-13.]

## IV. OFFICER SAMAYOA FIRES AT O'NEIL AFTER HE SUDDENLY AND UNEXPECTEDLY JUMPS FROM HIS MOVING VEHICLE AND RUNS DIRECTLY TOWARDS OFFICER SAMAYOA, WHO IS SEATED IN A PATROL CAR

While still driving, O'Neil began to open the driver side door of the van as he approached the intersection of Fitzgerald and Griffin Streets.  [Sims Decl., Ex. E, Security Footage at 10:42:04-10:42:09.]  Observing this, Officer Talusan told Officer Samayoa that the pursuit would likely become a foot chase.  [Sims Decl., Ex. D, Talusan Depo 75:4-22.]  The van simultaneously turned right and, in doing so, collided with a vehicle parked on the south curb of Fitzgerald Street.  [Sims Decl., Ex. E, Security Footage at 10:42:04-10:42:09; Ex. D, Talusan Depo 74:7-13.]  Officer Samayoa had the opportunity to see the door opening and into the driver compartment as the right turn was made.  [Declaration of Eric Rossetter, ("Rossetter Decl."), Ex. B, pg. 2, Opinion 3.]  This area to the right of the intersection of Fitzgerald and Griffin is not a through street and passage is secured by a locked gate.  [Sims Decl., Ex. D, Talusan Depo 74:7-13.]

### A. O'Neil Runs Directly Towards the Defendant Officers While Officer Samayoa Attempts to Open his Door but then Shoots O'Neil

As the Defendant Officers were still driving down Fitzgerald Street, Officer Samayoa pulled his service pistol from his holster with his right hand while simultaneously attempting to open the passenger-side door to the police car with his left hand.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:05-08.]  Simultaneously, O'Neil exited out of the driver's door of his still-moving van.  [Rossetter Decl., Ex. C, Frames 366-404.]  O'Neil ran directly towards the police car, which was still moving forward.  [Sims Decl., Ex. D, Talusan Depo 79:19-80:1, 81:11-23; Rossetter Decl., Ex. C, Frames 366-404.]

As O'Neil charged toward the Defendant Officers, Officer Samayoa took his left hand off the door handle, placed it on his firearm, and fired a single shot through the passenger-side window of the police car.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:08-09; Rossetter Decl., Ex. C, Frames 366-404.]  When this occurred, O'Neil had exited the van and was moving towards the officers.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:08-09; Rossetter Decl., Ex. C, Frame 404.]  O'Neil was under three feet from

the Defendant Officers when Officer Samayoa  fired the shot.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:08-09; Rossetter Decl., Ex. C, Frames 366-404.]  After O'Neil jumped out of the van, Officer Talusan saw O'Neil's hands around his waist area as he was running towards the police car.  [Sims Decl. Ex. D, Talusan Depo. 80:14-25.]  Based on this observation, Officer Talusan perceived that O'Neil posed a serious and immediate threat of bodily harm.  [Sims Decl. Ex. D, Talusan Depo 78:4-6; 79:19-80:1.]  Officer Samayoa would have had the opportunity to view O'Neil from the moment he exited the van until the moment the shot was fired.  [Rossetter Decl., Ex. B, pg. 2, Opinion 4.]  The shot struck and killed O'Neil.

SFPD officers are trained that criminal suspects will frequently conceal weapons, including firearms, in their waistband.  [Declaration of Steven Pomatto ("Pomatto Decl."), ¶ 3.]  SFPD recruits are taught to identify threat indicators that signal whether a suspect may have a weapon on their person.  [*Id.*]  Officers are trained that it is important to look for these indicators before a weapon is visible because it may be too late to respond after a firearm is drawn by a suspect.  [*Id.*]  Therefore, officers are trained that if a suspect grabs towards their waistband during a foot chase it is considered an indicator that the suspect has a weapon.  [*Id.*]

## V.    THE SPEED, TIMING, DISTANCE AND SAMAYOA'S VANTAGE OF THE EVENT

O'Neil was driving at an average speed of 37.3 miles per hour as he entered Double Rock. [Sims Decl. Ex.  Rossetter Depo, 13:22-15:18; 17:4-17, Rossetter Decl., Ex B, pg. 5, Figure 3, pg. 15, Table 2; Surveillance Video at 10:41:59-10:42:02.]  Defendant Officers followed at a speed of approximately 44.7 miles per hour.  [Sims Decl. Ex. G, Rossetter Depo, 13:22-15:18; 17:4-17; Ex. E, Surveillance Video at 10:42:00-10:42:02; Rossetter Decl., Ex. B, pg. 15, Table 2.]  When O'Neil opened the door of the van, he was travelling slightly slower at 37.1 miles per hour.  [Rossetter Decl., Ex B, pg. 5, Table 1 at frame 288, pg. 15 Table 2 at frame 287; Sims Decl., Ex. E, Surveillance Video at 10:42:04-10:42:06.]  The speed limit in this residential area is 25 miles per hour.  [Sims Decl., Ex. D, Talusan Depo 113:4-6.]

The events leading up the shooting unfolded rapidly and chaotically.  Only 4.4 seconds passed from the moment the door of the van began to open to when the shot was fired.  [Rossetter Decl., Ex. B, pg 5, Table 1.]  Only .83 seconds passed from the moment the van brake lights were released,

1    indicating that O'Neil was in the process of jumping out of the van, to when Officer Samayoa fired the

2    shot.  [Rossetter Decl., Ex. B, pg. 2, Opinion 7; pg. 5, Table 1.]  O'Neil was 16.1 feet away from the

3    police car at the moment he took his foot off the brakes of the van.  [Rossetter Decl., Ex. B, pg. 2,

4    Opinion 7.]  That distance closed to only 2.7 feet in the 0.83 seconds between the brake lights coming

5    off and the shot being fired.  [Rossetter Decl., Ex. B, pg. 2, Opinion 7.]

6         Officer Samayoa would have had a clear view of the van from his position inside the police

7    car.  [Rossetter Decl., Ex. B, pg. 2, Opinion 3 and 4.]  It is undisputed that from Officer Samayoa's

8    vantage that he would have the opportunity to view O'Neil opening his door, exiting the van, and

9    running directly at him with his arms moving toward his waistband.  [Rossetter Decl., Ex. B, pg. 2,

10   Opinion 7, pgs. 17-22, figures 18 to 23; Sims Decl. Ex. D, Talusan Depo. 80:14-25.]

11                            **SUMMARY JUDGMENT STANDARD**

12        Summary judgment is appropriate when there is no genuine issue as to any material fact and

13   the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  At summary

14   judgment, a court's function is not to weigh the evidence and determine the truth but to determine

15   whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

16   An ostensible factual "dispute" will not bar summary judgment where the purported fact "is blatantly

17   contradicted by the record," i.e., by "a video tape capturing the events in question," because "no

18   reasonable jury could believe it."  *Scott v. Harris*, 550 U.S. 372, 379-380 (2007).

19                                   **ARGUMENT**

20   **I.    PLAINTIFF'S FOURTH AMENDMENT CLAIM FAILS**

21        Plaintiff claims that the officers used unlawful force: (1) when Officer Samayoa shot and killed

22   Keita O'Neil and (2) when Officer Talusan failed to intervene prior to the shooting.  These claims fail

23   on the merits and are barred by the doctrine of qualified immunity.

24        Claims of excessive and deadly force are analyzed under a standard of reasonableness.  *Long v.*

25   *City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Graham v. Connor*, 490 U.S.

26   386, 395 (1989), *overruled on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001)).  "Determining

27   whether the force used to effect a particular seizure is reasonable under the Fourth Amendment

28   requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.  A court must consider the totality of circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).

When evaluating the totality of the circumstances, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  Reasonableness is not judged from calm remove or the perspective of the arrestee: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  Of all these considerations, the "most important" is "whether the suspect posed an immediate threat to the safety of the officers or others." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017).

### A.    Officer Samayoa's Use of Force Was Reasonable

An officer may reasonably believe the suspect poses an immediate threat when faced with a suspect who has led pursuing officers on a high-speed chase and then charges at the police vehicle while making a gesture officers are trained to recognize as reaching for a concealed weapon.  In addition, when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee*, 471 U.S. at 11.

Recently the Ninth Circuit addressed a very similar situation that faced Officer Samayoa.  In *Monzon v. City of Murietta*, 978 F.3d 1150 (2020), the plaintiffs sued alleging Constitutional and Bane Act violations following the shooting death of Junef Monzon.  Before the shooting, a van driven by Monzon had been reported stolen.  *Id.* at 1154.  Monzon led officers on a high-speed chase on both the highway and surface streets all while violating many traffic laws.  *Id.*  The chase came to a head when the van pulled into a dead-end street.  *Id.*  Five officers in four police vehicles pulled behind the van. *Id.*  Monzon then attempted a multi-point turn that resulted in the van pointing at the officers, who had

since exited their police cars.  *Id.* at 1154-1555.  The officers opened fire on Monzon after he refused to comply with their orders to stop the van.  *Id.*  Monzon was unarmed.  *Id.*

The Ninth Circuit found that the officers' use of force was reasonable.  *Monzon*, 978 F.3d at 1157.  While the court acknowledged several facts were in dispute, it emphasized that the fast-evolving situation, the preceding car chase, and Mozon's movements towards the officers warranted deadly force.  *Id.*  The court wrote:

> "It all happened in less time than it took to type this sentence, before daylight, in a very dynamic and chaotic environment, where officers were forced to make split-second decisions about a driver who deliberately turned his car around and drove it toward and between them. The officers were faced with a reckless driver who had already endangered their lives and the lives of the public with a high-speed chase, had broken traffic laws, ignored commands to stop his vehicle, and steered and accelerated his van toward them in close quarters on an unlit street." *Id.* at 1158.

Like *Monzon*, the undisputed facts show that the use of deadly force was justified.  Officer Samayoa was presented with a fast-evolving and chaotic situation, which was preceded by the commission of a violent felony and a car chase that posed a significant risk of serious injury to the pursuing officers and other members of the public.  It is undisputed that the underlying crime O'Neil was suspected of committing was a carjacking, a violent felony.

Further, the actions of O'Neil demonstrated he was willing to take whatever drastic measures that were required to evade the police.  *Graham*, 490 U.S. at 396.  After leading the police on a reckless car chase, he was speeding 15 miles per hour over the speed limit inside in a residential area, colliding with parked vehicles, driving on the wrong side of the street, and failing to yield to stop signs.  The Defendant Officers directly observed this erratic and dangerous behavior while they were in hot pursuit with their police vehicle lights and sirens activated.  [Sims Decl. Ex. G, Rossetter Depo, 13:22-15:18; 17:4-17; Ex. E, Surveillance Video at 10:41:59-10:42:02; Rossetter Decl., Ex. B, pg. 5, Figure 3, pg. 15, Table 2.]  Then, O'Neil jumped out of a moving van and began running directly towards the police car.  [Sims Decl. Ex. F, Samayoa BWC, 18:42:05-08; Ex. D, Talusan Depo 79:19-80:1, 81:11-23; Rossetter Decl., Ex. C, Frames 366-404.]  This unexpected and dangerous behavior would give any officer a reasonable fear for his life or safety and justified the use of deadly force.

The surprise Officer Samayoa felt in response to O'Neil's actions is reflected in the body worn camera footage.  It is undisputed that in the seconds before O'Neil jumped out of the van and ran toward him, Officer Samayoa had his left hand on the passenger side door and was attempting to open the door, presumably to exit the vehicle.  It is only after O'Neil exited the van that Officer Samayoa took his left hand off the door handle, moved it to the butt of his pistol and fired.  [Rossetter Decl., Ex. C, Frame 409.]  At that point, O'Neil had already run several feet directly towards the Defendant Officers after jumping out of his van.  [Rossetter Decl., Ex. C, Frame 409.]  Under these undisputed facts, any reasonable officer would consider O'Neil an immediate threat to his or her safety.

Further, the timing of this incident left Officer Samayoa no time to consider less lethal alternatives or issue a verbal warning that his use of deadly force was imminent.  Officer Samayoa was faced with a terrible predicament—wait to be shot, or neutralize the threat with the only option available to him, his service weapon.  The undisputed evidence shows that only 4.4 seconds passed from the moment the door of the van begins to open to when the shot is fired.  [Rossetter Decl., Ex. B, pg. 5, Table 1.]  Most of this time, O'Neil was in the van and a verbal warning would not have been effective. O'Neil was out of the vehicle for .083 seconds before the shot was fired.  [Rossetter Decl., Ex. B, pg. 5, Table 1; Rossetter Decl., Ex. B, pg. 2, Opinion 7.]  Accordingly, due to the actions of O'Neil, Officer Samayoa had less than one second to determine what course of action to take to protect his life and his partner's life as a suspected violent felon charged at his vehicle.  As in *Monzon*, "[t] he urgency of this chaotic situation makes it impractical to categorically require a deadly force warning because" of the speed at which the use of force became warranted.  *Monzon*, 978 F.3d at 1158.  Officer Samayoa simply had no time to issue a warning or use less lethal force.

Taken these undisputed facts into account, the use of deadly force was justified.  In the brief time Officer Samayoa was involved in this pursuit, O'Neil failed to yield to the officers behind him, committed numerous dangerous traffic violations in a residential neighborhood, struck a parked vehicle and jumped out of a still-moving van and ran directly towards Officer Samayoa.  Furthermore, the Defendant Officers were pursuing him because they knew he had committed a violent felony by carjacking the van.  This was not simply an auto theft, but an auto theft that was accomplished by the use of force against another person.  *See* Cal. Penal Code § 215.  Under these facts, Officer Samayoa

1   reasonably believed O'Neil was a threat to his life, to his partner's life, and to the community at large.

2   Officer Samayoa had to acted reasonably when he fired his service weapon at O'Neil.  As such, he is

3   entitled to summary judgment on Plaintiff's Fourth Amendment claim.

4       **B.      Officer Talusan Did Not Fail to Intervene**

5       Plaintiff alleges that Officer Talusan violated O'Neil's Fourth Amendment rights by failing to

6   intervene prior to Officer Samayoa firing his weapon.  An officer may be held liable only for his or her

7   own personal participation in an unconstitutional act.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)

8   ("[i]n a § 1983 suit . . . —where masters do not answer for the torts of their servants—the term

9   'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her

10  title notwithstanding, is only liable for his or her own misconduct.")  Where officers are present at an

11  alleged use of excessive force but do not actually use force, their actions create liability only when

12  "the officer had an opportunity to intervene and prevent or curtail the violation (e.g., enough time to

13  observe what was happening and intervene to stop it), but failed to do so." *Sturgis v. Brady*, Case No:

14  C 08-5363 SBA (PR), 2016 WL 924859, at *8 (N.D. Cal. March 11, 2016) (citing *Robins v. Meecham*,

15  60 F.3d 1436, 1442 (9th Cir. 1995)).  Here, Officer Samayoa acted quickly and decisively when

16  confronted with a fleeing felon who, when cornered, jumped out of a moving van.  The complaint

17  alleges no other use of force.  As argued above, the deadly force used in this case was warranted.

18      Nevertheless, even if there is a disputed fact regarding the reasonableness of the force, Officer

19  Talusan had no time to observe or to intervene.  The undisputed evidence shows that Officer Talusan

20  was operating a police car and attempting to keep his attention towards O'Neil in seconds after he

21  exited the van and began running towards the officers.  [Sims Decl., Ex. D, Talusan Depo., 87:16-23.]

22  Even if there was contrary evidence, there was simply not enough time to enable Officer Talusan to

23  intervene had he decided intervention was necessary.  Officer Samayoa fired one shot within seconds

24  of unholstering his weapon.  Officer Talusan was unaware that Officer Samayoa had even pulled out

25  his gun prior to hearing the gunshot.  [Sims Decl., Ex. D, Talusan Depo., 90:4-19.]  There is simply no

26  way that Talusan would have been able to both drive the car and prevent Samayoa from discharging

27  his weapon in that flash of time.

28

1   Given that this incident occurred in nearly the blink of an eye, and the undisputed fact that

2   Officer Talusan was unaware that Officer Samayoa had pulled out his firearm—much less was going

3   to fire at O'Neil—shows that he could not have observed the behavior or intervened in time.

4   Therefore, Plaintiff cannot prove liability as to Officer Talusan for use of excessive force, and the

5   Court should grant summary judgment in his favor on this claim.

6   **C.    The Defendant Officers are Entitled to Qualified Immunity**

7          Police officers are required to respond to dangerous situations, and to make split-second

8   decisions under rapidly-evolving circumstances.  Qualified immunity shields them from the

9   "harassment, distraction, and liability" associated with litigation, provided they did not violate clearly

10  established law.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity applies as long

11  as an official's conduct "does not violate clearly established statutory or constitutional rights of which

12  a reasonable person would have known."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal citations

13  and quotations omitted).  To be clearly established, "existing precedent must have placed the statutory

14  or constitutional question beyond debate."  *Id.*  "In other words, immunity protects 'all but the plainly

15  incompetent or those who knowingly violate the law.'"  *Id.*

16         The Supreme Court instructs, "clearly established law" should not be defined "at a high level

17  of generality."  *White*, 137 S. Ct. at 552 (citing *Ashcroft v. al–Kidd*, 131 S. Ct. 2074 (2011)).  The

18  clearly established law must be "particularized" to the facts of the case.  *White*, 137 S. Ct. 552, citing

19  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Otherwise, "[p]laintiffs would be able to convert

20  the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging

21  violation of extremely abstract rights."  *Id.*

22         Plaintiff bears the burden of showing "that the rights allegedly violated were clearly

23  established."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018).  In the context of

24  qualified immunity, the Supreme Court explains that "use of force" is an area of the law "in which the

25  result depends very much on the facts of each case," and thus police officers are entitled to qualified

26  immunity unless existing precedent "squarely governs" the specific facts at issue.  *Mullenix v. Luna*,

27  136 S. Ct. 305, 309.

28

### 1.      Officer Samayoa is Entitled to Qualified Immunity

Clearly established law supports Officer Samayoa's reasonable belief that O'Neil posed a threat of serious harm.  Under the Supreme Court decision in *Plumhoff v. Rickard*, 572 U.S. 765 (2014), the Defendant Officers are entitled to qualified immunity.  In *Plumhoff*, an officer initiated a traffic stop and during the investigation, the motorist fled off at a high rate of speed.  *Plumhoff*, 572 U.S. at 769-770.  The ensuing chase reached speeds of 100 miles per hour and involved a collision between the motorist and a police car.  *Id.*  Once the motorist was cornered, he apparently attempted to reverse at a high rate of speed and the pursuing officers, who exited their own police cars, opened fire and killed the motorist.  *Id.*  In finding the officers were entitled to qualified immunity, the Court noted that "a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road."  *Id.* at 777.

Courts have also found that Officers are entitled to qualified immunity in circumstances where an unarmed fleeing suspect is shot after exiting their vehicle and aggressively approaching the police vehicle.  In *Wenzel v. City of Bourbon*, Wenzel led police officers on a high-speed chase where they observed him running through stop signs, driving in the wrong lane, and exceeding the speed limit. 899 F.3d 598, 600 (8th Cir. 2018).  After Wenzel's vehicle became stuck in an embankment, he exited the vehicle with his hands at his sides and "walk[ed] aggressively toward Storm's patrol car."  *Id.* Officers did not see a weapon on Wenzel, but he continued to approach the police car with his "arms swinging as he walked."  *Id.* Once Wenzel came within a few feet of the police vehicle an Officer opened fire a shot Wenzel three times.  *Id*. As noted by the court, "[a]pproximately three seconds elapsed from the time Wenzel exited his vehicle to the time Storm fired the shots."  *Id.*  Wenzel was unarmed, but the court of appeals found that the district court had erred in denying qualified immunity. *Id*.  The court found that a reasonable officer could have interpreted Wenzel's conduct as a precursor to a physical attack and that the officer was justified in responding with deadly force.  *Id.*  This is consistent with the rulings of numerous other circuit courts.  *See e.g. Mitchell v. Schlabach*, 864 F.3d 416, 423 (6th Cir. 2017) (holding an officer did not violate clearly established law by shooting a suspect who approached him in a threatening manner); *Guerra v. Bellino*, 703 F. App'x 312, 317 (5th

Cir. 2017) (holding reasonable police officer could have perceived threat of serious harm when detainee ran toward deputy sheriff from car's length away); *Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004) (holding officers acted reasonably in shooting an unarmed fleeing suspect who ran directly at a police cruiser)).

Courts have also found officers are entitled to qualified immunity when they use lethal force against a fleeing suspected carjacker. *Savage v. City of Memphis*, 620 F. App'x 425, 426 (6th Cir. 2015). In *Savage*, officers pursuing a carjacking suspect witnessed the suspect accelerate away from the officers, run a stop sign, and collide with another vehicle. *Id* at 426-427. The suspect then exited the vehicle and the officers gave chase on foot before shooting the suspect in the back when he reached for his waistband and turned towards the officers. *Id* at 427. Despite the Memphis Police Department terminating the shooting officer for violating their deadly force policy, the court still found that the officer was entitled to qualified immunity. *Id*. The court noted that the combination of the carjacking report and the suspect placing his hand on his waist indicated that it was not unreasonable for officers to believe he posed and threat and that lethal force was necessary. *Id* at 428.

Here, as in *Plumhoff, Monzon*, and *Wenzel*, O'Neil led officers on a high-speed chase. In the short time the Defendant Officers were behind O'Neil, he was driving significantly over the speed limit, failing to obey traffic signs, and struck a parked car. The situation was fast-evolving that required split-second judgment from Officer Samayoa. Like in *Savage*, Officer Talusan directly witnessed a carjacking suspect reach for his waist, an area that weapons are frequently concealed, and Officer Samayoa had the opportunity to observe the same. Officer Samayoa is entitled to qualified immunity.

### 2.     Officer Talusan is Entitled to Qualified Immunity

Officer Talusan is entitled to qualified immunity because there is no existing precedent putting him on notice that an officer who is driving a police car must intervene when his partner fires his weapon. This is especially true given the undisputed facts show that Officer Talusan was unaware the Officer Samayoa had even unholstered his weapon in the short amount of time this incident unfolded.

## II.   PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM FAILS

Plaintiff's claim for interference with familial relationship is integrally predicated upon the Defendants' other allegedly unconstitutional conduct discussed above.  *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004).  But the standard that Plaintiff must meet to succeed on her Fourteenth Amendment due process claim is higher than the "objective reasonableness" standard required for her Fourth Amendment claim.  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  Instead, Plaintiff must show that Defendants' conduct shocks the conscience.  *Id*. at 1137 (9th Cir. 2008).  The Supreme Court has emphasized "that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  *County of Sacramento v. Lewis,* 523 U.S. 833, 848 (1998), *abrogation on other grounds recognized by Suit v. City of Folsom*, No. 2:16-00807 WBS AC, 2016 WL 4192437, at *3 (E.D. Cal. Aug. 8, 2016).

The key question is "whether the circumstances are such that actual deliberation is practical." *Porter v. Osborn,* 546 F.3d at 1137.  Where an officer lacks time to deliberate and instead must make instantaneous judgments, the plaintiff must show that the officer had "a purpose to cause harm unrelated to the legitimate object of arrest."  *Lewis*, 523 U.S. at 834.  "Legitimate law enforcement objectives include, among others, arrest, self-protection, and protection of the public."  *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018).  Effectuating arrest of a fleeing suspect is a legitimate law enforcement objective.  *Id*.

In *Lewis* the Supreme Court recognized that when responding to a high-speed chase officer "decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance."  *Lewis*, 523 U.S. at 853.  The Court noted that "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'"  *Id* (internal citations omitted).

### A.   Officer Samayoa's Conduct Does Not Shock The Conscience

Officer Samayoa's decision to fire his weapon was a decision that had to be made in a matter of seconds.  [Rossetter Decl., Ex. B, pg. 2, Opinion 7, pg. 5, Table 1.]  There can be no reasonable argument that the circumstances of the high-speed chase of a suspected felon, who abruptly and

aggressively charged at the police vehicle, deprived Officer Samayoa of the time to meaningfully

deliberate.  Accordingly, Plaintiff can only prevail if she can provide evidence that Officer Samayoa

acted with "a purpose to cause harm unrelated to the legitimate object of arrest." *Lewis* 523 U.S. at

834.  Plaintiff can provide the court with no such evidence beyond raw speculation.

Nor does the fact that Officer Samayoa chose to fire his weapon demonstrate a purpose to

cause harm unrelated to a legitimate purpose.  Case law specifically rejects arguments that infer a

purpose based on a use of force alone.  *See Wroth v. City of Rohnert Park*, No. 17-CV-05339-JST,

2019 WL 1766163, at *9 (N.D. Cal. Apr. 22, 2019) (quoting *Gonzalez v. City of Anaheim, 747 F.3d

789, 797 (9th Cir. 2014)*). (holding that "[E]ven where the officer uses force that is intended to inflict

bodily harm – such as shooting a suspect – the question is whether the officer actually had in mind

'legitimate law enforcement objectives' or instead, improper 'ulterior motives for using force.'").

Moreover, "speculation as to ... improper motive does not rise to the level of evidence sufficient to

survive summary judgment." *Id.* (quoting *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir.

2003)).  There is simply no evidence before this Court that Officer Samayoa had "ulterior motives for

using force." *Gonzalez*, 747 F.3d at 797-98.  All of the evidence indicates that Officer Samayoa was

pursuing a fleeing felon in a stolen vehicle, which is plainly a law enforcement objective.  *See Foster*,

908 F.3d at 1211.  Accordingly, Plaintiff's Fourteenth Amendment claims fail against Officer

Samayoa.

### B. Officer Talusan's Conduct Does Not Shock The Conscience

It is undisputed that Officer Talusan's sole role is that he was the driver of the pursuing police

vehicle.  Plainly, a police officer pursuing a fleeing felony is not the sort of conduct that would shock

the conscience.  It is unclear specifically what conduct Plaintiff alleges Officer Talusan engaged in

that would shock the conscience, but there is simply nothing in the universe of allegations or facts

related to Officer Talusan's conduct that would rise to the level of shocking the conscience.  Nor is

there any evidence that Officer Talusan acted with ulterior motives in pursuing a fleeing violent felon.

### C. The Defendant Officers are Entitled to Qualified Immunity

The Defendant Officers are entitled to qualified immunity for the same reasons argued above

regarding the Fourth Amendment.  This incident unfolded in a matter of seconds, leaving the

1  Defendant Officers no time to deliberate.  As such, their conduct did not shock the conscious.  Even
2  so, there is no existing precedent putting the Defendant Officers on notice that their conduct under
3  these facts shocks the conscious.  The Defendant Officers are entitled to qualified immunity.

4  **III.   PLAINTIFF'S *MONELL* CLAIM FAILS**

5  Under Section 1983 a municipality cannot be held responsible for the acts of its employees
6  under a *respondeat superior* theory of liability.  *Monell*, 436 U.S. at 691; *Board of County Comm'rs*
7  *v. Brown*, 520 U.S. 397, 403 (1997) (hereafter "*Brown*").  Instead, because liability under Section
8  1983 must rest on actions of the municipality – and not the actions of its employees – a plaintiff must
9  prove that the alleged constitutional deprivation was the product of an official policy or custom of the
10 municipality.  *Monell*, 436 U.S. at 690-691; *Brown*, 520 U.S. at 403.  Thus, to establish a Section
11 1983 claim against a municipality, a plaintiff must prove: (1) the existence of an officially adopted
12 policy, or alternatively a permanent custom, of the municipality; and (2) that the policy or custom
13 "caused" an employee to violate another person's constitutional right.  *Monell*, 436 U.S. at 691-92
14 (citing 42 U.S.C. § 1983); *Brown*, 520 U.S. at 403.  Plaintiff lacks evidence to establish a triable issue
15 of fact on all three theories and her allegations are conclusory.

16 **A.   There was No Constitutional Violation.**

17 A claim of direct liability against a municipality under 42 U.S.C. section 1983 cannot survive
18 in the absence of an underlying constitutional violation.  *Orin v. Barclay*, 272 F.3d 1207, 1217 (9th
19 Cir. 2001).  For the reasons already discussed, because there was no constitutional violation, the City
20 is entitled to summary judgment on the *Monell* claim.

21 **B.   Plaintiff Fails to Identify Any Official Written Policy.**

22 Plaintiff cannot prove the existence of any unconstitutional written policy of the City, nor
23 does she make any attempt to identify such a policy.  The San Francisco Police Department's written
24 policies prohibit false arrest, the use of excessive force, and other unconstitutional acts, and the
25 policies encourage officers to de-escalate situations where feasible.  [Declaration of Lt. Arran Pera
26 ("Pera Decl."), ¶¶ 4 and 7, and Exs. B (DGO 5.01), C (DGO 5.04), and D (DGO 5.21).]

27
28

**C.      Plaintiff Lacks Evidence of Any Permanent Custom or Practice**

       **1.      The SAC Does Not Allege Facts to Establish Monell Liability Based on Permanent Custom or Practice**

Plaintiff alleges the following 'permanent custom or practice' theories for her *Monell* claim: "high ranking City Officials… knew or reasonably should have known that SFPD police officer trainees and/or SFPD police academy graduates are inadequately trained" [Sims Decl., Ex. A, Second Amended Complaint, ¶¶ 34, 67]; "failure to adequately supervise" officers [*Id.* ¶¶ 36, 38]; and "tacitly authorized the failure to adequately supervise SFPD trainees and officers" of officers [*Id.* ¶ 37].  None of these theories are supported by evidence and all are conclusory.

Even if Plaintiff had evidence to show unlawful conduct, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* . . . ."  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985), *abrogation recognized by Collins v. City of San Diego*, 841 F.2d 337 (9th Cir. 1988).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon [longstanding] practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999); *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (requiring plaintiffs to "show[] a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity"); *Brown v. Contra Costa County*, No. C 12-1923 PJH, 2013 WL 5422947, at *8 (N.D. Cal. Sept. 27, 2013) (holding that a "custom" for the purposes of *Monell* liability "is so permanent and well-settled as to constitute a custom or usage with the force of law").  Therefore, the single instance of alleged misconduct here is insufficient to impose *Monell* liability because no facts show either (1) the existence of any prior constitutional deprivations, or (2) the similarity between other purported deprivations and the alleged misconduct here.  *Christie*, 176 F.3d at 1235; *Denman v. City of Tracy, No. 2:11-CV-00310-TLN, 2013 WL 2434707, at *3-4 (E.D. Cal. June 4, 2013)*.

      **2.      The Evidence Does Not Show Inadequate Training.**

Plaintiff's evidence fails to establish that the SFPD training regarding arrests, de-escalation techniques, or use of force are inadequate.  "A municipality's culpability for a deprivation of rights is

at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A plaintiff must present evidence that "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, [and] the policymakers choose to retain that program." *Id.*  Without evidence showing a pattern of violations, as a matter of law "there can be no notice to the [government] decisionmaker." *Brown*, 520 U.S. at 408.  Plaintiffs alleging *Monell* liability must show that a final policy maker was aware of, and acquiesced in, a training program that was likely to result in a pattern of constitutional violations.  *Canton v. Harris*, 489 U.S. 378, 390 (1989).  "[m]ere negligence in training . . ., however, does not give rise to a *Monell* claim."  *Dougherty v. City of Covina*, 654 F.3d 892, 900-901 (9th Cir. 2011); *Canton*, 489 U.S. at 390-91

Plaintiff puts forward zero evidence to support a claim of inadequate training.  In response to discovery requests, Plaintiff argued that the fact that this incident occurred demonstrates that the training was inaccurate, but fails to illustrate any way the training was inaccurate.  [Sims Decl., Ex. H, Plaintiff' Response to Talusan Interrogatory, Nos. 6, 7.]  These are precisely the sort of failure to train allegations that courts routinely hold insufficient.

### 3.   The Evidence Does Not Show Inadequate Supervision.

Plaintiff also alleges *Monell* liability on the ground that the SFPD fails to adequately supervise – i.e., hire, discipline, and/or retrain – cadets and officers who engage in misconduct.  [Sims Decl., Ex. A, Second Amended Complaint, ¶¶ 36-40.]  To state a *Monell* claim based on past incidents of misconduct that were not addressed, Plaintiff must prove that the environment in the SFPD was such that "it was almost impossible for a police officer to suffer discipline as a result of a complaint."  *See Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001).  It is not enough that the police department was ineffective or even incompetent in overseeing citizen complaints.  "If [the department] took steps to eliminate the practice, the fact that the steps were not effective would not establish that [the department] had acquiesced in it and by doing so adopted it as a policy of the city." *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993).  Deliberate indifference to complaints requires a much stronger showing, such as "[i]f [the police chief] had thrown the complaints into his wastepaper basket or had told the office of investigations to pay no attention to them."  *Id.*

Here, the City has a comprehensive process for addressing complaints against peace officers. [Pera Decl. ¶¶ 2-6.]  In addition to its robust Internal Affairs unit, the Department of Police Accountability, a citizen review Board, has authority to investigate and bring misconduct charges against officers.  [*Id.*, ¶¶ 2-3.] S.F. Charter § 4.127.  SFPD also has a fulsome process to address excessive force.  SFPD has a policy that prohibits the use of unreasonable force.  [*Id.*, ¶ 7.]  SFPD has a policy that complaints of misconduct be taken seriously and that such complaints be systematically reviewed.  [*Id.* ¶ 6.]  SFPD takes disciplinary recommendations from DPA.  [*Id.*, ¶ 3.]  SFPD also investigates complaints internally, and employs an early warning system.  [*Id.*, at ¶¶ 4-5.]  SFPD's internal affairs division conducts investigations into complaints of misconduct.  [*Id.*, at ¶ 5.]  Plaintiff's vague, unsupported assertions that the Defendant Officers engaged in misconduct in the past without consequence is insufficient to establish municipal liability.

### D.  Plaintiff Has No Evidence of the Causation Element for the *Monell* Claim.

The insufficiency of Plaintiff's *Monell* evidence is most obvious with respect to the requirement of facts showing that a policy or custom was the "moving force" or "cause" behind the alleged constitutional injury.  "Causation is, of course, a required element of a § 1983 claim."  *Knight v. Yarborough*, No. CV 03-01210-AG (VBK), 2011 WL 4550190, at *11 (C.D. Cal. Aug. 22, 2011). Without facts alleging a "direct causal link" between a policy or custom and the alleged constitutional violation, a plaintiff cannot prove a *Monell* claim.  *Brown*, 520 U.S. at 404; *Tuttle*, 471 U.S. at 813, 823-24 (holding that "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged").  For example, plaintiffs must prove "that the deficiency in training actually caused the police officers' [conduct]."  *Canton*, 489 U.S. at 391.

Here, Plaintiff cannot show that an official policy or permanent custom caused Officer Samayoa's or Talusan's actions.  Nor can Plaintiff prove that either allegedly inadequate training or supervision caused any constitutional violation.  Without evidence that City's policies or customs caused the officers' alleged violations, *Monell* liability cannot be imposed.  District courts routinely grant summary judgment against plaintiffs and dismiss their *Monell* claims for failing to demonstrate that the alleged deprivation was caused by a municipal policy or custom.  *See*, *e.g. Buckheit v. Dennis*,

No. C 09-5000 JCS, 2012 WL 1166077, at *23-24 (N.D. Cal. Apr. 6, 2012), aff'd, 573 F. App'x 662

(9th Cir. 2014), and *Silva v. City of San Leandro*, 744 F. Supp. 2d 1036, 1049 (N.D. Cal. 2010).

**IV.  PLAINTIFF'S STATE TORT CLAIMS FAIL**

Plaintiff's fourth and fifth causes of action, for "Battery and "Wrongful death – Negligence"

respectively, are brought against all Defendants and allege the Defendant Officers caused the death of

O'Neil.  Plaintiff alleges the City is vicariously liable for the actions of the Defendant Officers.

**A.  The Negligence Claim Fails Because The Shooting Was Privileged**

The test for tort liability under state law is the same as the test for unreasonable force under the

Fourth Amendment.  *Hayes v. County of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013).  The same

standard of reasonableness articulated in *Graham*, 490 U.S. at 397, applies.  *Hernandez v. City of

Pomona*, 46 Cal. 4th 501, 514 (2009).  When an officer has probable cause to arrest a suspect, he "may

use reasonable force to effect the arrest" and "need not retreat or desist from his efforts to make an

arrest by reason of the resistance or threatened resistance of the person being arrested."  *Id.* at 518-519;

*see also*, Cal. Penal Code § 835a.  "The same consideration of the totality of the circumstances is

required in determining reasonableness under California negligence law."  *Id.*; *Accord, Hayes*, 736

F.3d at 1232 ("Claims of excessive force under California law are analyzed under the same standard of

objective reasonableness used in Fourth Amendment claims."); *Brown v. Ransweiler*, 171 Cal. App.

4th 516, 527 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of

force.  In both, a plaintiff must prove that the peace officer's use of force was unreasonable.").

Summary judgment cannot be defeated based on hindsight that some other course of action

might have been "more reasonable" or led to a different outcome.  "[A]s long as an officer's conduct

falls within the range of conduct that is reasonable under the circumstances, there is no requirement

that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm

and at the same time the most likely to result in the successful apprehension of a violent suspect, in

order to avoid liability for negligence."  *Brown,* 171 Cal. App. 4th at 537–538.

As discussed with respect to Plaintiff's Fourth Amendment claim, an officer may reasonably

use deadly force when confronted with a suspected felon charging at them.  Thus, this Court should

grant summary judgment for the same reason that Plaintiff's Fourth Amendment claim fails.

1

2

**B.   The Officers Were Not Negligent In Their Pre-Shooting Conduct Because They Were Privileged To Persist In Making An Arrest And To Use Reasonable Force**

3

4

Plaintiff will similarly fail if she pursues a theory that officers were negligent in their approach

5

to O'Neil and thus caused him to react as he did.  The California Supreme Court in *Hernandez* rejected

6

such a claim.  Finding that officers had legal cause to arrest the suspect, the Court held that there is no

7

viable negligence theory based on officers' persistence in detaining or making an arrest.  *Hernandez*,

8

46 Cal. 4th at 518-21.  When an officer has probable cause to detain or arrest a suspect, he or she is

9

"not obliged simply to let [the suspect] go."  *Id*. at 518.  The officer "'is not bound to put off the arrest

10

until a more favorable time' and is 'under no obligation to retire in order to avoid a conflict.'"  *Id*.

11

(internal citations omitted).  "Instead, an officer may 'press forward and make the arrest, using all the

12

force [reasonably] necessary to accomplish that purpose."  *Id*. (internal citations omitted & italics

13

added).  "Thus, [section 835a] expressly authorized [the shooting officer] to pursue [the suspect] and

to use reasonable force to make an arrest."  *Id*. at 519. [2]

14

Here, the officers had a valid basis to detain O'Neil and had no duty to retreat or withdraw.

15

They already had probable cause to arrest O'Neil for the carjacking and the traffic violations

16

committed in their presence.  Cal. Penal Code § 245(a)(1).  Upon being confronted by officers, O'Neil

17

refused to pull over, committed numerous traffic violations while driving in a manner that was

18

dangerous to the officers and pedestrians, and then advanced on the officers after running out of the

19

van.  The officers thus had probable cause to arrest O'Neil for the additional crimes of delaying an

20

investigation or resisting arrest.  Cal. Penal Code § 148(a).  State tort claims cannot arise from the

21

officers' decision to press forward to confront O'Neil rather than retreat.  And as discussed, above, the

22

officers acted reasonably, foreclosing both a Fourth Amendment and the state tort claims.

23

Plaintiffs may cite *Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013), to argue that factual

24

issues concerning whether the officers' pre-shooting tactics were negligent preclude summary

25

26

27

28

[2] Under California law, a statutory privilege defeats all tort claims, including negligence claims.  *Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 421-422 (1991) ("A privileged act is by definition one for which the actor is absolved of any tort liability, whether premised on the theory of negligence or of intent."); *see also Horwich v. Superior Court*, 21 Cal. 4th 272, 285 (1999) (citing *Gilmore*) ("[W]hen the defendant has been justified in the use of deadly force against the decedent, the privileged nature of the conduct is a defense to all civil liability regardless of the plaintiff's status.").

judgment.  In *Hayes*, on certification by the Ninth Circuit, the California Supreme Court addressed "[w]hether under California negligence law, liability can arise from tactical conduct and decisions employed by law enforcement preceding the use of deadly force."  *Id.* at 626.  The Court held, "as a purely legal question," that "such liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable."  *Id.*  The Court stated that "the pre-shooting conduct is only relevant … to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent."  *Id.* at 631. *Hayes* did not address and does not affect the Defendant Officers' statutory privileges to use force against O'Neil in the situation they faced.  Those privileges are discussed below.

Even on the duty issue, the Court acknowledged that "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence."  *Hayes*, 57 Cal. 4th at 632 (quoting *Brown*, 171 Cal.App.4th at 537-38). Under this standard, summary judgment would be warranted even if Penal Code Section 835a didn't expressly authorize the officers to arrest O'Neil.

### C.   The Officers Enjoy Statutory Immunity Under California Penal Code § 196 And Government Code §§ 821.6 and 820.6

Even if Plaintiff could state a claim for battery or negligence, Defendants are immune from suit pursuant to three separate, independent immunities.

First, the officers are immune under California Penal Code § 196.[3]  The test for determining whether a homicide was justifiable under … section 196, as articulated in Penal Code Section 835a, is whether the officers reasonably believe deadly force is required "[t]o defend against an imminent threat of death or serious bodily injury to the officer or another person."  Thus, the test for that privilege is the same as that governing the reasonableness of deadly force under the Fourth

---

[3] "There can be no civil liability under California law as the result of a justifiable homicide." *Brown*, 171 Cal. App. 4th at 533 (quoting *Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996)); *Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1159 (E.D. Cal. 2005).

1   Amendment.  As explained above, the circumstances reasonably created in the minds of each of the

2   Defendants a fear of death or serious bodily harm to themselves, triggering the immunity of § 196.

3   Summary judgment should be granted for this reason alone.

4        Second, the officers are immune under California Government Code § 821.6.[4]  This immunity

5   applies to the tactical conduct and decisions during the investigation and other activities in response to

6   a call for help, regardless of whether the officers have developed probable cause to make an arrest.  If

7   Plaintiff advances a theory that the officers' efforts at investigation and information-gathering, namely

8   attempts to arrest O'Neil, were unreasonable and deficient, Section 821.6 immunizes that conduct

9   under state law.  Section 821.6 immunity extends beyond prosecuting attorneys to include all

10  employees of a public entity, including police officers.  *Asgari v. City of Los Angeles*, 15 Cal. 4th 744,

11  756-57 (1997); *Amylou R. v. County of Riverside*, 28 Cal. App. 4th 1205, 1208-09 (1994).  Pursuant to

12  this immunity, summary judgment is warranted on Plaintiff's claims.

13       Third, the officers are immune under California Government Code § 820.6.[5]  This immunity

14  applies, because the officers at the very least acted without malice and under the good faith belief that

15  Penal Code section 196 and 835a authorized their actions.  The "good faith immunity" of § 820.6 is a

16  state law statutory analogous to the federal doctrine of qualified immunity.  *County of Los Angeles v.*

17  *Superior Court*, 181 Cal. App. 4th 218, 231 (2009), *as modified* (Jan. 22, 2010) (referring to

18  "Government Code § 820.6 qualified immunity"); *City of South Lake Tahoe v. California Tahoe*

19  *Regional Planning Agency*, 625 F.2d 231, 239 (9th Cir. 1980) (noting similarities with federal

20  qualified immunity).  Because the officers are immune under 820.6, the state tort claims are barred.

21  **D.    The City is Immune from the State Law Torts**

22       The City is immune from liability as to each of the state tort claims contained in Plaintiff's

23  Second Amended Complaint.  Unless a tort cause of action against a government entity, such as the

24

25       [4] Cal. Gov. Code § 821.6 provides: A public employee is not liable for an injury caused by his
    instituting or prosecuting any judicial or administrative proceeding within the scope of his
26  employment, even if he acts maliciously and without probable cause.

27       [5] Cal. Gov. Code § 820.6 provides: If a public employee acts in good faith, without malice, and
    under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not
28  liable for an injury caused thereby except to the extent that he would have been liable had the
    enactment been constitutional, valid, and applicable."

City, is "based on a specific statute declaring them to be liable, or at least creating some specific duty of care," the cause of action fails as a matter of law. *Eastburn v. Regional Fire Protection Authority*, 31 Cal. 4th 1175, 1183 (2002). This immunity precludes holding public entities liable for non-statutory, common law torts. *Miklosy v. Regents of the University of California*, 44 Cal. 4th 876, 899 (2008). To properly state a cause of action against a governmental entity, a plaintiff must specifically allege the applicable statute or regulation and plead with particularity "every fact material to the existence of [the entity's] statutory liability." *Sipple v. City of Hayward*, 225 Cal. App. 4th 349, 362 (2014). Plaintiff's complaint does not allege a specific statutory basis for liability. As such, the Court should grant summary judgment for the City on Plaintiff's state law claims.

## V.    PLAINTIFF'S BANE ACT CLAIM FAILS

Plaintiff's cause of action under California Government Code Section 52.1 is barred because Plaintiff cannot prove the elements of this claim. Plaintiff sues the Defendant Officers under the Bane Act (California Civil Code § 52.1), which prohibits interfering with "the exercise or enjoyment . . . of rights secured by the Constitution or laws of the United States or the rights secured by Constitution or laws of this state" through "threats, intimidation, or coercion." Cal. Civil Code § 52.1(a).

Although the legislature adopted this section to "stem the tide of hate crimes," plaintiffs primarily use it to sue law enforcement. *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004). Following the California Court of Appeal decision in *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017), the Ninth Circuit has held that a plaintiff alleging a Bane Act claim must show first a constitutional violation, and second that the defendant acted with specific intent to violate that right. *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018); *see also Losee v. City of Chico*, 738 F. App'x 398, 401 (9th Cir. 2018) (granting summary judgment on Bane Act claim when there is a question of fact about objective reasonableness of force because no evidence that officer who shot motorist had subjective intent to deprive plaintiff of his constitutional rights). Here, the Defendant Officers had objective reason to fear for their safety and that of the other people in the area, and reasonably used lethal force. In addition, Officer Talusan had no opportunity to intervene in the shooting assuming it was unconstitutional. Thus, the Defendant Officers did not

violate O'Neil's Fourth Amendment rights and the Court should grant summary judgment on Plaintiff's Bane Act claim.

Even if the Court finds a question of fact on the objective reasonableness of the force, Plaintiff must show the Defendant Officers acted with specific intent to violate O'Neil's constitutional rights to establish a Bane Act violation. For example, in *Losee*, five officers shot at a driver of a car. Despite finding a question of fact on qualified immunity, the Court affirmed summary judgment on plaintiff's Bane Act claim because "evidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee*, 738 F. App'x at 401, (citing *Cornell*, 17 Cal. App. 5th at 1045). In *Losee*, the plaintiff provided no evidence that the officers "'intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances.'" *Id.* (*quoting United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993))*; see also Gonzalez,* 747 F.3d at 798 (noting that "speculation as to ... improper motive does not rise to the level of evidence sufficient to survive summary judgment") (quoting *Karam,* 352 F.3d at 1194).

Therefore, under both *Reese* and *Losee*, Plaintiff here must present admissible evidence that each officer not only used unreasonable force, but also that he intended to use it for the illegitimate purpose of violating O'Neil's constitutional rights. The only evidence here is that each officer used force because he subjectively believed that O'Neil posed an imminent threat. As discussed above, there is no evidence lethal force was used for an illegitimate purpose. The Court should therefore grant summary judgment on Plaintiff's Bane Act claim.

Moreover, three California Court of Appeal cases decided before *Cornell* addressing the elements of Section 52.1 all held that a plaintiff must prove threats, intimidation, and coercion separate and apart from the force that plaintiff claims violated his rights. *See Allen v. City of Sacramento*, 234 Cal. App. 4th 41 (2015), *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947 (2012); *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968 (2013) (all holding that a plaintiff must prove unlawful threats, intimidation, or coercion independent from the underlying constitutional violation.) Based on that standard the Defendant Officers are entitled to summary judgment in their favor because none

1  engaged in threats, intimidation or coercion separate from their use of force to take O'Neil into

2  custody.  Under either standard, the Court should grant summary judgment on Plaintiff's 52.1 claim.

3  **CONCLUSION**

4  For the foregoing reasons, the Court should grant the Defendants' motion for summary

5  judgment in its entirety and as to each cause of action in the Second Amended Complaint.

6

7  Dated:  May 14, 2021

8  DENNIS J. HERRERA
   City Attorney
9  MEREDITH B. OSBORN
   Chief Trial Deputy
10 HUNTER W. SIMS III
   RYAN STEVENS
11 Deputy City Attorneys

12

13 By:/s/ *Hunter W. Sims III*
   HUNTER W. SIMS III

14

15 Attorneys for Defendants
   CITY AND COUNTY OF SAN FRANCISCO,
16 CHRISTOPHER SAMAYOA and EDRIC TALUSAN

17

18

19

20

21

22

23

24

25

26

27

28