# EXHIBIT C

**DECLARATION OF HUNTER W. SIMS III**

**IN SUPPORT OF DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT**

**DEPOSITION OF OFFICER GARY MORIYAMA - VIDEOCONFERENCE**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

JUDY O'NEIL, individually )
and as successor-in-interest)
to Decedent KEITA O'NEIL,   )
                            )
            Plaintiff,      )
                            )
     vs.                    )CASE NO.: 3:17-cv-07190-JCS
                            )
CITY AND COUNTY OF SAN      )
FRANCISCO, a municipal      )
corporation, et al.         )
                            )
            Defendants.     )
_____)    CERTIFIED COPY


VIDEOCONFERENCE

DEPOSITION OF OFFICER GARY MORIYAMA

THURSDAY, SEPTEMBER 17, 2020

1:06 P.M. - 1:55 P.M.

San Francisco, California




REPORTED BY:  GINA GLANTZ, CSR No. 9795, RPR, RMR

1

```
 1                   APPEARANCES OF COUNSEL
 2

 3    For the Plaintiff:

 4        BY: PATRICK BUELNA, ATTORNEY AT LAW
          POINTER & BUELNA, LLP
 5        LAWYERS FOR THE PEOPLE
          1901 Harrison Street, Suite 1140
 6        Oakland, California 94612
          (510)929-5400
 7        (videoconference appearance)
          pbuelna@lawyersftp.com
 8

 9
      For the Defendants:
10
          BY: Hunter W. Sims, III, Deputy City Attorney
11        OFFICE OF THE CITY ATTORNEY
          1390 Market Street, Sixth Floor
12        San Francisco, California 94102
          (415)554-4259
13        (videoconference appearance)
          hunter.sims@sfcityatty.org
14

15

16                          --o0o--

17

18

19

20

21

22

23

24

25
                                                          3
```

1     Zoom videoconference deposition taken pursuant
2     to Notice and on Thursday, September 17, 2020,
3     commencing at the hour of 1:06 p.m., thereof, before
4     me, GINA GLANTZ, CSR No. 9795, a Certified
5     Shorthand Reporter and Deposition Officer of the State
6     of California, there personally appeared:
7                         GARY MORIYAMA,
8     called as a witness by the Plaintiff, who having been
9     duly sworn by me, to tell the truth, the whole truth and
10    nothing but the truth, testified as hereinafter set
11    forth:
12
13                          --o0o--
14
15
16
17
18
19
20
21
22
23
24
25

5

```
 1     Q.   All right.  I'm going to spare you my typical
 2   background in creating a spiel in questions and just kind
 3   of get right down to the incident.  I just want to know a
 4   couple of things about your background.  How long have you
 5   been working for the San Francisco Police Department?
 6     A.   21 years.
 7     Q.   Have you worked in any other department?
 8     A.   No.
 9     Q.   And what is your current rank?
10     A.   Police officer.
11     Q.   And did you review any documents in preparation
12   for today's testimony?
13     A.   Yes, I did.
14     Q.   And what documents did you review?
15     A.   SF police report and two county reports.
16     Q.   Did you review anything else?
17     A.   No.
18     Q.   And when you say "reports," you reviewed your
19   statement; correct?
20     A.   That's correct.
21     Q.   Did you review any other statement?
22     A.   No.
23     Q.   Do you recall -- I mean, I'm getting to the
24   incident, and you understand what I mean when I say
25   "incident"?
```

10

1    A.   Yes.
2    Q.   Just to make the record clear, when I say
3 "incident," I mean December 1st, 2017, call that basically
4 brought you to follow a couple of vehicles in response to
5 a possible carjacking.  Does that make sense?
6    A.   Yes.
7    Q.   Okay.  So can you just take me to that day, and
8 what was the call that you received, the call for service?
9    A.   Well, that specific date and time in question, I
10 was assigned to the Special Investigations Division on an
11 unrelated surveillance operation, and I was basically
12 driving on the freeway when I observed a tan GMC Suburban
13 and a white van with a state logo on its side, and they
14 were driving in the emergency lane with a, you know, high
15 rate of speed.  That's what first brought my attention to
16 this incident.
17    Q.   And you hadn't received or heard any call for
18 service prior to that or --
19    A.   Not prior to me observing the cars traveling on
20 the emergency lane, no.
21    Q.   So once you saw the cars traveling on the
22 emergency lane, what did you do next?
23    A.   I continued to observe the vehicles.  I was in the
24 number 2 lane going southbound 280, and my location was
25 just south of the 25th Street off-ramp.  So I had already

11

1  passed the off-ramp, and I look in my rearview mirror,
2  side mirror, and I see two vehicles in the emergency lane
3  driving at a high rate of speed, I believe I approximated
4  his speed to be about 80, and when they passed me, they
5  were kicking up dust and debris from the roadway.  And so
6  it was hard to miss.  So I continued to observe those cars
7  in the same fashion on the right side of the roadway, and
8  as I was watching them drive erratically, that's when I
9  turned on the emergency district channel, and I heard of
10 the carjacking that had just occurred in the Mission
11 District.
12     Q.   And when you say they were driving on the side of
13 the roadway, was it dirt road or was it that emergency --
14 paved emergency lane, where sometimes debris ends up on
15 the side of it?
16     A.   Yeah, you're correct.  It's the right side of the
17 roadway designated for emergency vehicles.  They were
18 driving on that.
19     Q.   So would it be fair to say for the time you
20 observed them, they remained driving in that far right
21 lane -- or far right emergency lane?
22     A.   Yes.
23          MR. SIMS:  Vague as to time.
24 BY MR. BUELNA:
25     Q.   And I mean to say that the time we discussed so

12

```
 1   far?
 2      A.   Yes.
 3      Q.   And then you turned on your emergency dispatch
 4   radio where you can hear the emergency channel; is that
 5   fair to say?
 6      A.   Right.  So I would have been on channel 11, which
 7   would broadcast all emergency broadcasts on any district
 8   channel.
 9      Q.   And at that time, you heard some dispatch come
10   through about a carjacking; correct?
11      A.   That's correct.
12      Q.   Now, I see -- did you bring the CAD with you
13   today?
14      A.   Yes, I did.
15      Q.   And maybe what I'll do is I'm just going to show
16   you on my screen, and maybe they're the same and maybe
17   they're different, but you can tell me.  I'm going to show
18   you my screen real quick.  Are you able to see the screen
19   all right?
20      A.   I see you.
21      Q.   Just tell me if it's big enough, is what I'm
22   saying.  Hold on.
23           Do you see the CAD?
24      A.   Yes.
25      Q.   Now, do you see my cursor?
```

13

1    A.   That's dispatch.

2    Q.   And that's informing you kind of about the
3  carjacker, that there's no weapons seen, and it's a black
4  male under 30 years old, skinny, wearing a black hood;
5  correct?

6    A.   Yeah, it's a depiction from maybe the 911 caller
7  giving that information to dispatch, and dispatch is
8  relaying that information to patrol.

9    Q.   Okay.  So likely all responding officers who are
10 on the channel that you're on are hearing this; right?

11   A.   If they're on the same channel, yes.

12   Q.   And then you said the first thing that stuck out
13 in your memory was about the white Dodge Caravan with the
14 state logo on both sides; right?

15   A.   Yes.

16   Q.   And that's when you connected that van that was
17 driving on the emergency lane to this -- to this call for
18 service; correct?

19   A.   Yeah.  So a couple other things went through my
20 mind prior to me hearing that there was a carjacking that
21 just occurred, and it involved a white van.  So when I
22 mentioned that they passed me at a high rate of speed on
23 the right shoulder, I noticed that the passenger side door
24 of the van was open.  And a lot of things were going
25 through my mind at the moment.  Not only that this erratic

17

1  driving being a danger to all the surrounding vehicle
2  traffic, but I thought maybe at a quick second that these
3  two vehicles were chasing each other.  I thought the van
4  was chasing the Suburban, and what came to mind is it was
5  either a shooting had just occurred or -- I've seen chases
6  where the cars chase each other after a shooting, or
7  trying to commit a shooting.  So that went through my head
8  before the radio broadcast came out, that it was an actual
9  carjacking.
10      Q.  And once the radio broadcast came out, you
11 understood that it appeared that the carjacking related to
12 lottery tickets; right?
13      A.  Yes.
14      Q.  All right.  Okay.  And then what happened next,
15 once you heard -- once you connected the carjacking with
16 the lottery tickets and the white van together, what did
17 you do next?
18      A.  Well, I stayed in my lane.  So I was in the number
19 2 lane southbound, and from that vantage point, I could
20 still see them drive at a high rate of speed on the far
21 right shoulder.  It was easy to see where they were on the
22 freeway, because as they traveled southbound 280, they
23 were kicking up more dust and debris, so it was easy to
24 get an approximate location of where they were driving.
25          So I watched that for a few seconds before they

18

1  came up to the -- when I say "they," the driver of the
2  Suburban, driver of the white van, they came up to the
3  280/101 split, and from just traveling in the number 2
4  lane, I can see that they made an abrupt lane change from
5  the far right emergency lane.  They swept all the lanes to
6  go to the 101 south ramp to take you to 101 south.
7      Q.  And so where the 280 and 101 split, they
8  essentially went all the way -- they went across, what is
9  that, three lanes of traffic to get over to the 101?
10     A.  Two for sure.  And then where it splits, it's --
11 there's two that go south, and it eventually goes two to
12 go -- or two in each direction south, but they would have
13 split -- they would have crossed two lanes to get to the
14 101 south.
15     Q.  Fair enough.
16         And then what did you do?
17     A.  So eventually I was able to just stay within my
18 lane, and when I went to the 101 south split, it turns --
19 there's a little bit of a left turn.  And it's a high turn
20 before it drops down to a straightaway to go 101 south.
21 So as you're traveling 101 south, the next exit would be
22 Paul.  And before you get to Paul, that area of 101 south
23 straightens up.  From where I turned on to 101 south, and
24 I came from the merging ramp down to the freeway, I
25 regained visual of the two cars, and I could see that they

19

1   were weaving in and out of lanes sporadically on 101 south
2   as they're passing Paul, still continuing south.
3        Q.   All right.  And then eventually -- let me go back
4   here real quick, having said that, we kind of left off
5   where you passed the Paul exit; right?
6        A.   You want to go to that place?
7        Q.   Yes.  So as I passed -- so actually, no, let me
8   return real quick to the CAD.  I'm trying to kind of do
9   this -- I'm trying to connect what you're doing and what's
10  coming out on the CAD.  Does that make sense?
11       A.   Okay.
12       Q.   All right.  So you see here on the CAD, and this
13  is on Bates stamp 247, which looks like it's about -- your
14  first one is Bates-stamped -- or is time-stamped 10:35:11,
15  this one appears to come out from you about 3 minutes
16  later at 10:38:28, and I'm highlighting it.  And then
17  here's you; correct?
18       A.   Yeah, I see it.
19       Q.   Is that you?  Okay.
20            And it says "POSS DODGE CARAVAN PASSENGER SIDE
21  REAR DOOR WAS STUCK OPEN," "DODGE CARAVAN WAS VIC."  Could
22  you explain to me what this comment is here, the 10:38:28
23  and 10:38:29, what they mean?
24       A.   Sure.  That's just me informing dispatch what I
25  had observed, the Dodge Caravan passenger-side rear door

20

1  was stuck open, and, you know, that's it.  10:38:28,
2  dispatch is acknowledging what I said, you know, just a
3  split second later, so it's just being documented in CAD,
4  it's just an observation that's being recorded, that I
5  said over the air.
6      Q.  And if you can recall, do you recall if you made
7  these comments while you were still on the freeway?
8      A.  Yes, I believe I did while I was still on the
9  freeway.
10     Q.  Because I'm just kind of helping you -- or push
11 this along.  Down here at, it looks like about a minute
12 and a half later -- or no, that's 2 minutes -- I'm not
13 great at math -- at time stamp 10:40:40, you have a
14 comment here, and I just highlighted the time stamp,
15 "TAKING CANDLESTICK TOWARDS DOUBLE ROAD."  Does that
16 mean -- what does that mean?
17     A.  That's me informing dispatch that, at that point,
18 I was taking Candlestick exit towards Double Rock, even
19 though it says Double Road.  That's just one way to get to
20 Double Rock.
21     Q.  And then what does this mean here right below,
22 "Plate: SPEEDS Comment: TAKING SAFE"?
23     A.  I'm not sure.  I didn't give out that information.
24     Q.  Fair enough.  So about 18 seconds after you took
25 the exit at Candlestick a comment came out from dispatch,

21

1  "SUSPECT CAME FROM BEHIND.....TOOK KEY FROM RP'S
2  POCKET.....GRABBED RP'S HAND AND TOOK THE KEY."  Do you
3  recall hearing that?
4      A.   No, I don't recall that.
5      Q.   But you likely would have heard that if it came
6  over the dispatch; correct?
7      A.   Well, yes.  It most likely came over the air, but
8  at this time, the setting is now I'm looking for two cars
9  that were driving at a high rate of speed that were
10 possibly involved in a hijacking, so I'm probably -- well,
11 I know I'm looking around that area that I got off on,
12 Candlestick, Executive Parkway, all the roads that lead
13 back to Double Rock.  At this time, I'm searching for two
14 vehicles.
15     Q.   And was it explained right here, at 10 -- and just
16 for the record, I highlighted the -- both areas of where I
17 was talking about before, but I'm going to highlight
18 another time stamp here at 10:41:13, where this appears to
19 be another comment from you right here, "Gilman/HAWES
20 PASSING GILMAN"?
21     A.   Yes.
22     Q.   And so you're just updating -- what are you doing
23 here?
24     A.   I'm giving a location of where I'm at at that
25 point, and this is the area where, when I got off the 101

22

1  freeway, took Candlestick, searched the surrounding areas,
2  and that's from the freeway all the way down to Double
3  Rock.  I recall driving around Candlestick adjacent to the
4  shoreline, and just across from where the 49ers' parking
5  lot would be, or would have been, searching for this
6  vehicle.  So at some point, I made it all the way down to
7  the Gilman playground, and my first pass, I didn't see the
8  Caravan, or the van, but when I turned around to go back
9  towards the freeway, I picked up the vehicles again,
10 heading towards Double Rock.
11     Q.   That appears to be reflected here about 20 seconds
12 after the last time stamp here at 10:41:32.  This is you
13 again, correct, "PASSING GILMAN PLAYGROUND...GOLD
14 GMA...STATE DODGE CARAVAN."  That's you, time-stamped
15 10:41:32?
16     A.   Yes.
17     Q.   That appears to be you shortly after seeing the
18 vehicle again; correct?
19     A.   Yes.
20     Q.   And then right about 15 seconds later, and I'm
21 highlighting it again, 10:41:47, it says -- this is you,
22 correct -- "TAKING OFF ON MARKED UNIT"?
23     A.   Yes.
24     Q.   What does that mean?
25     A.   So at some point when I observed the cars heading

23

1  towards Double Rock, I turned around, and I started to
2  follow them.  And this time around, instead of the white
3  van following the GMC, the GMC was following the white van
4  as they were heading towards Double Rock and Gilman
5  playground.  So I broadcast this, that I observed -- I
6  regained visual of the vehicles, I broadcast that.  And
7  then a Bayview marked unit, marked patrol car, I could see
8  coming down Gilman, and I pointed the vehicles out.
9      Q.  And this time you noted, correct, that they were
10 actually driving the speed limit?
11     A.  Yes, they were driving a lot slower on surface
12 streets, yes.
13     Q.  And in your report, you actually noted they were
14 driving the speed limit; correct?
15     A.  Yes, I believe I mentioned that somewhere.
16     Q.  And then you continued to follow the vehicles;
17 correct?
18     A.  Yeah, it was a short distance from the Gilman
19 playground to Gilman, and I believe it was Ingalls.  I
20 believe that was the location where the marked unit came
21 on scene, and I believe they turned their vehicle around,
22 and we were trying to effect an enforcement stop of both
23 vehicles.  So when the marked unit, from what I recall,
24 activated their overhead lights and siren, the Suburban
25 yielded and the white van immediately sped off, took a

24

1  right turn, and just got out of the area.
2       Q.   And you were in an unmarked vehicle; correct?
3       A.   Yes.
4       Q.   What kind of vehicle were you in?
5       A.   My recollection is a minivan.
6       Q.   So you were in a minivan, you see the -- and you
7  can correct me where I go wrong.  You're following the
8  vehicle, a marked unit tried to follow them, and the
9  minivan and the GMC take off; is that fair to say?
10      A.   Right.  So at this point, it wasn't -- it was a
11 short follow from the Gilman playground to Gilman/Ingalls,
12 that area, we had just passed the Double Rock gate on the
13 right side, and when I observed the marked Bayview unit
14 arrive, coming from the other direction, I recall saying
15 something on the air "That's them in front of me."  And so
16 that's when they initiated a turn, a U-turn, to get into
17 an enforcement stop position on the vehicles.
18      Q.   And then what happened next?
19      A.   So the first marked unit on scene was able to turn
20 around and get behind the Suburban, and the white van
21 immediately took a right turn, I believe it was Ingalls,
22 and just left the scene in a hurry, screeched around the
23 corner, took off, but the Suburban yielded, and we were
24 able to do an enforcement stop on that vehicle.
25      Q.   So it is you and Officer Cloud and Officer

25

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

1          I, the undersigned, a Certified Shorthand Reporter
2     of the State of California, do hereby certify:
3          That the foregoing proceedings were taken before
4     me at the time and place herein set forth; that any
5     witnesses in the foregoing proceedings, prior to
6     testifying, were administered an oath; that a record of
7     the proceedings was made by me using machine shorthand
8     which was thereafter transcribed under my direction;
9     that the foregoing transcript is a true record of the
10    testimony given.
11         Further, that if the foregoing pertains to the
12    original transcript of a deposition in a Federal Case,
13    before completion of the proceedings, review of the
14    transcript [  ] was [ X ] was not requested.
15         I further certify I am neither financially
16    interested in the action nor a relative or employee
17    of any attorney or any party to this action.
18         IN WITNESS WHEREOF, I have this date subscribed my
19    name.
20
21    Dated: October 5, 2020
22
23              _/s/Gina Glantz_____
              GINA GLANTZ
24
              CSR No. 9795, RPR, RMR
25

32