# EXHIBIT D

**DECLARATION OF HUNTER W. SIMS III**

**IN SUPPORT OF DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT**

**DEPOSITION OF OFFICER EDRIC TALUSAN (nonconfidential portion) - VIDEOCONFERENCE**

```
              IN THE UNITED STATES DISTRICT COURT

        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

                        --o0o--

JUDY O'NEIL, individually   )
and as successor-in-interest)
to Decedent KEITA O'NEIL,   )
                            )
              Plaintiff,    )
                            )
         vs.                )CASE NO.: 3:17-cv-07190-JCS
                            )
CITY AND COUNTY OF SAN      )
FRANCISCO, a municipal      )
corporation, et al.         )
                            )
              Defendants.   )
_____)   CERTIFIED COPY




              VIDEOTAPED VIDEOCONFERENCE

          DEPOSITION OF OFFICER EDRIC TALUSAN

                THURSDAY, JANUARY 7, 2021

                 10:06 a.m. - 1:13 p.m.

       (Page 15, Line 6 through Page 24, Line 17;
       Page 100, Line 17 through Page 103, Line 3
            are SEALED and BOUND SEPARATELY)
```

```
   REPORTED BY:  CHRISTY CURRY, CSR No. 13982
```

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
**1659 Scott Blvd., Suite 15, Santa Clara, CA 95050  -  (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)**

**DEPOSITION OF OFFICER EDRIC TALUSAN (nonconfidential portion) - VIDEOCONFERENCE**

```
 1                    APPEARANCES OF COUNSEL

 2

 3   For the Plaintiff:

 4        BY:  Patrick Buelna, Attorney At Law
          POINTER & BUELNA, LLP
 5        Lawyers for the People
          Wells Fargo Center
 6        1901 Harrison Street, Suite 1140
          Oakland, California 94612
 7        (510)929-5400
          (Videoconference appearance.)
 8

 9

     For the Defendants:
10
          BY:  Hunter Sims, Deputy City Attorney
11        OFFICE OF THE CITY ATTORNEY
          1390 Market Street, Sixth Floor
12        San Francisco, California 94102
          (415)554-4259
13        (Videoconference appearance.)

14

15   Also Present:  Sean McAleer, Videographer
                     April Green, Plaintiff
16

17

18                       --o0o--

19

20

21

22

23

24

25
                                                        3
```

1    BE IT REMEMBERED that pursuant to Notice of Taking

2  Deposition, and on Thursday, January 7, 2021, commencing

3  at the hour of 10:06 a.m., Via Zoom Meetings, before me,

4  CHRISTY CURRY, CSR No. 13982, a Certified Shorthand

5  Reporter in and for the State of California, personally

6  appeared

7                      EDRIC TALUSAN,

8  produced as a witness in the above-entitled action,

9  who being by me first duly sworn, was thereupon examined

10  as a witness in said action.

11                      --o0o--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1    time you saw the body camera footage or surveillance

2    footage?

3    A.      Over a year ago.

4    Q.      Okay.  Have you looked at any -- and this might

5    be -- have you looked at any kind of frame-by-frame

6    photographs of the body camera footage?  Do you

7    understand that question?

8    A.      I do.

9    Q.      Okay.  Have you looked at any of those frames

10   from the body camera footage?

11   A.      Not since the incident.

12   Q.      Okay.  All right.  Okay.  What is your current

13   position with the San Francisco Police Department?

14   A.      I am employed as a police officer with the

15   San Francisco Police Department.

16   Q.      And what is your rank?

17   A.      Police officer.

18   Q.      Okay.  And what was your rank at the time of the

19   incident?

20   A.      Police officer.

21   Q.      Now, other than being a police officer, or a

22   normal police officer, did you have any other

23   responsibilities at the time of the incident?

24   A.      My responsibility that day was as a field

25   training officer.

                                                          14

```
1    into this other shooting, I'd ask that it be marked as
2    confidential at this time.
3              MR. BUELNA:  Right now I'm just asking if he was
4    involved in one and when it was.
5              MR. SIMS:  All right.  We will see what he says.
6              THE WITNESS:  I believe it was 2012, but I can't
7    be exact- -- exactly sure.
8    BY MR. BUELNA:
9    Q.     Do you recall the name of the -- well, did
10   you -- did you -- 2012.  Do you recall the name of the
11   individual you shot at?
12   A.     Unfortunately I don't.
13   Q.     Okay.  We can -- have you -- other than this
14   incident have you ever had a recruit that you were field
15   training shoot during an incident?
16   A.     No.
17   Q.     At the time of the incident you were in full
18   uniform, right?
19   A.     Yes.
20             MR. SIMS:  Hold on.  We are talking about the
21   subject incident now, right, not the other shooting?
22             MR. BUELNA:  Yeah.  Talking about the subject
23   incident.
24             THE WITNESS:  Yes.
25   ///
```

49

1    A.      So if we check out a rifle, then we would just

2    have the rifle.  If we just have the shotgun, we would

3    have the shotgun due to the fact you -- the car is only

4    able to hold either a rifle or a shotgun and the ERIW.

5    Q.      And where are those kept, the ER- -- not the

6    ERIW.  Just the shotgun or the rifle that you select?

7    A.      In the passenger compartment of the vehicle.

8    Q.      Okay.  And where in the passenger compartment of

9    the vehicle?

10   A.      In the rifle rack, I believe.  The rack.

11   Q.      Is that -- is that something that kind of sits

12   between yourself and the passenger seat or the driver

13   and the passenger seat?

14   A.      Correct.

15   Q.      All right.  What about the ERIW?

16   A.      In the rifle rack as well, in the passenger

17   compartment.

18   Q.      And on the day of the incident do you recall

19   whether or not you had checked out a rifle or a shotgun?

20   A.      I don't remember.

21   Q.      Okay.  But it would have been one or the other,

22   correct?

23   A.      Correct.

24   Q.      As well as the ERIW, correct?

25   A.      Correct.

51

**DEPOSITION OF OFFICER EDRIC TALUSAN (nonconfidential portion) - VIDEOCONFERENCE**

1          MR. BUELNA:  All right.  We are at about an

2    hour.  This is -- I typically take a break every hour.

3    So what I'm going do is, we will break for five minutes,

4    and then come back.  So right now it's 11:06.  So

5    probably just make it 11:15.  Okay?

6          MR. SIMS:  Sounds good.  Okay.

7          MR. BUELNA:  We are going off the record, and we

8    will be back on at 11:15.

9          THE VIDEOGRAPHER:  We are going off the record

10   at 11:06 a.m.

11          (Recess taken.)

12          THE VIDEOGRAPHER:  We are back on the record at

13   11:18 a.m.

14   BY MR. BUELNA:

15   Q.      All right.  Back on the record.  Mr. Talusan,

16   going back to your training as a -- as a field training

17   officer, you understand that you're expected to be a

18   role model for your trainee, correct?

19   A.      Yes.

20   Q.      You're also expected to be able to recognize

21   situations that have heightened liability and danger,

22   correct?

23   A.      Yes.

24   Q.      You're also trained that you're responsible for

25   the performance of your trainee, correct?

                                                        52

1    A.       You're breaking up.  I'm sorry.

2    Q.       Sure.  You're also expected to be responsible

3    for the performance of your trainee and his conduct?

4    A.       Yes.

5    Q.       And it's my understanding that you would --

6    that -- strike that.

7             Do you recall how many days prior to the

8    incident Mr. Samayoa had been assigned to you?

9    A.       This would have been our fourth day.

10   Q.       Did you know Mr. Samayoa outside of the police

11   department?

12   A.       No.

13   Q.       Okay.  When -- other than obviously you met him

14   the first day, right?

15   A.       Correct.

16   Q.       Did you receive any other information about him

17   other than, you know, obviously meeting him in person?

18   A.       No.

19   Q.       Okay.  Did you know anything -- or by the fourth

20   day did you have any understanding about his background

21   in law enforcement?

22   A.       No.

23   Q.       Okay.  You knew where he grew up or why he

24   wanted to become a police officer?

25            MR. BUELNA:  It's compound.

53

```
 1              THE WITNESS:  Prior --
 2              MR. SIMS:  Go ahead.
 3              THE WITNESS:  Sorry.  Prior to meeting him?
 4    BY MR. BUELNA:
 5    Q.     No.  After meeting him.
 6    A.     Yes.  I -- we had a discussion about where he
 7    grew up.
 8    Q.     In regards to his training as a police officer,
 9    you knew that he had just left the academy, right?
10    A.     Yes.
11    Q.     Can you -- do you recall where Mr. Samayoa grew
12    up?
13    A.     I believe he grew up in the Mission district.
14    Q.     And he was assigned for his field training to
15    the Bayview district, correct?
16    A.     Yes.
17    Q.     Do you know why he was assigned to the Bayview
18    district?
19    A.     No.
20    Q.     Do you have any familiarity with the term "radio
21    ear"?
22    A.     Yes.
23    Q.     What does that mean?
24    A.     For myself that means that a person is trying to
25    get used to listening to their radio.
```

54

1   with the Bayview district.

2   BY MR. BUELNA:

3   Q.       But you did -- you did know that he had only

4   been essentially in field training for four days, right?

5   A.       Yes.

6   Q.       Now, turning to the date of the incident, do you

7   recall what it was that first brought your attention to

8   responding to the incident, whether it was a comment

9   from another officer or something you heard over the

10  radio?

11  A.       I heard an A priority call come out on the

12  radio.

13  Q.       And what does that mean, A priority call?

14  A.       It is dispatch -- dispatch's -- calls for

15  service by priority A, B, and C, A being the highest

16  rated, I would assume.

17  Q.       Okay.  And what did you do -- what was the -- so

18  you learned about an A priority call.  Did you learn

19  anything else?

20  A.       That the call for service was regarding a

21  carjacking.

22  Q.       And what does that mean, carjacking?

23  A.       Carjacking is when a vehicle is taken by force

24  or fear.

25  Q.       Other than knowing that it was a carjacking, did

                                                            57

1   you -- were you aware of any other facts regarding the

2   carjacking?

3   A.      I'm sorry.  Any other what?

4   Q.      Sure.  Facts, or, like, how it happened.  Was it

5   by gun?  Was it by hand?

6   A.      The call originated from 23rd and Arkansas.  It

7   involved a white van described as a state lottery van,

8   and that the victim or somebody was calling for the

9   victim, and that the suspect had presumably left the

10  scene already with the vehicle.

11  Q.      Did you learn through dispatch on your way to --

12  did you learn from dispatch at all that the person had

13  taken the keys from the person's pocket?

14  A.      No.

15  Q.      So you just knew -- it sounds like what you knew

16  was that they had taken the vehicle, but you didn't know

17  how?

18  A.      Correct.

19  Q.      Okay.  And there was no weapons reported as

20  well, correct?

21  A.      Not that I can recall.  No.

22          MR. SIMS:  Hold on.  Strike that -- I'm sorry.

23  Not strike that.  But belatedly, that is ambiguous as

24  far as whether or not he knew that when he -- I thought

25  the questions were about what he heard from dispatch at

58

1  the initial point.  So it's vague and ambiguous as to

2  that.

3  BY MR. BUELNA:

4  Q.    Sure.  Did you ever learn prior to making

5  contact with the subject that -- through dispatch or any

6  other way that he had weapons?

7  A.    I did not hear dispatch say that there was a

8  weapon involved.

9  Q.    And prior to a shot being fired, you never saw a

10 weapon, right?

11 A.    No.

12 Q.    And prior to the shot being fired, you never

13 learned through dispatch how the vehicle was taken,

14 correct?

15 A.    Correct.

16 Q.    I mean, you didn't know if the vehicle -- if the

17 person had set the keys down on the counter and the

18 person -- the suspect grabbed the keys and ran into the

19 van, right?

20      MR. SIMS:  Incomplete hypothetical.

21      Go ahead.

22      THE WITNESS:  No.  I did not know.

23 BY MR. BUELNA:

24 Q.    Okay.  And is it fair to say that -- or is it

25 safe to say that since you were listening to the radio,

59

```
 1    that -- strike that.
 2            Where were you when you heard the call for
 3    service, first heard the call for service?
 4    A.      Bayview station.
 5    Q.      Were you with Defendant Samayoa at that point?
 6    A.      No.
 7    Q.      And do you know where he was?
 8    A.      Somewhere around the station.
 9    Q.      How did you get into contact with Defendant
10    Samayoa?
11    A.      I saw him earlier, prior to the call being
12    dispatched.  I believe he was already dressed, so I saw
13    him at the station.
14    Q.      And this happened at the start of your shift,
15    right?
16    A.      Correct.
17    Q.      What was your shift that day, if you can recall?
18    A.      11:00 to --
19    Q.      Meaning the hours.
20    A.      The time on my shift?
21    Q.      Yeah.
22    A.      11:00 a.m. to 9:00 p.m.
23    Q.      Do you know what Defendant Samayoa's shift was?
24    A.      The same.
25    Q.      I'm sorry.  I couldn't hear you.  What did you
```

60

1    say?

2    A.      The same.

3    Q.      Okay.  So once you got the call, what did you --

4    or you heard the call on the radio, what did you do?

5    A.      I went to the sergeant's office.  I asked my

6    sergeant if I could go out to that call with my recruit.

7    Q.      What did your sergeant say?

8    A.      He said yes.  He either nodded yes or he said

9    yes.  I can't recall which one.

10   Q.      Do you recall which sergeant it was?

11   A.      Sergeant Merris Goldsworth (phonetic).

12   Q.      And when you asked for permission to take your

13   recruit out to the -- did you tell them that you were

14   going to go to take him to do a report on the carjacking

15   or to respond to the actual pursuit of the carjacker?

16   A.      I just asked if we could go out to the call.

17   Q.      What was your intention when you left to respond

18   to the call?  Was it -- was it to pursue the suspect, or

19   was it to collect evidence?

20   A.      My initial intention when the call came out was

21   to respond to 23rd and Arkansas to the victim, to meet

22   with the victim and get information and to take the

23   report.

24   Q.      Why did -- why did you want to take your recruit

25   to do that?

61

1  A.     I considered it a great training experience for

2  him, taking an active carjacking robbery call.

3  Q.     To take the report, right?

4  A.     Correct.

5  Q.     Do you know if he had taken a report before

6  that?

7  A.     For that particular incident, no.

8  Q.     So it would be his first time taking a report

9  from someone, right?

10  A.     I don't remember if he took a report prior to

11  that, but if it was, it wasn't a carjacking report.

12  Q.     It would be fair to say that it was one -- it

13  would still be one of his very first reports, right,

14  among the very -- since he had only been on the job for

15  four days, right?

16  A.     Yes.

17  Q.     All right.  So -- and then obviously -- how did

18  you get to your car?  Did he -- did he get it for you,

19  or you went and got the car?

20  A.     I got the car.

21  Q.     And do you recall what car that it -- that it

22  was you got?

23  A.     Black and white 081.

24  Q.     And when you got the car, you understood that it

25  was equipped and ready to go on patrol, right?

62

1   A.      I can't remember.

2   Q.      Do you remember if that car had any issues?

3           MR. SIMS:  Vague.

4           Go ahead, Edric.

5           THE WITNESS:  Oh.  It did have some prior

6   issues.  Yes.

7   BY MR. BUELNA:

8   Q.      What issues were those?

9   A.      The car had just returned from the preparation

10  yard for a faulty driver side window.  Also, the

11  passenger side door due to the continuous times to -- by

12  officers to close the door had kind of dislodged off the

13  hinges and track, so it would rub against the front

14  quarter panel of the -- of the vehicle.

15  Q.      Is it fair to say it made sort of a pop noise

16  when you opened or closed the door?

17  A.      Yes.

18  Q.      And that is on the front passenger side of the

19  door, correct?

20  A.      Correct.

21  Q.      Once you got the car, did you pick up or -- your

22  recruit, or did your recruit go with you to get the car?

23  A.      I don't remember.

24  Q.      Okay.  Obviously you guys both made it into the

25  car, though, right?

63

1    A.      Yes.

2    Q.      Okay.  And where were you heading when you got

3    into the car and started driving with your recruit?

4    A.      Away from the station.

5    Q.      And where was your destination?

6    A.      To 23rd and Arkansas.

7    Q.      And did you have any discussions with your

8    recruit on your way to Arkansas?  And by Arkansas I mean

9    Arkansas Street.

10   A.      Yeah.  I might have told him that we were going

11   to a carjacking call.

12   Q.      Did you tell him anything else?

13   A.      I can't remember.

14   Q.      All right.  And then what happened next?

15   A.      While en route to the call for service, I heard

16   the units imply that they were following a suspect

17   vehicle that matched the description of the vehicle

18   taken in the carjacking.

19   Q.      And what did -- did that information that you

20   learned cause you to do anything different than what you

21   were doing before?

22   A.      Yeah.  At that point we had a location of the

23   suspect vehicle being followed by a unit.  So now we had

24   a positive location.  So I made a decision to reroute

25   and try to catch up to that unit to help apprehend the

64

1    vehicle.

2    Q.       Did you tell your recruit that you had decided

3    rather than taking him to take down the report to

4    respond to a carjacking suspect?

5    A.       I don't remember.

6    Q.       Would -- is that something you typically would

7    tell a recruit?

8    A.       Not necessarily.

9    Q.       Okay.

10   A.       I just don't remember what -- if I said anything

11   to him about it at that time.

12   Q.       Was it your practice to tell your recruits when

13   they were in your car with you on a way to a destination

14   if you reroute, meaning if you were going to a different

15   destination?

16   A.       Sometimes I would, I guess.

17   Q.       Well, I mean, if it's -- it was your recruit's

18   fourth day on the job, right?

19   A.       Yes.

20   Q.       And you're initially taking him to take down a

21   report from a victim, right?

22   A.       Yes.

23   Q.       That's a fairly low risk task.  Would that be

24   fair to say?  Right?

25   A.       Yes.

                                                          65

1   Q.      It's a much higher risk to respond to a felony

2   carjacking, right?

3   A.      Yes.

4   Q.      Okay.  So it would be important probably as a

5   field training officer to sort of begin giving him some

6   instruction and some context, right?

7           MR. SIMS:  Argumentative.  And vague.

8           Go ahead.

9           THE WITNESS:  Like I said, I don't recall if I

10  did or did not tell him.  I may or may not have told him

11  so...

12  BY MR. BUELNA:

13  Q.      All right.  So once you rerouted, what happened?

14  Did you try to debrief him at all?

15  A.      No.

16  Q.      What happened next?

17  A.      The unit following the vehicle gave updated

18  location, direction of travel, description of the

19  vehicle, stated that the vehicle was going southbound on

20  101.  At that point judging where the vehicle was, I

21  thought that the vehicle may either continue south on

22  101 or take an exit and go either to the Ingalls side or

23  back into the Bayview.

24  Q.      We had talked a little bit earlier about your

25  uniform.  Did you also have a body camera on your

                                                          66

1   Q.      And you received training on when you're

2   expected to turn on your body camera, correct?

3   A.      Yes.

4   Q.      Now, is this the kind of body camera where

5   essentially you can turn it on and it remains in

6   buffering mode, and then you click it and it turns into

7   recording mode?  Are you familiar with kind of what I'm

8   describing?

9   A.      Yes.

10  Q.      Are you required to turn on your body camera in

11  the buffering mode at the start of your shift?

12  A.      Yes.

13  Q.      Okay.  Did you turn on your body camera into

14  buffering mode at the start of your shift that day?

15  A.      I believe I did.

16  Q.      Okay.  All right.  So you're driving, you have

17  your body camera, you're with your recruit, and you're

18  responding to where you believe -- or you're trying to

19  anticipate where the suspect might go; is that fair to

20  say?

21  A.      Yes.

22  Q.      Okay.  And what happened next?

23  A.      The unit that was following the vehicle stated

24  that the suspect vehicle had taken the, I believe,

25  Candlestick Point exit.  And from there he could still

                                                          68

1    either go into the Ingalls side or into the Bayview, so
2    we continued in that direction.
3    Q.      Okay.  What happened next?
4    A.      Then the unit following the vehicle stated that
5    the vehicle was passing Candlestick Park, Candlestick
6    Point.  So now we had a direction of travel back into
7    San Francisco, back into Bayview.  So we -- so I drove
8    towards that direction.
9    Q.      And at this point did you debrief or have any
10   conversations with your recruit to get him ready for the
11   pursuit of this -- this suspect?
12   A.      No.
13   Q.      Did you have your lights and sirens on at this
14   point?
15   A.      I don't believe so.  I can't recall.
16   Q.      Okay.  Do you recall if you were driving above
17   the speed limit, or were you still following the traffic
18   laws?
19   A.      I believe I was still following the traffic
20   laws.
21   Q.      Does it -- at some point if you're responding
22   code three, it's fair to say that there are times when
23   you turn on your lights and sirens and will drive kind
24   of beyond the speed limit, right?
25   A.      When you're driving code three.  Yes.

69

1    Q.      So at this point do you recall if you were

2    driving code three?

3    A.      I can't recall.

4    Q.      Do you believe you were following the speed,

5    though, laws?

6    A.      I -- I believe so, but I can't be sure.

7    Q.      All right.  What happened next?

8    A.      So we -- I traveled -- I was traveling

9    southbound on Bayshore.  Then I ended up at Gilman and

10   Ingalls.  I heard that the suspect vehicle was traveling

11   westbound on Gilman.  I observed a vehicle matching the

12   description traveling westbound on Gilman approaching my

13   location traveling at a high rate of speed on the

14   opposite side of the roadway going counterflow in

15   oncoming traffic being followed by another police

16   vehicle.

17   Q.      And what happened next?

18   A.      The suspect vehicle passed my location.  I fell

19   in behind the suspect vehicle activating my lights and

20   siren and began pursuing the suspect vehicle.

21   Q.      At this point were you driving code three,

22   meaning you're essentially pursuing and not following

23   traffic laws?

24   A.      Yes.

25   Q.      At this point did you brief -- debrief or

70

1    A.        At the time.

2    Q.        Do you know why he didn't put it over the radio?

3    A.        I do not.

4    Q.        Did you have any understanding as to whether or

5    not Officer -- or Defendant Samayoa knew how to operate

6    a police radio?

7    A.        My understanding that he received training at

8    the police academy.  Part of that training is how to

9    operate a radio, how to use a radio, how to use radio

10   codes.  In the previous days he was using a radio,

11   transmitting and listening to a radio.

12   Q.        What happened next?

13   A.        The suspect then turned eastbound from Ingalls

14   onto Fitzgerald failing to stop at numerous stop signs.

15   We continued to pursue the vehicle.

16   Q.        So at that -- at that point you said you

17   witnessed him run several stop signs; is that right?

18   A.        Correct.

19   Q.        Okay.  So at this point you suspected whoever

20   was in the van of violating traffic laws and possibly a

21   carjacking, right?

22   A.        Correct.

23   Q.        Did you have any other information or any other

24   crime that you suspected him of at this point?

25   A.        No.

72

**DEPOSITION OF OFFICER EDRIC TALUSAN (nonconfidential portion) - VIDEOCONFERENCE**

1  Q.      Okay.   What happened next?

2  A.      The suspect vehicle continued west- -- I'm sorry

3  eastbound on Fitzgerald, ran another stop sign, I

4  believe it was at Fitzgerald and Hawes, and entered

5  through the gates of Alice Griffith housing project also

6  known as Doublerock.

7  Q.      Okay.   And we will call it Doublerock because

8  it's easier.   And are you familiar with the Doublerock

9  area?

10  A.      I am.

11  Q.      Okay.   And you understand that essentially as a

12  one way entrance and exit?

13  A.      For vehicles.   Yes.

14  Q.      And have you patrolled in Doublerock before?

15  A.      I'm sorry.   What was the question?

16  Q.      Sure.   Have you patrolled in Doublerock before?

17  A.      I have.

18  Q.      Okay.   What about your recruit?   Do you know if

19  he's ever patrolled in Doublerock?

20  A.      I can't recall if I ever brought him there prior

21  to this day.

22  Q.      And when you entered Doublerock you knew that

23  vehicle wasn't able to get back out without essentially

24  going the opposite way again, right?

25  A.      Correct.

73

1    Q.       And you followed him into Doublerock, right?

2    A.       I did.

3    Q.       Do you know if there was any other patrol cars

4    behind you?

5    A.       I knew that there was at least one patrol car

6    that was behind me during the pursuit.

7    Q.       Okay.   What happened next?

8    A.       The suspect vehicle continued westbound on

9    Fitzgerald, swerved to the right, hit a parked vehicle,

10   and then moved and made a right turn.   I can't remember

11   what street that is, but towards a -- essentially a dead

12   end because there is a closed and locked gate at the end

13   of that street.

14   Q.       And so you knew that this vehicle was -- the

15   vehicle pursuit was about to come to an end in some

16   form, right?

17   A.       At that point my thought was that he was going

18   to go wide and -- to navigate that sharp left turn.   At

19   some point I felt that this would result in a foot

20   pursuit.

21   Q.       And that's sometime before he actually stopped

22   and got out of his car, right?

23   A.       I'm sorry.   Repeat the question.

24   Q.       Yeah.   Sure.   You felt that it would end in a

25   foot pursuit at some time -- sometime before he actually

74

1    ever stopped and got out of his car, right?

2    A.       I felt that it could end in a foot pursuit, but

3    I didn't know when, or if and when it would.

4    Q.       Fair enough.  At that -- at this point when

5    you're in Doublerock and thinking that it might end in a

6    foot pursuit, did you converse or debrief your recruit?

7    A.       I believe I told him that this might end up in a

8    foot pursuit.  I believe I also advised dispatch that

9    this might end up in a foot pursuit.

10   Q.       Did you tell -- did you tell your recruit other

11   than that it might be -- end up in a foot pursuit how to

12   handle it, whether or not he should follow the person,

13   or stay behind you, or anything like that?

14   A.       No.

15   Q.       Why not?

16   A.       For myself it is very -- it's very difficult to

17   dictate telling a person what they should and shouldn't

18   do when you are reacting to another subject's actions.

19   There is nothing set in stone about what tactics you can

20   use when you're reacting to another person's actions.

21   So I think that is why I didn't tell Chris what he

22   should or should not do.

23   Q.       You did know, though, when you were in

24   Doublerock that you had another patrol car behind you,

25   correct?

                                                          75

1    BY MR. BUELNA:

2    Q.      As soon as Mr. O'Neil got out of the car.

3    A.      Yes.

4    Q.      You perceived a serious and immediate threat of

5    bodily harm when he got out of the car?

6    A.      Yes.

7    Q.      So you thought you could -- if you hadn't been

8    driving you could use deadly force at him for getting

9    out of a car?

10         MR. SIMS:  Objection.  It calls for speculation.

11   But you asked him about how he felt.  So yeah.

12         Go ahead.  Answer.

13         THE WITNESS:  Not necessarily elevate it to the

14   use of deadly force, but any time somebody is fleeing

15   from the police and they are already exhibiting

16   resistance, and now you have somebody jumping out of a

17   vehicle who may or may not have a weapon that -- I would

18   consider that a threat.  Yes.

19   BY MR. BUELNA:

20   Q.      So far the only thing you saw from -- that you

21   witnessed was flight, correct, from Mr. O'Neil?

22         MR. SIMS:  Vague as to time.

23         MR. BUELNA:  Sure.

24   BY MR. BUELNA:

25   Q.      Up to the point that he jumped out of the car,

78

1   including jumping out of the car, the only thing you

2   witnessed Mr. O'Neil do was flee, correct?

3   A.      Yes.

4   Q.      And when he got out of the car, you perceived

5   that as an attempt to flee as well, correct?

6   A.      That was one of the possibilities.  Yes.

7   Q.      And that was consistent with what he had been

8   doing up to that point, correct, is fleeing?

9   A.      Up to that point he was fleeing.  Yes.

10  Q.      At that point when he gets out of the car and is

11  still fleeing, is it your training that you're permitted

12  to use deadly force in that circumstance?

13          MR. SIMS:  That is an incomplete hypothetical.

14  Misstates his testimony.

15          Go ahead if you can answer it.

16          THE WITNESS:  Can you repeat the question,

17  please?

18  BY MR. BUELNA:

19  Q.      Sure.  When he was fleeing in the car and then

20  got out and continued to flee on foot, is it your

21  understanding that you're permitted to use deadly force

22  in that situation?

23          MR. SIMS:  Same objections.  It's also compound.

24          THE WITNESS:  At that point he is not longer

25  fleeing away from us.  He is running towards us.  So now

79

1   he is -- in my mind he is a threat.

2   BY MR. BUELNA:

3   Q.      And do you believe per your training that at

4   that point that he is running towards you, you are

5   permitted to use deadly force?

6          MR. SIMS:  Incomplete hypothetical.  Vague.

7          THE WITNESS:  It is dependent on his actions

8   after that, from that point forward.

9   BY MR. BUELNA:

10  Q.      No, but I'm asking you, when you saw him running

11  towards you, did you believe at that point you were

12  permitted to use deadly force?

13  A.      Myself, no.

14  Q.      And in fact you told investigators that you saw

15  Mr. O'Neil's hands down, right, at his side?

16  A.      I believe I said they were down by his waist --

17  by his waist area.

18  Q.      Your waist is -- waist and your side.  Was it

19  the front waist area, back waist area, or the side?

20  A.      Are you asking what I told investigators, or

21  what I did -- what I saw?

22  Q.      What you recall.

23  A.      They were by his waist pants -- by his waist

24  area.  I can't remember side or just -- they were just

25  down by his waist.

                                                        80

1    Q.      Can you -- okay.  Can you stand up and show me
2    what you recall him doing?
3    A.      As far as my recollection, they were down in
4    this area (indicating).
5    Q.      Were they moving at all, or were they just
6    static?
7    A.      He was moving so they -- as a result, his whole
8    body was moving.
9    Q.      Okay.  But you didn't see any weapons, correct?
10   A.      Not from my point of view.
11   Q.      And was he walking or running or stumbling?
12   A.      Initially when he came out of the car he was
13   stumbling, and then he began running towards our
14   vehicle.
15   A.      Okay.  A full on sprint, a jog, or a brisk walk?
16           MR. SIMS:  I'm sorry.  What was the -- what was
17   the last one you said?
18           MR. BUELNA:  A brisk walk.
19           MR. SIMS:  Oh.  I heard bird squawk.  Sorry.
20           If you can answer, Edric, go ahead.
21           THE WITNESS:  Looked like it was the beginning
22   of a sprint, like when you're just starting out to run
23   fast.
24   BY MR. BUELNA:
25   Q.      Okay.  At that point -- and at this point

81

1  A.      No.

2  Q.      Why not?

3  A.      I was at the time focused on the pursuit.  I

4  knew that he was trained extensively with body cam as

5  they are in the academy, so I assumed that he activated

6  his own body camera.

7  Q.      Would you call the situation or describe the

8  situation that you encountered with a person who had

9  just jumped out of a car -- carjacking suspect running

10  past you a high risk situation?

11  A.      Yes.

12  Q.      And you had mentioned before that you considered

13  him a threat to the extent that he may or may not have a

14  weapon, right?

15  A.      Correct.

16  Q.      So is it fair to say that you kept your eyes on

17  him as he ran towards your car?

18  A.      That would be fair.

19  Q.      Okay.  You wouldn't -- you didn't take your eyes

20  off of him as he ran past your car, right?

21  A.      I can't remember.  As far as I -- as far as I

22  remember, I tried to keep my eyes on him as much as

23  possible.

24  Q.      And you didn't see him do anything that would

25  cause you to pull out your gun and shoot him, right?

87

```
 1              THE WITNESS:  Yes.

 2              MR. SIMS:  Yes.

 3    BY MR. BUELNA:

 4    Q.     All right.  I'm going to go back to the incident

 5    and prior to the -- hearing the shot fire.  I believe

 6    you told investigators that you actually saw your

 7    recruit pull out his weapon prior to him firing the

 8    weapon, right?

 9              MR. SIMS:  Misstates testimony.

10              THE WITNESS:  No.

11              (Simultaneous speaking.)

12    BY MR. BUELNA:

13    Q.     What was that?

14    A.     I did not.

15    Q.     You never saw him pull out his weapon --

16    A.     That's correct.

17    Q.     -- prior to the shot?

18    A.     I never saw him pull out his weapon prior to the

19    shooting.

20    Q.     If you had known he pulled out his weapon prior

21    to you braking or stopping the car, would you have told

22    him -- would you have instructed him to put it away?

23              MR. SIMS:  Calls for speculation.  Incomplete

24    hypothetical.

25              Go ahead.

                                                          90
```

```
 1   A.      Yeah.  Not come to work.

 2   Q.      Anything else?

 3   A.      I know it's all hypothetical.  It ended up the

 4   way it ended up with the chain of -- chain of action

 5   that occurred.  It ended very badly.

 6           MR. BUELNA:  All right.  I don't have any other

 7   questions.

 8           MR. SIMS:  I've got just a very few number of

 9   questions.

10                  EXAMINATION BY MR. SIMS

11   BY MR. SIMS:

12   Q.      Officer Talusan, you mentioned that you saw the

13   van driving in the opposite line of traffic in the -- as

14   it approached you when you were on, I think, Gilman and

15   Ingalls; is that -- is that accurate?

16   A.      Yes.

17           THE COURT REPORTER:  May we take one second

18   before we continue?  I just need to plug something in.

19           MR. SIMS:  Sure.

20           THE COURT REPORTER:  Thank you.

21           MR. SIMS:  You want to just take a break?

22           MR. BUELNA:  Okay.

23           THE VIDEOGRAPHER:  We can do that.

24           MR. SIMS:  Well, let's just let her -- I'm not

25   going to be very long.  I'm getting hungry too.  So...
```

                                                        111

**DEPOSITION OF OFFICER EDRIC TALUSAN (nonconfidential portion) - VIDEOCONFERENCE**

1       THE COURT REPORTER:  Sorry about that.  I'm all

2   ready to go.

3       MR. SIMS:  Okay.  Could you just read back the

4   last question just so he's got it?

5       (Whereupon, the record was read back.)

6       THE WITNESS:  Yes.  The suspect vehicle was

7   traveling at a high rate of speed westbound in the

8   eastbound lane of Gilman approaching Ingalls.

9       MR. SIMS:  And, Madam Court Reporter, just for

10  your reference, Ingalls is spelled I-N-G-A-L-L-S.

11      THE COURT REPORTER:  (Nods head.)

12  BY MR. SIMS:

13  Q.     How many times -- from the moment you first saw

14  the van to the end of the pursuit, how many times do you

15  think you saw the van go into the opposite lane of

16  traffic?

17  A.     On Gilman and also on Fitzgerald it was either

18  in the opposite lane or straddling the middle of the

19  lane, I believe.

20  Q.     Okay.

21  A.     As far as I can recall.  Yeah, on Fitzgerald.

22  Q.     And you said the van was going at a high rate of

23  speed.  Do you have any estimate at what speed the van

24  was going at?

25  A.     I don't know exactly how fast we were going, but

112

```
 1   it was above the speed limit.  I did not look down at my

 2   speedometer, but it was beyond speed limit and

 3   conditions safe for that -- the roadway.

 4   Q.      And what -- what -- do you know the speed limit

 5   in that area?

 6   A.      I believe it's 25.

 7           MR. SIMS:  Okay.  Thank you.  That's all I have.

 8           MR. BUELNA:  All right.  Thank you, Madam Court

 9   Reporter and Videographer.  I appreciate it.  Thank you

10   for coming in.

11           All right.  And, Hunter, if you have two seconds

12   I just want to ask you something strategic-wise.  We can

13   end the -- go off record, too, by the way.  My bad.

14           THE VIDEOGRAPHER:  We are going off the record

15   at 1:13 p.m.  This is the end of today's proceeding.

16           (The deposition was concluded at 1:13 p.m.)

17                           --OOO--

18

19

20

21

22

23

24

25
```

                                                              113

**DEPOSITION OF OFFICER EDRIC TALUSAN (nonconfidential portion) - VIDEOCONFERENCE**

1                        CERTIFICATE OF REPORTER

2

3          I, Christy Curry, CSR No. 13982, a Certified

4    Shorthand Reporter in and for the State of California,

5    do hereby certify:

6          That prior to being examined, the witness named in

7    the foregoing deposition was by me duly sworn to testify

8    to the truth, the whole truth, and nothing but the

9    truth.

10         That said deposition was taken before me at the

11   time and place set forth and was taken down by me in

12   shorthand and thereafter reduced to computerized

13   transcription under my direction and supervision, and I

14   hereby certify the foregoing deposition is a full, true

15   and correct transcript of my shorthand notes so taken.

16         And I further certify that I am neither counsel for

17   nor related to any party to said action nor in any way

18   interested in the outcome thereof.

19         IN WITNESS WHEREOF, I have hereunto subscribed my

20   name this 18th of January, 2021.

21

22

23                 _____/s/Christy Curry_____
                   CHRISTY CURRY
24                 CSR No. 13982

25                      --o0o--

                                                        115