1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  MEREDITH B. OSBORN, State Bar #250467
   Chief Trial Deputy
3  HUNTER W. SIMS III, State Bar #266039
   RYAN STEVENS, State Bar #306409
4  Deputy City Attorneys
   Fox Plaza
5  1390 Market Street, Sixth Floor
   San Francisco, California 94102-5408
6  Telephone:      (415) 554-4259 (Sims)
   Telephone:      (415) 554-3975 (Stevens)
7  Facsimile:      (415) 554-3837
   E-Mail:         hunter.sims@sfcityatty.org
8  E-Mail:         ryan.stevens@sfcityatty.org

9
   Attorneys for Defendants
10 CITY AND COUNTY OF SAN FRANCISCO,
   CHRISTOPHER SAMAYOA and EDRIC TALUSAN
11

12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15 JUDY O'NEIL, individually and as successor-        Case No. 17-cv-07190 JCS
   in-interest to Decedent KEITA O'NEIL,
16 through her Guardian Ad Litem, APRIL               **DEFENDANT CITY AND COUNTY OF SAN**
   GREEN,                                            **FRANCISCO AND CHRISTOPHER**
17                                                   **SAMAYOA'S OPPOSITION TO PLAINTIFF'S**
         Plaintiff,                                  **MOTION FOR PARTIAL SUMMARY**
18                                                   **ADJUDICATION OF HER EXCESSIVE**
         vs.                                         **FORCE AND NEGLIGENCE CLAIMS**
19
   CITY AND COUNTY OF SAN
20 FRANCISCO, a municipal corporation;               Hearing Date:    July 2, 2021
   CHRISTOPHER SAMAYOA, individually                 Time:            9:30 a.m.
21 and in his capacity as a City of San Francisco    Place:           Courtroom F, 15th Floor
   Police Officer; EDRIC TALUSAN,
22 individually and in his official capacity as a    Trial Date:      October 12, 2021
   San Francisco Police Officer; and DOES 1-50,
23 inclusive,

24       Defendants.

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 1

    I.      O'NEIL CARJACKS POLLY CHOW ................................................................... 1

    II.     O'NEIL IS SEEN DRIVING ERRATICALLY AND AT HIGH SPEEDS ON INTERSTATE 280, HIGHWAY 101 AND IN THE BAYVIEW NEIGHBORHOOD OF SAN FRANCISCO ......................................................... 2

    III.    OFFICERS TALUSAN AND SAMAYOA PURSUE O'NEIL INTO DOUBLE ROCK ................................................................................................................... 3

    IV.    OFFICER SAMAYOA FIRES AT O'NEIL AFTER HE SUDDENLY AND UNEXPECTEDLY JUMPS FROM HIS MOVING VEHICLE AND RUNS DIRECTLY TOWARDS OFFICER SAMAYOA, WHO IS SEATED IN A PATROL CAR ......................................................................................................... 4

        A.    O'Neil Runs Directly Towards the Defendant Officers While Officer Samayoa Attempts to Open his Door but then Shoots O'Neil ................... 5

    V.     THE SPEED, TIMING, DISTANCE AND SAMAYOA'S VANTAGE OF THE EVENT ................................................................................................................. 6

ARGUMENT .............................................................................................................................. 6

    I.      OFFICER SAMAYOA'S USE OF FORCE WAS REASONABLE ..................... 6

    II.     PLAINTIFF FAILS TO ESTABLISH OFFICER SAMAYOA IS NOT ENTITLED TO QUALIFIED IMMUNITY ..................................................... 12

    III.    PLAINTIFF'S NEGLIGENCE CLAIM FAILS ................................................ 17

        A.    Officer Samayoa is Immune from Plaintiff's Negligence Claim .............. 17

        B.    Officer Samayoa's Pre-Shooting Tactics Were Reasonable ..................... 17

        C.    Officer Samayoa Use of Force was Reasonable ....................................... 18

CONCLUSION ......................................................................................................................... 19

## **TABLE OF AUTHORITIES**

**State Cases**

*Brown v. Ransweiler*
    171 Cal. App. 4th 516 (2009) ...............................................................17, 18

*Martinez v. Cty. of Los Angeles*
    47 Cal. App. 4th 334 (1996)) ...............................................................17

**State Statutes & Codes**

California Government Code § 815 ...............................................................17

California Government Code § 815.2 ...............................................................17

California Penal Code § 196 ...............................................................17

California Penal Code § 215 ...............................................................9

California Penal Code § 835a ...............................................................17, 18

California Penal Code § 835a(c)(1)(B) ...............................................................17

**Federal Cases**

*Billington v. Smith*
    292 F.3d 1177 (9th Cir. 2002) ...............................................................7

*Carswell v. Borough of Homestead*
    381 F.3d 235 (3d Cir. 2004) ...............................................................16

*Cruz v. City of Anaheim*
    765 F.3d. 1076 (9th Cir. 2014) ...............................................................13, 14

*Curnow By & Through Curnow v. Ridgecrest Police*
    952 F.2d 321 (9th Cir. 1991) ...............................................................12

*Estate of Lopez v. Gelhaus*
    149 F. Supp. 3d 1154 (N.D. Cal. 2016) ...............................................................12, 13

*Foster v. City of Fresno*
    392 F. Supp. 2d 1140 (E.D. Cal. 2005) ...............................................................16, 17

*Graham v. Connor*
    490 U.S. 386 (1989) ...............................................................7, 9

*Guerra v. Bellino*
    703 F. App'x 312 (5th Cir. 2017) ...............................................................16

*Hayes v. County of San Diego*
    57 Cal. 4th 622 (2013) ...............................................................17

*Hayes v. County of San Diego*
   736 F.3d 1223 (9th Cir. 2013) .............................................................................18

*Kisela v. Hughes*
   138 S. Ct. 1148 (2018).................................................................................15, 16

*Long v. City & County of Honolulu*
   511 F.3d 901 (9th Cir. 2007) ...............................................................................7

*Mitchell v. Schlabach*
   864 F.3d 416 (6th Cir. 2017) .............................................................................15

*Monzon v. City of Murietta*
   978 F.3d 1150 (2020).....................................................................7, 8, 10, 16

*Plumhoff v. Rickard*
   572 U.S. 765 (2014)....................................................................................14, 16

*S.B. v. County of San Diego*
   864 F.3d 1010 (9th Cir. 2017) .............................................................................7

*S.E.C. v. Benson*
   657 F. Supp. 1122 (S.D.N.Y. 1987) ...................................................................11

*Savage v. City of Memphis*
   620 F. App'x 425 (6th Cir. 2015)........................................................................16

*Sec. & Exch. Comm'n v. Strategic Glob. Invs., Inc.*
   262 F. Supp. 3d 1007 (S.D. Cal. 2017)...............................................................11

*Tennessee v. Garner*
   471 U.S. 1 (1985)..................................................................................................7

*Tolan v. Cotton*
   572 U.S. 650 (2014)........................................................................12, 13, 14

*Wenzel v. City of Bourbon*
   899 F.3d 598 (8th Cir. 2018) ......................................................................15, 16

**INTRODUCTION**

After carjacking a white minivan from a California State Lottery employee, Keita O'Neil ("O'Neil") led pursuing officers on a dangerous high-speed vehicle chase into the Bayview neighborhood of San Francisco.  San Francisco Police Officers Chris Samayoa and Edric Talusan responded to the high alert priority call, gave chase, and pursued O'Neil into the Alice Griffith Housing project, commonly referred to as "Double Rock."  Once inside Double Rock, O'Neil's vehicle was boxed in by a fence blocking the road in front of him and officers pursuing him from behind.  Rather than surrender, O'Neil jumped from the van and charged directly toward the Defendant Officers while appearing to reach toward his waistband, a place on the body where officers know suspects routinely conceal weapons.  Having only seconds to react, Officer Samayoa fired one shot killing O'Neil.

Plaintiff's Motion for Partial Summary Adjudication should be denied.  Officer Samayoa was justified in using lethal force against O'Neil under the circumstances.  His belief that O'Neil posed a threat of serious harm to himself, Officer Talusan, and bystanders was objectively reasonable as a matter of law.  In addition, Officer Samayoa is entitled to qualified immunity for his actions.

Plaintiff's negligence claim is barred for the reasons her Fourth Amendment claim fails: Officer Samayoa's use of force was objectively reasonable.  Plaintiff's negligence claim also fails because the undisputed facts show Officer Samayoa's pre-shooting tactics were reasonable and Officer Samayoa is entitled to statutory immunity from suit.

**STATEMENT OF FACTS**

**I.    O'NEIL CARJACKS POLLY CHOW**

On December 1, 2017, Polly Chow ("Chow") was working as a district sales representative for the California State Lottery.  [Declaration of Hunter W. Sims III in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Adjudication ("Sims Decl."), Ex. B, Chow Depo 12: 6-13.] As part of her job duties, she drove an official California State Lottery van to the M&M Market located at 6670 3rd Street.  After Chow completed her business inside the market she returned to the van, which was parked on the street in front of the market.  [Sims Decl., Ex. B, Chow Depo 15:10-21; 16: 12-22; 17: 19-22.]  As Chow opened the door to the van, a man later identified as O'Neil

approached her from behind, put his arms around her, and demanded money.  [Sims Decl., Ex. B, Chow Depo 18:9-24; 19:22-21:9.]  Chow told O'Neil that she had no money and O'Neil responded by patting her down and searching her pockets.  [Sims Decl., Ex. B, Chow Depo 20:10-12.20:15-17.]  O'Neil took the key to the van, got into the driver's seat, and attempted to start the van.  [Sims Decl., Ex. B, Chow Depo 23:2-14; 24:1-21; 25:10-14.]

Chow followed O'Neil to the driver's side door and demanded O'Neil return her key.  [Sims Decl., Ex. B, Chow Depo 25:21-26:7.]  O'Neil got out of the van, grabbed Chow's phone, threw it on the ground and violently pushed Chow onto the ground.  [Sims Decl., Ex. B, Chow Depo 26:8-17; 27:17-28:11.]  O'Neil then walked over to an SUV that was parked nearby and, after conversing with the occupants, got back in the van and drive away.  [Sims Decl., Ex. B, Chow Depo 26:8-27:8.]  O'Neil left Chow, who suffered an injury to her knee as a result of this incident, lying on the ground as he sped away.  [Sims Decl., Ex. B, Chow Depo 28:17-25.]

At approximately 10:32 a.m., the City's Department of Emergency Management dispatch broadcasted an "A Priority" report of "strongarm robbery" involving a vehicle to all SFPD officers in the Bayview police district.  [Declaration of Kirstin Walker in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Adjudication ("Walker Decl."), Exhs. A and B.]  The suspect was described as a skinny, African-American male, under 30 years old and wearing a black hoody.  [*Id.*]  Dispatch noted that no weapons were seen in the commission of the carjacking.  [Walker Decl., Ex. A, Audio CAD at 10:35:19.]

## II.   O'NEIL IS SEEN DRIVING ERRATICALLY AND AT HIGH SPEEDS ON INTERSTATE 280, HIGHWAY 101 AND IN THE BAYVIEW NEIGHBORHOOD OF SAN FRANCISCO

SFPD Officer Gary Moriyama was driving on southbound Interstate 280 in an unmarked SFPD vehicle when he observed a tan GMC Suburban and a white van with a state logo approaching from behind at a speed of approximately 80 miles per hours in the emergency lane of traffic.  [Sims Decl., Ex. C, Moriyama Depo 10:23-12:11; 25:2-5: 10:23-12:18.]  Officer Moriyama turned on his emergency district channel and learned there had recently been a carjacking.  [Sims Decl., Ex. C, Moriyama Depo 10:23-12:11; 13:3-11.]  Officer Moriyama reported his observations to dispatch and began to follow the vehicles, which he now connected to the carjacking.  [Sims Decl., Ex. C,

Moriyama Depo 17:12-18:13; 20:12-21:5; 18:10-19:6; Declaration of Kristen Walker, Ex. B, at
10:35:19-10:38:29.]

Officer Moriyama saw the vehicles were kicking up dust and debris due to their speed and the
fact they were in the emergency lane on the right shoulder.  [Sims Decl., Ex. C, Moriyama Depo
18:14-19:6.]  As the vehicles approached where Highway 101 splits from Interstate 280, the vehicles
abruptly turned from the emergency lane to the left and across two lanes of traffic so that the vans
were travelling on southbound Highway 101.  [Sims Decl., Ex. C, Moriyama Depo 18:14-19:14.]

After exiting the freeway, Officer Moriyama spotted the vehicles near the Gilman Playground
on Gilman Street in San Francisco.  [Sims Decl., Ex. C, Moriyama Depo 22:24:23:10.]  Officer
Moriyama was able to pull behind the vehicles just as a marked SFPD patrol car coming from another
direction arrived in the area with its lights and sirens activated.  [Sims Decl., Ex. C, Moriyama Depo
24:16-25:17.]  At that point, the GMC Suburban pulled over, but the van accelerated and turned
abruptly to the right onto Ingalls Street.  [Sims Decl., Ex. C, Moriyama Depo 25:6-24.]

### III.     OFFICERS TALUSAN AND SAMAYOA PURSUE O'NEIL INTO DOUBLE ROCK

Officers Edric Talusan and Christopher Samayoa were in their SFPD uniforms and preparing
for their shift at Bayview Station, which was scheduled to begin at 11:00 a.m.  [Sims Decl., Ex. D,
Talusan Depo 49:17-19; 50:21-51:25; 60:2-24.]  They heard an "A priority" broadcast about the
carjacking, which is reserved for responding to the most serious criminal activity.  [Sims Decl., Ex. D,
Talusan Depo 57:6-24.]  At the time, Officer Samayoa was a recruit who recently graduated from
SFPD's police academy and Officer Talusan was his field training officer.  [Sims Decl., Ex. D,
Talusan Depo 14:21-25; 53:5-9; 54:8-10.]  Officer Talusan knew from the broadcast that the
carjacking originated at 23rd and Arkansas Streets and involved a white lottery van.  [Sims Decl., Ex.
D, Talusan Depo 58:4-10.]  He was unaware of the dispatch's report that no weapons were seen.
[Sims Decl., Ex. D, Talusan Depo 58:19-59:8.]

Officer Talusan then told Officer Samayoa to meet him at their police car.  [Sims Decl., Ex. D,
Talusan Depo 61:3-62:4; Walker Decl., Ex. A, Audio CAD 10:37:20.] Officer Talusan sat in the
driver's seat and Officer Samayoa was in the passenger seat.  [Sims Decl., Ex. D, Talusan Depo 63:21-
64:4; Ex. F, Samayoa BWC generally.]  When they left Bayview Station, it was Officer Talusan's

1  intention to drive with Officer Samayoa to the M&M Market to take a report.  [Sims Decl., Ex. D,

2  Talusan Depo 61:17-23.]

3       Shortly after leaving the station, the Defendant Officers heard on their radio that the van

4  suspected in the carjacking was nearby.  [Sims Decl., Ex. D, Talusan Depo 64:14-65:1.]  Officer

5  Talusan then drove the police car to the intersection of Gilman and Ingalls Streets because he believed

6  that intersection would place him in position to locate the van.  [Sims Decl., Ex. D, Talusan Depo

7  66:16-23; 68:16-69:8.]  Shortly after, the Defendant Officers saw the white van travelling westbound

8  on Gilman Street at a high rate of speed and in the eastbound lane of traffic.  [Sims Decl., Ex. D,

9  Talusan Depo 70:7-16.]  The van sped past the Defendant Officers, and Officer Talusan gave chase.

10  [Sims Decl., Ex. D, Talusan Depo 70:7-20.]  Officer Talusan pulled in behind the van, activated his

11  lights and sirens, and began pursuing the van.  [Sims Decl., Ex. D, Talusan Depo 70:7-20.]

12       While trailing the van, the Defendant Officers observed O'Neil driving increasingly

13  dangerously and erratically.  O'Neil turned the van from Ingalls Street onto eastbound Fitzgerald

14  Street and, in doing so, failed to stop at numerous stop signs.  O'Neil was driving in the opposite lane

15  of travel.  [Sims Decl., Ex. D, Talusan Depo 72:12-22; 111:12-112:8.]  O'Neil drove the van on

16  Fitzgerald Street and into Double Rock.  [Sims Decl., Ex. D, Talusan Depo 73:1-13.]

17  **IV.   OFFICER SAMAYOA FIRES AT O'NEIL AFTER HE SUDDENLY AND**
**UNEXPECTEDLY JUMPS FROM HIS MOVING VEHICLE AND RUNS DIRECTLY**
18  **TOWARDS OFFICER SAMAYOA, WHO IS SEATED IN A PATROL CAR**

19       While still driving, O'Neil began to open the driver side door of the van as he approached the

20  intersection of Fitzgerald and Griffin Streets.  [Sims Decl., Ex. E, Security Footage at 10:42:04-

21  10:42:09.]  Observing this, Officer Talusan told Officer Samayoa that the pursuit would likely become

22  a foot chase.  [Sims Decl., Ex. D, Talusan Depo 75:4-22.]  The van simultaneously turned right and, in

23  doing so, collided with a vehicle parked on the south curb of Fitzgerald Street.  [Sims Decl., Ex. E,

24  Security Footage at 10:42:04-10:42:09; Ex. D, Talusan Depo 74:7-13.]  Officer Samayoa had the

25  opportunity to see the door opening and into the driver compartment as the right turn was made.

26  [Declaration of Eric Rossetter ("Rossetter Decl."), Ex. B, pg. 2, Opinion 3.]  This area to the right of

27  the intersection of Fitzgerald and Griffin is not a through street and passage is secured by a locked

28  gate.  [Sims Decl., Ex. D, Talusan Depo 74:7-13.]

**A.     O'Neil Runs Directly Towards the Defendant Officers While Officer Samayoa Attempts to Open his Door but then Shoots O'Neil**

As the Defendant Officers were still driving down Fitzgerald Street, Officer Samayoa pulled his service pistol from his holster with his right hand while simultaneously attempting to open the passenger-side door to the police car with his left hand.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:05-08.]  At the same time, O'Neil exited out of the driver's door of his still-moving van.  [Rossetter Decl., Ex. C, Frames 366-404.]  O'Neil ran directly towards the police car, which was still moving forward.  [Sims Decl., Ex. D, Talusan Depo 79:19-80:1, 81:11-23; Rossetter Decl., Ex. C, Frames 366-404.]

As O'Neil charged toward the Defendant Officers, Officer Samayoa took his left hand off the door handle, placed it on his firearm, and fired a single shot through the passenger-side window of the police car.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:08-09; Rossetter Decl., Ex. C, Frames 366-404.]  When this occurred, O'Neil had exited the van and was moving towards the Defendant Officers.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:08-09; Rossetter Decl., Ex. C, Frame 404.]  O'Neil was under three feet from the Defendant Officers when Officer Samayoa fired the shot.  [Sims Decl., Ex. F, Samayoa BWC, 18:42:08-09; Rossetter Decl., Ex. C, Frames 366-404.]  After O'Neil jumped out of the van, Officer Talusan saw O'Neil's hands around his waist area as he was running towards the police car.  [Sims Decl. Ex. D, Talusan Depo 80:14-25.]  Based on this observation, Officer Talusan perceived that O'Neil posed a serious and immediate threat of bodily harm.  [Sims Decl. Ex. D, Talusan Depo 78:4-6; 79:19-80:1.]  Officer Samayoa would have had the opportunity to view O'Neil from the moment he exited the van until the moment the shot was fired.  [Rossetter Decl., Ex. B, pg. 2, Opinion 4.]  The shot struck and killed O'Neil.

SFPD officers are trained that criminal suspects will frequently conceal weapons, including firearms, in their waistband.  [Declaration of Steven Pomatto ("Pomatto Decl."), ¶ 3.]  SFPD recruits are taught to identify threat indicators that signal whether a suspect may have a weapon on their person.  [*Id*.]  Officers are trained that it is important to look for these indicators before a weapon is visible because it may be too late to respond after a firearm is drawn by a suspect.  [*Id*.]  Therefore, officers are trained that if a suspect grabs towards their waistband during a foot chase it is considered an indicator that the suspect has a weapon.  [*Id*.]

V.      THE SPEED, TIMING, DISTANCE AND SAMAYOA'S VANTAGE OF THE EVENT

     O'Neil was driving at an average speed of 37.3 miles per hour as he entered Double Rock. [Sims Decl. Ex. G, Rossetter Depo 13:22-15:18; 17:4-17, Rossetter Decl., Ex B, pg. 5, Figure 3, pg. 15, Table 2; Surveillance Video at 10:41:59-10:42:02.] Defendant Officers followed at a speed of approximately 44.7 miles per hour. [Sims Decl. Ex. G, Rossetter Depo 13:22-15:18; 17:4-17; Ex. E, Surveillance Video at 10:42:00-10:42:02; Rossetter Decl., Ex. B, pg. 15, Table 2.] When O'Neil opened the door of the van, he was travelling slightly slower at 37.1 miles per hour. [Rossetter Decl., Ex B, pg. 5, Table 1 at frame 288, pg. 15 Table 2 at frame 287; Sims Decl., Ex. E, Surveillance Video at 10:42:04-10:42:06.] The speed limit in this residential area is 25 miles per hour. [Sims Decl., Ex. D, Talusan Depo 113:4-6.]

     The events leading up the shooting unfolded rapidly and chaotically. Only 4.4 seconds passed from the moment the door of the van began to open to when the shot was fired. [Rossetter Decl., Ex. B, pg 5, Table 1.] Only .83 seconds passed from the moment the van brake lights were released, indicating that O'Neil was in the process of jumping out of the van, to when Officer Samayoa fired the shot. [Rossetter Decl., Ex. B, pg. 2, Opinion 7; pg. 5, Table 1.] O'Neil was 16.1 feet away from the police car at the moment he took his foot off the brakes of the van. [Rossetter Decl., Ex. B, pg. 2, Opinion 7.] That distance closed to only 2.7 feet in the 0.83 seconds between the brake lights coming off and the shot being fired. [Rossetter Decl., Ex. B, pg. 2, Opinion 7.]

     Officer Samayoa would have had a clear view of the van from his position inside the police car. [Rossetter Decl., Ex. B, pg. 2, Opinion 3 and 4.] It is undisputed that from Officer Samayoa's vantage that he would have the opportunity to view O'Neil opening his door, exiting the van, and running directly at him with his arms moving toward his waistband. [Rossetter Decl., Ex. B, pg. 2, Opinion 7, pgs. 17-22, figures 18 to 23; Sims Decl. Ex. D, Talusan Depo 80:14-25.]

ARGUMENT

I.      OFFICER SAMAYOA'S USE OF FORCE WAS REASONABLE

     Plaintiff claims that Officer Samayoa used excessive force when he shot and killed O'Neil. This claim fails on the merits and is barred by the doctrine of qualified immunity.

Claims of excessive and deadly force are analyzed under a standard of reasonableness.  *Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotation marks omitted).  A court must consider the totality of circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*; *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).

When evaluating the totality of the circumstances, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97; *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).  Reasonableness is not judged from calm remove or the perspective of the arrestee: "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  Of all these considerations, the "most important" is "whether the suspect posed an immediate threat to the safety of the officers or others."  *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017).

An officer may reasonably believe the suspect poses an immediate threat when faced with a suspect who has led pursuing officers on a high-speed chase and then charges at the police vehicle while making a gesture officers are trained to recognize as reaching for a concealed weapon.  In addition, when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  *Tennessee*, 471 U.S. at 11.

Recently the Ninth Circuit addressed a very similar situation that faced Officer Samayoa.  In *Monzon v. City of Murietta*, 978 F.3d 1150 (2020), the plaintiffs sued alleging Constitutional and Bane Act violations following the shooting death of Junef Monzon.  Before the shooting, a van driven by

Monzon had been reported stolen. *Id.* at 1154. Monzon led officers on a high-speed chase on both the highway and surface streets all while violating many traffic laws. *Id.* The chase came to a head when the van pulled into a dead-end street. *Id.* Five officers in four police vehicles pulled behind the van. *Id.* Monzon then attempted a multi-point turn that resulted in the van pointing at the officers, who had since exited their police cars. *Id.* at 1154-1555. The officers opened fire on Monzon after he refused to comply with their orders to stop the van. *Id.* Monzon was unarmed. *Id.*

The Ninth Circuit found that the officers' use of force was reasonable. *Monzon*, 978 F.3d at 1157. While the court acknowledged several facts were in dispute, it emphasized that the fast-evolving situation, the preceding car chase, and Mozon's movements towards the officers warranted deadly force. *Id.* The court wrote:

> "It all happened in less time than it took to type this sentence, before daylight, in a very dynamic and chaotic environment, where officers were forced to make split-second decisions about a driver who deliberately turned his car around and drove it toward and between them. The officers were faced with a reckless driver who had already endangered their lives and the lives of the public with a high-speed chase, had broken traffic laws, ignored commands to stop his vehicle, and steered and accelerated his van toward them in close quarters on an unlit street." *Id.* at 1158.

Like *Monzon*, the undisputed facts show that the use of deadly force was justified. Officer Samayoa was presented with a fast-evolving and chaotic situation, which was preceded by the commission of a violent felony and a car chase that posed a significant risk of serious injury to the pursuing officers and other members of the public. It is undisputed that the underlying crime O'Neil was suspected of committing was a carjacking, a violent felony.

Plaintiff's arguments supporting her motion focus on 1) her speculative arguments of what O'Neil was doing at the instant he was shot and 2) the fact that Officer Samayoa has exercised his Fifth Amendment right. Neither of these arguments taken individually or in conjunction support the notion that Plaintiff is entitled to summary adjudication.

Plaintiff minimizes the severity of the circumstances facing the Defendant Officers by arguing that O'Neil was simply running past the officers. There is no evidence, however, to support such an argument. Plaintiff's statement that O'Neil was intending to simply run past the officers has no testimonial support or evidentiary support—it is a pure guess as to what the intentions of O'Neil may

have been at the time.  Furthermore, the Defendant Officers were pursuing O'Neil because they knew he had committed a violent felony by carjacking the van.  This was not simply an auto theft, but an auto theft that was accomplished by the use of force against another person.  *See* Cal. Penal Code § 215.  It is undisputed that the underlying crime at issue was severe and that it involved the use of force by O'Neil against an innocent person.

In addition, the undisputed evidence shows that the threat O'Neil presented to Officers Talusan and Samayoa was serious and immediate.  O'Neil had clearly demonstrated he was willing to take whatever drastic measures that were required to evade the police.  *Graham*, 490 U.S. at 396.  After leading the police on a reckless car chase, he was speeding 15 miles per hour over the speed limit inside in a residential area, colliding with parked vehicles, driving on the wrong side of the street, and failing to yield to stop signs.  The Defendant Officers directly observed this erratic and dangerous behavior while they were in hot pursuit with their police vehicle lights and sirens activated.  [Sims Decl. Ex. G, Rossetter Depo 13:22-15:18; 17:4-17; Ex. E, Surveillance Video at 10:41:59-10:42:02; Rossetter Decl., Ex. B, pg. 5, Figure 3, pg. 15, Table 2.]  Immediately following this dangerous driving, O'Neil jumped out of a moving van and began running directly towards the police car while reaching into his waistband.  [Sims Decl. Ex. F, Samayoa BWC, 18:42:05-08; Ex. D, Talusan Depo 79:19-80:1, 81:11-23; Rossetter Decl., Ex. C, Frames 366-404.]  In doing so, Officer Talusan perceived a serious threat to his safety and there is no evidence that Officer Samayoa was somehow looking away from the suspect he was pursuing in the seconds before he fired his gun. Indeed, Officer Samayoa reaction to O'Neil's actions is reflected in the body worn camera footage.  It is undisputed that in the seconds before O'Neil jumped out of the van and ran toward him, Officer Samayoa had his left hand on the passenger side door and was attempting to open the door, presumably to exit the vehicle.  It is only after O'Neil exited the van that Officer Samayoa took his left hand off the door handle, moved it to the butt of his pistol and fired.  [Rossetter Decl., Ex. C, Frame 409.]  At that point, O'Neil had already run several feet directly towards the Defendant Officers after jumping out of his van.  [Rossetter Decl., Ex. C, Frame 409.]  Under these undisputed facts, any reasonable officer would consider O'Neil an immediate threat to his or her safety.

Lastly, the timing of this incident left Officer Samayoa no time to consider less lethal alternatives or issue a verbal warning that his use of deadly force was imminent.  The undisputed evidence shows that only 4.4 seconds passed from the moment the door of the van begins to open to when the shot is fired.  [Rossetter Decl., Ex. B, pg. 5, Table 1.]  Most of this time, O'Neil was in the van and a verbal warning would not have been effective.  O'Neil was out of the vehicle for .083 seconds before the shot was fired.  [Rossetter Decl., Ex. B, pg. 5, Table 1; Rossetter Decl., Ex. B, pg. 2, Opinion 7.]  Accordingly, due to the actions of O'Neil, Officer Samayoa had less than one second to determine what course of action to take to protect his life and his partner's life as a suspected violent felon charged at his vehicle.  As in *Monzon*, "[t] he urgency of this chaotic situation makes it impractical to categorically require a deadly force warning because" of the speed at which the use of force became warranted.  *Monzon*, 978 F.3d at 1158.  Officer Samayoa simply had no time to issue a warning or use less lethal force.

Plaintiff ignores these facts and, instead, focuses on the fraction of the second when Officer Samayoa fired his weapon and speculates that, at that instant, O'Neil was simply running past the officers with one hand visible.  Plaintiff does not mention that the other hand was not visible in the body-worn-camera footage and the natural motion of O'Neil would place his other hand in area of his waistband.  Nor does Plaintiff provide a shred of evidence to support her claim that O'Neil was "running past" the Defendant Officers.  Nevertheless, Plaintiff attempts to bolster this argument by stating Officer Samayoa did not have any information that any weapons were involved in the carjacking.  However, the converse is true as well, there was no information available to the Defendant Officers ruling out the possibility that weapons were used in the carjacking.  In fact, given the drastic measures O'Neil used to evade capture and the underlying crime at issue, it was reasonable to believe O'Neil was armed.

Plaintiff also makes much of Officer Talusan's testimony that he did not perceive a threat justifying the use of deadly force.  Plaintiff misconstrues this testimony and takes it out of context.  Nor is Talusan's perception of the threat the key issue, as he did not use force.  While Defendant Talusan did not perceive a deadly threat at the instant he heard the shot, he did perceive a deadly threat when O'Neil leapt out of the van, began running towards the officers and reached towards his

1    waistband.  [Sims Decl. Ex. D, Talusan Depo 77:11-80:1.]  In addition, what Officer Talusan may

2    have perceived at one time or another is a red herring.  The proper analysis is what a reasonable officer

3    would view at the scene.  There is no evidence that Talusan observed exactly what Samayoa observed,

4    especially since Talusan had to focus on operating the vehicle.  To that end, the undisputed evidence

5    shows that after O'Neil jumped out of the van Officer Talusan saw O'Neil's hands around his waist

6    area as he was running towards the police car.  [Sims Decl. Ex. D, Talusan Depo 80:14-25.]

7         Lastly, the fact that Officer Samayoa invoked his Fifth Amendment right does not mean that

8    this Court should draw an adverse inference against Defendants and grant summary judgment in favor

9    of Plaintiff.  Although "district courts have broad discretion in responding to a party's invocation of

10   the Fifth Amendment"…"direct inference of guilt from silence is forbidden." *Sec. & Exch. Comm'n v.*

11   *Strategic Glob. Invs., Inc.,* 262 F. Supp. 3d 1007, 1023 (S.D. Cal. 2017); *S.E.C. v. Colello*, 139 F.3d

12   674, 678 (9th Cir. 1998). Indeed, "[o]n summary judgment, an adverse inference alone is not enough

13   to support the absence of a genuine dispute of material fact."  *Strategic Glob. Invs., Inc.*, 262 F. Supp

14   3d at 1023.  "Such an inference may be drawn only when there is independent evidence of the fact to

15   which the party refuses to answer.  When there is no corroborating evidence to support the fact under

16   inquiry, no negative inference is permitted."  *Id.*  Here, there is no corroborating evidence supporting

17   Plaintiff's argument as to the adverse instruction that should be given.  Nor has Plaintiff identified

18   specific adverse inferences that the Court should make on account of the Fifth Amendment privilege

19   beyond simply deciding the entire dispute in Plaintiff's favor.  Finally, Defendants have not engaged

20   in obstructive or improper refusals to engage in discovery as is sometimes the basis for an adverse

21   inference arising from pleading the Fifth Amendment.  See e.g. *S.E.C. v. Benson*, 657 F. Supp. 1122,

22   1129 (S.D.N.Y. 1987).

23        Under these facts, Plaintiff's Motion should be denied as no reasonably jury could find that

24   Officer Samayoa violated the Constitution.  To the contrary, the undisputed facts show that Officer

25   Samayoa reasonably believed O'Neil was a threat to his life, to his partner's life, and to the

26   community at large.  Nor is there a shred of evidentiary support for the alleged facts that form the

27   basis for Plaintiff's Motion.  Officer Samayoa had acted reasonably when he fired his service weapon

28   at O'Neil.  As such, Plaintiff's Motion should be denied.

## II. PLAINTIFF FAILS TO ESTABLISH OFFICER SAMAYOA IS NOT ENTITLED TO QUALIFIED IMMUNITY

Plaintiff contends Officer Samayoa's use of force was unlawful and thus qualified immunity is not available.  Plaintiff fails to meet her burden of proving that the alleged force violated clearly established law.  The cases Plaintiff cites in support of her opposition are either inapposite to the facts of this case or support extending qualified immunity to Officer Samayoa.

Plaintiff relies primarily on three cases, none of which are analogous to this case, to establish that Officer Samayoa is not entitled to qualified immunity.  Plaintiff first relies on *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991), in support of her argument that Officer Samayoa's conduct clearly violated the Constitution.  In *Curnow*, officers shot a man in the back inside his own home.  *Id.*, 952 F.2d at 323.  An officer witnessed what he believed to be a domestic violence incident and saw a rifle near Curnow in his home.  *Id.*  Officers entered the home because they claimed they were concerned Curnow would use the rifle on his girlfriend.  *Id.*  Curnow was shot and killed during the entry and ensuing events because the officers believed Curnow raised the rifle and pointed it at them.  *Id.*  In opposition to summary judgment, Curnow's girlfriend submitted a declaration stating that Curnow was not in possession of a rifle, never attempted to retrieve a rifle before getting shot, and was initially shot in the back, suggesting he was unarmed and fleeing from the officer.  *Id.*  In upholding the lower court's denial of qualified immunity, the Ninth Circuit found under plaintiff's version of the events "Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time."  *Id.* at 325.

The facts of *Curnow* bear almost no similarities to this case.  This case involved a shooting that was preceded by a high-speed chase and only terminated when O'Neil jumped out of the van.  Further, unlike *Curnow* where the decedent ran away from the officers, O'Neil ran directly towards Officer Samayoa in the moments before he was shot.  Lastly, it is undisputed that O'Neil's hands were near his waistband in the moments before he was shot.  These factual differences prevent *Curnow* from putting Officer Samayoa on notice that his conduct was unreasonable.

In addition to *Curnow*, Plaintiff relies on *Estate of Lopez v. Gelhaus*, 149 F. Supp. 3d 1154 (N.D. Cal. 2016), *Tolan v. Cotton*, 572 U.S. 650 (2014), and *Cruz v. City of Anaheim*, 765 F.3d 1076

(9th Cir. 2014).  *Estate of Lopez* involved an officer-involved shooting where a minor was carrying a toy gun that the officer mistook for an assault rifle.  The officers came upon the boy and ordered him to drop the rifle.  *Estate of Lopez*, 149 F. Supp. 3d. at 1158.[1]  The officers alleged that the boy turned and pointed the barrel of the gun towards the officers, which prompted them to open fire.  While the Ninth Circuit affirmed the district court's denial of qualified immunity, they noted that the minor was not accused of committing a serious crime, and there were factual disputes regarding the manner in which the minor turned to face the officers and the movement of the gun.  *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1008-1009 (9th Cir. 2017).  Further, the court noted that officers had the opportunity to give a deadly force warning prior to shooting and had the opportunity to do so, unlike in this case.  *Id.* at 1011.  The court denied the officers qualified immunity because there was no evidence the officers had information that the minor intended to use the weapon, the minor did not threaten the officers with the weapon, and there were no reports of erratic behavior suggesting a propensity for harming others. *Id.* at 1013.

Again, the facts of *Estate of Lopez* would not put a reasonable officer in this situation on notice that his or her acts were unconstitutional.  *Estate of Lopez* did not involve a high speed chase or a suspect that was accused of committing a serious crime involving violence.  Lastly, there cannot be a credible argument, and Plaintiff makes none, that Officer Samayoa had the opportunity to give a deadly force warning.  Perhaps most persuasive, the district court in its original order that qualified immunity is inappropriate where "the suspect does not 'come at' the officers or make any sudden movements towards the officers." *Estate of Lopez*, 878 F.3d. at 1004.  The undisputed facts show that O'Neil did both: he came at Officer Samayoa and made a sudden movement towards his waistband.

In *Tolan v. Cotton*, 572 U.S. 650 (2014), the Supreme Court did not specifically address the issue of whether the officer's underlying conduct was constitutional nor did it offer an opinion whether qualified immunity applied.  Instead, the Supreme Court vacated the decision from the Fifth Circuit because "the opinion below reflects a clear misapprehension of summary judgment standards in light

---

[1] Plaintiff inexplicably cites to the district court's opinion in *Estate of Lopez* instead of the Ninth Circuit's opinion.  *See Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017).  For the purposes of the qualified immunity analysis Defendant cites to the Ninth Circuit opinion.

or our precedents." *Id.* at 659. Specifically, the Court stated that they do not "express a view as to whether Cotton's actions violated clearly established law" and remanded the case so that the Fifth Circuit could "determine whether…Cotton's actions violated clearly established law." *Id.* at 660. This case does not assist Plaintiff's argument on qualified immunity.

Lastly, in *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir 2014), officers fired 20 shots into a suspect who had been pulled over for a broken tail light before he had even exited the vehicle. Officers surrounded the vehicle in a parking lot and ordered Cruz to exit the vehicle. Shortly after he opened the door to the vehicle, but before he had exited the driver seat, the officers fired 20 shots in a span of 3 seconds. *Id*. at 1078. A bystander witnessed the events and was unable to see Cruz reaching for his waistband, which was the officers' stated basis for opening fire. *Id*. After the shots were fired, officers found that Cruz was still buckled into his seat belt. *Id*. Although the district court granted summary judgment in the officers' favor, the Ninth Circuit found that there was a fact issue precluding the grant of summary judgment. Specifically, the court asked, "[d]id the police see Cruz reach for his waistband? If they did, they were entitled to shoot; if they didn't, they weren't." *Id.* at 1079.

The court also noted that in a deadly force case the court must "determine whether the officer's story is internally consistent and consistent with other known facts." *Cruz*, 765 F.3d at 1079 (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). In reversing the district court's grant of summary judgment for some of the officers, the court focused on whether evidence could contradict the officer's testimony that Cruz reached for his waistband—including the testimony of a third party bystander witness. *Cruz*, 765 F.3d at 1080. However, unlike in *Cruz*, there was no conflicting evidence that O'Neil's hands were around his waistband or that it coincided with a suspect jumping from his still-moving car following a high-speed chase and then running directly towards the officers, as we have in this case. Here, those facts are undisputed, they do not come solely from the officers, are confirmed by objective video evidence and Dr. Rossetter's reconstruction. Under the guidelines set forth by the Ninth Circuit in *Cruz*, Officer Samayoa was entitled to shoot because the suspect reached for his waistband.

The situation facing Officer Samayoa is much more analogous to the Supreme Court decision in *Plumhoff v. Rickard*, 572 U.S. 765 (2014), where an officer initiated a traffic stop and during the

investigation, the motorist fled off at a high rate of speed. *Plumhoff*, 572 U.S. at 769-770. The ensuing chase reached speeds of 100 miles per hour and involved a collision between the motorist and a police car. *Id*. Once the motorist was cornered, he apparently attempted to reverse at a high rate of speed and the pursuing officers, who exited their own police cars, opened fire and killed the motorist. *Id*. In finding the officers were entitled to qualified immunity, the Court noted that "a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id*. at 777.

The Supreme Court's decision in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) is also analogous to this case. While the suspect in *Kisela* was armed with a knife, she had committed no crimes, was acting erratically and failed to obey the officers' commands. *Id*. at 1151. The suspect then walked within six feet of her roommate. *Id*. The Court found the officers were entitled to qualified immunity because they believed the suspect was a threat to her roommate and only had seconds to assess the situation. *Id*. at 1153.

Courts have also found that officers are entitled to qualified immunity in circumstances where an unarmed fleeing suspect is shot after exiting their vehicle and aggressively approaching the police vehicle. In *Wenzel v. City of Bourbon*, Wenzel led police officers on a high-speed chase where they observed him running through stop signs, driving in the wrong lane, and exceeding the speed limit. *Wenzel v. City of Bourbon*, 899 F.3d 598, 600 (8th Cir. 2018). After Wenzel's vehicle became stuck in an embankment, he exited the vehicle with his hands at his sides and "walk[ed] aggressively toward Storm's patrol car." *Id*. Officers did not see a weapon on Wenzel, but he continued to approach the police car with his "arms swinging as he walked." *Id*. Once Wenzel came within a few feet of the police vehicle an officer opened fire and shot Wenzel three times. *Id*. As noted by the court, "[a]pproximately three seconds elapsed from the time Wenzel exited his vehicle to the time Storm fired the shots." *Id*. Wenzel was unarmed, but the court of appeals found that the district court had erred in denying qualified immunity. *Id*. The court found that a reasonable officer could have interpreted Wenzel's conduct as a precursor to a physical attack and that the officer was justified in responding with deadly force. *Id*. This is consistent with the rulings of numerous other circuit courts. *See e.g. Mitchell v. Schlabach*, 864 F.3d 416, 423 (6th Cir. 2017) (holding an officer did not violate

clearly established law by shooting a suspect who approached him in a threatening manner); *Guerra v. Bellino*, 703 F. App'x 312, 317 (5th Cir. 2017) (holding reasonable police officer could have perceived threat of serious harm when detainee ran toward deputy sheriff from car's length away); *Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004) (holding officers acted reasonably in shooting an unarmed fleeing suspect who ran directly at a police cruiser).

Lastly, in *Foster v. City of Fresno,* 392 F. Supp. 2d 1140, 1157–58 (E.D. Cal. 2005), a deadly force case where a fleeing suspect moved his hand towards his waistband prior to the shooting, the district court noted that the minor factual discrepancies did not change the fact that the relevant inquiry was "whether Foster posed an immediate threat immediately before the shots were fired."  The district court granted summary judgment because the officer "reasonably believed Foster was armed and that all three officers saw Foster move his arm down.  *Id.* at 1157.

Courts have also found officers are entitled to qualified immunity when they use lethal force against a fleeing suspected carjacker.  *Savage v. City of Memphis*, 620 F. App'x 425, 426 (6th Cir. 2015).  In *Savage*, officers pursuing a carjacking suspect witnessed the suspect accelerate away from the officers, run a stop sign, and collide with another vehicle.  *Id* at 426-427.  The suspect then exited the vehicle and the officers gave chase on foot before shooting the suspect in the back when he reached for his waistband and turned towards the officers.  *Id* at 427.  Despite the Memphis Police Department's terminating the shooting officer for violating their deadly force policy, the court still found that the officer was entitled to qualified immunity.  *Id.*  The court noted that the combination of the carjacking report and the suspect placing his hand on his waist indicated that it was not unreasonable for officers to believe he posed and threat and that lethal force was necessary. *Id* at 428.

Here, as in *Plumhoff, Kisela, Monzon*, *Wenzel*, and *Foster*, O'Neil led officers on a high-speed chase.  In the short time the Defendant Officers were behind O'Neil, he was driving significantly over the speed limit, failing to obey traffic signs, and struck a parked car.  The situation was fast-evolving that required split-second judgment from Officer Samayoa, which is shown through the body worn camera footage and Dr. Rossetter's reconstruction.  As in *Savage*, Officer Talusan directly witnessed a carjacking suspect reach for his waist, an area where weapons are frequently concealed, and Officer

Samayoa had the opportunity to observe the same.  Plaintiff's Motion should be denied because Officer Samayoa is entitled to qualified immunity.

## III.   PLAINTIFF'S NEGLIGENCE CLAIM FAILS

Plaintiff claims that Officer Samayoa was negligent in his pre-shooting tactics and his use of deadly force.  This claim fails on the merits for the same reasons Plaintiff's Fourth Amendment claim fails and Officer Samayoa is immune from this claim.  Further, because Plaintiff's negligence claims fail as to Officer Samayoa, the claim against the City also fails.  Cal. Gov. Code §§ 815, 815.2.

### A.   Officer Samayoa is Immune from Plaintiff's Negligence Claim

Officer Samayoa is immune from Plaintiff's negligence allegation under California Penal Code § 196.[2]  The test for determining whether a homicide was justifiable under … section 196, as articulated in Penal Code Section 835a, is whether the officers reasonably believe deadly force is required "[t]o defend against an imminent threat of death or serious bodily injury to the officer or another person."  Pen. Code 835a(c)(1)(B).  Thus, the test for that privilege is the same as that governing the reasonableness of deadly force under the Fourth Amendment.  As explained above, the circumstances reasonably created in the mind of Officer Samayoa a fear of death or serious bodily harm to themselves and others, triggering the immunity of § 196.  Plaintiff's Motion should be denied for this reason alone.

### B.   Officer Samayoa's Pre-Shooting Tactics Were Reasonable

Plaintiffs relies on *Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013), to argue that Officer Samayoa's pre-shooting tactics were negligent.  In *Hayes*, on certification by the Ninth Circuit, the California Supreme Court addressed "[w]hether under California negligence law, liability can arise from tactical conduct and decisions employed by law enforcement preceding the use of deadly force." *Id.* at 626.  The Court held, "as a purely legal question," that "such liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable."  *Id.*  The Court stated that "the pre-

---

[2] "There can be no civil liability under California law as the result of a justifiable homicide." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 533 (2009) (quoting *Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996)); *Foster*, 392 F. Supp. 2d at 1159.

shooting conduct is only relevant … to the extent it shows, as part of the totality of circumstances, that the shooting itself was negligent." *Id.* at 631.  *Hayes* did not address and does not affect Officer Samayoa's statutory privileges to use force against O'Neil in the situation they faced.  Those privileges are discussed below.

Even on the duty issue, the Court acknowledged that "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." *Hayes*, 57 Cal. 4th at 632 (quoting *Brown*, 171 Cal. App. 4th at 537-38).  Under this standard, Plaintiff's Motion should be denied even if Penal Code Section 835a didn't expressly authorize the officers to arrest O'Neil.

As Plaintiff's motion acknowledges and the facts above demonstrate, this shooting unfolded extremely rapidly.  However, Plaintiff's motion ignores all of the events leading up to Officer Samayoa's use of force.  Namely, that a suspected carjacker led the police on a dangerous high-speed chase, leapt out of his vehicle, and ran directly towards Officer Samayoa while his hands were near his waistband.  In addition, Plaintiff fails to acknowledge that Officer Samayoa was not driving the patrol car and thus not in control where he was positioned in the moments leading up to firing his weapon. The entirety of Plaintiff's arguments amounts to second-guessing Officer Samayoa's decision-making in an event that occurred within seconds.  The undisputed evidence shows there was no opportunity for Officer Samayoa to provide a deadly force warning, even assuming one would have been effective from inside the patrol car.

Plaintiff also criticizes Officer Samayoa's pre-shooting tactics for his failure to confer with other officers, that he unholstered his gun without Officer Talusan telling him to do so, and his failure to utilize other unspecified options.  Again, these arguments ignore the situation facing Officer Samayoa in the minutes before the shot was fired.

### C.    Officer Samayoa Use of Force was Reasonable

The test for tort liability under state law is the same as the test for unreasonable force under the Fourth Amendment.  *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013).  Accordingly,

1  Defendants refer the Court to their Fourth Amendment briefing herein, *supra*, and to their briefing in

2  support of their summary judgment motion (ECF. No. 147, at pp. 10-13).

3  **CONCLUSION**

4        For the reasons stated herein, the undisputed facts show that Plaintiff cannot prove any of her

5  claims for relief or any of the discrete issues related thereto.  Therefore, Defendants request that

6  Plaintiff's motion for partial summary adjudication be denied.

7  Dated:  June 4, 2021

8

9                            DENNIS J. HERRERA

10                           City Attorney
                             MEREDITH B. OSBORN

11                           Chief Trial Deputy
                             HUNTER W. SIMS III

12                           RYAN STEVENS
                             Deputy City Attorneys

13

14                   By:*/s/Hunter W. Sims III*
                             HUNTER W. SIMS III

15

16                           Attorneys for Defendants
                             CITY AND COUNTY OF SAN FRANCISCO,

17                           CHRISTOPHER SAMAYOA and EDRIC TALUSAN

18

19

20

21

22

23

24

25

26

27

28