UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUDY O'NEIL,<br><br>Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Defendants. | Case No. 17-cv-07190-JCS<br><br>**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT, MOTION TO EXCLUDE EXPERT TESTIMONY, AND ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL**<br><br>Re: Dkt. Nos. 140, 145–47, 153, 160, 164 |

## I.    INTRODUCTION

On December 1, 2017, Defendant Christopher Samayoa, at the time a San Francisco police officer undergoing field training, shot and killed Keita O'Neil when O'Neil ran from a stolen van. Plaintiff Judy O'Neil, Keita O'Neil's mother,[1] brought this action asserting claims under state and federal law against Samayoa, his training officer Edric Talusan, and the City and County of San Francisco (the "City"). Defendants now move for summary judgment on all claims in the case, and Plaintiff moves for summary judgment on some claims and to exclude testimony of Defendants' expert witness Michael Pickett. The Court held a hearing on July 2, 2021.

For the reasons discussed below, Plaintiff's motion for partial summary judgment is DENIED. Defendants' motion for summary judgment is GRANTED as to Plaintiff's Fourteenth Amendment claim against Samayoa, Plaintiff's federal claims against the City, and all claims against Talusan. Defendants' motion is DENIED as to Plaintiff's Fourth Amendment and state law claims against Samayoa and as to Plaintiff's state law claims against the City. Plaintiff's motion to exclude the opinions of Michael Pickett is GRANTED in large part. The parties'

---

[1] Hereinafter, this order refers to Keita O'Neil as "O'Neil" and Judy O'Neil as "Plaintiff."

administrative motions to file under seal are GRANTED in part and DENIED in part, and the parties are ORDERED file documents in the public record as addressed below.[2]

## II.     BACKGROUND

### A.     Procedural History

Plaintiff brought this case in December of 2017, soon after her son's death. The Court stayed the case in 2019 when Plaintiff's deteriorating medical condition required appointment of a guardian ad litem. Dkt. 71. After that stay was lifted, ongoing criminal investigations of the defendant officers complicated discovery, but in August of 2020 the Court set a schedule for trial. *See* dkts. 97, 101, 106. The San Francisco District Attorney filed criminal charges related to the shooting against Samayoa on November 23, 2020, and Defendants sought a further stay on that basis, which the Court denied due to Plaintiff's health—in particular, the serious risk that Plaintiff could die before trial if the case were stayed. *See* dkts. 127, 129.[3] Samayoa has elected not to testify based on his rights under the Fifth Amendment and advice of his criminal defense attorney. Talusan, who has not been criminally charged, provided deposition testimony.

The following subsections of this order summarize evidence in the record and should not be construed as resolving any disputed question of fact.

### B.     Talusan's Deposition Testimony

The day of the shooting was Samayoa's fourth day of field training after leaving the police academy and Talusan, an experienced police officer, was assigned as his training officer. Buelna Decl. (dkt. 145-6) Ex. 1 (Talusan Dep.) at 53:7–9, 54:8–10. Talusan was at the Bayview police station when he heard a call at "A priority"—the highest level—for service regarding a carjacking, which he understood to mean "when a vehicle is taken by force or fear." *Id.* at 57:11–24, 60:2–4. Talusan testified that he did not learn from the dispatch call how the vehicle was taken, and did not hear any report that the suspect had a weapon. *Id.* at 58:15–59:22. Talusan asked his sergeant

---

[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

[3] *O'Neil v. City & Cty. of San Francisco*, No. 17-cv-07190-JCS, 2021 WL 105773 (N.D. Cal. Jan. 12, 2021); *O'Neil v. City & Cty. of San Francisco*, No. 17-cv-07190-JCS, 2021 WL 242900 (N.D. Cal. Jan. 25, 2021).

if he could respond to the call with his trainee, Samayoa, and the sergeant indicated that he could. *Id.* at 61:5–9. Initially, Talusan intended to meet the victim where the carjacking had occurred and take a report, which he believed would be a valuable training experience for Samayoa, who had taken few if any reports at that point and none for a carjacking. *Id.* at 61:20–62:16. Talusan took a patrol car with Samayoa, and told Samayoa that they were responding to a carjacking call. *Id.* at 62:20–23, 64:7–11.

While en route to meet the victim and take a report, Talusan "heard the units imply that they were following a suspect vehicle that matched the description of the vehicle taken in the carjacking," and decided to try to catch up to them and "help apprehend the vehicle." *Id.* at 64:15–65:1. Talusan does not remember whether he told Samayoa about the change of plans to apprehend the suspect rather than take a report. *Id.* at 65:2–5. He did not "try to debrief"[4] Samayoa on apprehending a carjacking suspect. *Id.* at 66:13–15. Talusan acknowledged at his deposition that chasing the suspect presented "much higher risk" than taking a report. *Id.* at 65:20–66:3.

When Talusan heard on the radio that the suspect was passing Candlestick Park, he turned in that direction, but still did not "have any conversation with [Samayoa] to get him ready for the pursuit." *Id.* at 69:9–12. At his deposition, Talusan stated that he believed he was driving in accordance with traffic laws at this point rather than using his lights and siren, although he was not certain of that recollection. *Id.* at 69:13–70:6.

Talusan had heard on the radio that the suspect vehicle was traveling westbound on Gilman Avenue, and when he reached that street he saw the van approaching "at a high rate of speed on the opposite side of the roadway going counterflow in oncoming traffic being followed by another police vehicle." *Id.* at 70:8–16. He "fell in behind the suspect vehicle," activated his lights and siren, and pursued the van "driving code three," no longer in accordance with traffic

---

[4] Plaintiff's counsel used the term "debrief" in questioning Talusan on this issue. In context, since no operation had yet been completed, he presumably meant "brief" rather than "debrief," and Talusan appears to have understood the question as such. *See also* Talusan Dep. at 69:9–11 ("And at this point did you debrief or have any conversations with your recruit to get him ready for the pursuit . . . ?"). There is no indication that counsel's misspeaking affected Talusan's answers.

3

laws. *Id.* at 70:18–24. The speed limit in that area was twenty-five miles per hour, and the van was driving faster than that, at a speed Talusan considered unsafe. *Id.* at 112:25–113:3. Talusan did not look at his speedometer to determine exactly how fast they were driving. *Id* at 113:1–2. The van crossed into the opposite lane or straddled the middle of the road while Talusan was following it. *Id.* at 112:17–19.

Talusan instructed Samayoa to advise the dispatcher by radio that they were in pursuit of the stolen vehicle, but Samayoa did not do so, for reasons unclear to Talusan. *Id.* at 71:4–72:3. Talusan had observed Samayoa operating the radio over the previous days of field training and believed that he was trained to do so. *Id.* at 72:4–11. Talusan still did not brief Samayoa on the situation or what he expected to happen. *Id.* at 70:25–71:10, 71:19–21.

Talusan continued to follow the van as it ran through intersections without stopping at stop signs. *Id.* at 72:13–18. Talusan suspected the driver of the van of traffic violations and carjacking, but not of any other crime. *Id.* at 72:19–25. The van continued to the Alice Griffith housing project, also known as "Doublerock," an area Talusan was familiar with and had patrolled before. *Id.* at 73:2–17. The street was the only entrance to Doublerock, such that Talusan knew the van would not be able to exit the area without turning back the way it came. *Id.* at 73:11–13; 73:22–25. Talusan followed with van into Doublerock with at least one other patrol car also following. *Id.* at 74:1–6. Talusan did not know how far behind the other patrol car was. *Id.* at 75:23–76:12.

The van swerved to the right and hit a parked car, and then turned right down a street that Talusan knew dead-ended at a locked gate. *Id.* at 74:8–13. Talusan thought the van would attempt a sharp left turn to get out from there, but "[a]t some point [he] felt that this would result in a foot pursuit," although he did not know when. *Id.* at 74:17–75:3. Talusan remembers advising both Samayoa and the dispatcher that the chase might end on foot, but he did not tell Samayoa what to do if that happened, because he believed it would be too dependent on circumstances and "[t]here is nothing set in stone about what tactics you can use when you're reacting to another person's actions." *Id.* at 75:4–22.

According to Talusan, the van swerved to the right, and the driver—O'Neil—jumped out

the door while the van was still moving, turned to his left, and began running towards the officers. *Id.* at 76:4–7. Talusan did not draw his gun because he was still driving the car with both hands on the wheel. *Id.* at 77:16–20. He answered affirmatively when asked if he "perceived a serious and immediate threat of bodily harm when [O'Neil] got out of the car," and testified that when O'Neil was running towards the officers "in my mind he is a threat," but ultimately stated that he did not believe deadly force was permissible at that time based on what he could see. *Id.* at 77:16–80:13.

Talusan acknowledged that that O'Neil had been attempting to flee while he was driving the van, and that a continued attempt to flee "was one of the possibilities" when O'Neil jumped out of the van. *Id.* at 78:25–79:9. Talusan noted that his field of view differed from Samayoa's and that Samayoa might see and react to something Talusan did not see. *Id.* at 77:11–15. He did not instruct Samayoa to draw his gun, *id.* at 77:7–9, and did not see that Samayoa had drawn his gun before he fired it, *id.* at 90:4–91:2. Talusan would not have instructed Samayoa to put the gun away if he had seen it because Talusan did not have the same field of view as Samayoa and would not want to give an instruction that could jeopardize Samayoa's safety. *Id.* at 91:4–24.

According to Talusan, O'Neil's hands "were down by his waist" and "his whole body was moving," but he could not recall more specifically where O'Neil's hands were. *Id.* at 8014–81:8. Talusan did not see any weapons, but testified that "he could have possibly had a weapon," and the waistband is a common place to keep a weapon. *Id.* at 81:9–10, 99:15–19. Talusan "couldn't tell if he was reaching into his waistband" because "it was all a blur." *Id.* at 99:24–100:8.

O'Neil was initially stumbling when he left the van and then started running towards Talusan's vehicle, which was stopped, as if he was just beginning a sprint. *Id.* at 81:12–23. Talusan heard a bump, which he understood to be O'Neil colliding with the front right quarter panel of the patrol car. *Id.* at 83:11–84:8.

Talusan tried to keep his eyes on O'Neil "as much as possible," and did not see any cause to draw his gun and shoot O'Neil. *Id.* at 87:16–88:1. O'Neil was still running past the patrol car when Samayoa shot him. *Id.* at 84:11–15, 98:22–99:1. Up to that time, Talusan "still considered him a threat," but he did not perceive a threat of serious and immediate bodily harm at the time of

5

the shot. *Id.* at 88:2–89:6.

Talusan had intended to get out of the car to chase O'Neil if he continued running. *Id.* at 84:25–85:2. He did not give Samayoa any instructions to that effect because there was not enough time. *Id.* at 84:16–24. Talusan does not recall Samayoa saying anything before shooting O'Neil. *Id.* at 82:25–83:8.

After Samayoa shot O'Neil, Talusan got out of the car and came around the back of the car to check on O'Neil. *Id.* at 103:7–14. He did not draw his gun. *Id.* at 106:7–13. Samayoa was standing near the back of the car at that time. *Id.* at 104:2–8. Talusan yelled "gun down" because he believed he was crossing into Samayoa's field of fire, although he was not sure if Samayoa was still pointing his gun at O'Neil. *Id.* at 103:14–23. Talusan saw O'Neil prone on the ground, not moving, with blood pooling by his head. *Id.* at 104:20–23. He could not tell whether O'Neil was alive, but did not perceive him as a threat. *Id.* at 104:24–105:2.

Talusan did not check O'Neil's vital signs or pat him down for a weapon, and instead turned back to make sure Samayoa was not hurt. *Id.* at 105:3–4, 105:22–106:2, 106:24–25. Samayoa still had his gun drawn. *Id.* at 106:3–6. Talusan took it from him. *Id.* at 107:22–23. He explained:

> Officer Samayoa had just shot somebody. It's a traumatic experience for a veteran officer, let alone somebody that just started a job and is four days on. At that point he looked like he was in shock. I was concerned for his -- not only for his physical wellbeing, but for his mental wellbeing.
>
> I didn't know how he would react to knowing that he had just shot somebody and possibly killed somebody. So I elected to take his firearm for not only our safety, the safety of the people around him, but for his safety as well.

*Id.* at 108:23–109:8.

Another officer rendered aid to O'Neil. *Id.* at 108:1–3. Talusan never discovered a weapon on O'Neil. *Id.* at 95:7–8.

Talusan and Samayoa were both wearing Axon body cameras, which the San Francisco Police Department had been using for some time before the incident. *Id.* at 66:24–67:22. Talusan, per normal procedure, had turned his camera on to "buffering mode" when he started his shift. *Id.*

at 68:4–15. When he began following the van, Talusan attempted to activate his camera to record, which would have also captured thirty seconds before he activated it, but no footage was captured by his camera during the events at issue. *See id.* at 85:7–86:19.

### C. Samayoa's Body Camera

Footage from Samayoa's body camera begins shortly before the shooting. *See* Buelna Decl. Ex. 3; Sims Decl. (dkt. 147-1) Ex. F.

Samayoa appears to draw his gun moments before the patrol car pulls alongside the van and raises it to the window as the van comes into view. Due to the camera angle, the position of Samayoa's hands, and the portion of the patrol car between the windshield and side window, O'Neil is not visible to the camera until he is nearly alongside the window. The camera therefore does not reveal what he did with his hands before he comes into view, and no portion of the video before the shooting shows both of his hands, although he appears to have at least one hand raised in a few frames. *See* Rossetter Decl. (dkt. 151) Ex. C at Frames 417–20. O'Neil's waist is not visible to the camera before the shooting.

Samayoa shoots O'Neil through the passenger window of the patrol car as it pulls alongside the van, shattering the glass, and immediately opens his door, which reveals O'Neil falling to the pavement. As Samayoa exits the vehicle, O'Neil's arms spread outward from his body. His face is covered with blood. Samayoa walks backwards away from O'Neil.

Talusan walks from the driver's seat around the back of the car to stand over O'Neil, and two officers from a second patrol car also walk to O'Neil. Audio for the recording begins at this point, and Talusan calls on the radio for assistance while still standing over O'Neil.

Samayoa covers the camera with his hand for a few seconds. Talusan then approaches Samayoa and instructs him to give Talusan his gun, which Samayoa does. Talusan instructs Samayoa to "get in the front seat right now," gesturing to their patrol car, and Samayoa does so. Samayoa sits in the driver's seat, apparently alone, for a little over thirty seconds. During that time he is silent, except at one point he quietly says the word "fuck," apparently to himself.

Someone off screen, who seems to be another police officer, approaches and says that he needs to ask Samayoa some "public safety questions," to which Samayoa responds, "yes sir."

Samayoa provides generally accurate and unremarkable answers to questions about whether anyone was injured, whether he was aware of other suspects, and the like. The officer does not ask Samayoa about the circumstances leading to the shooting, and Samayoa does not discuss them. The officer asking questions eventually instructs another officer to take Samayoa "back to the station, put him in the sergeant's office, and shut the door." Samayoa walks with that officer to another patrol car and sits in the passenger seat. Around thirty seconds after they start driving, Samayoa turns off his camera.

**D. Surveillance Video**

Surveillance cameras show the van followed by Talusan's patrol car driving quickly into the Doublerock area at 10:41 AM. Sims Decl. Ex. E. Video from a surveillance camera shows the van is turning right at a stop sign and glancing off a parked car to the right. Buelna Decl. Ex. 2. The driver's door of the van is fully open and Talusan's patrol car is in pursuit, one or two car-lengths behind. The van turns right and slows down, with something—perhaps its passenger-side mirror—falling to the ground as it passes the parked car. Talusan's patrol car follows the van around the corner and pulls to partially overlapped with the van as it comes to a near stop after the intersection. O'Neil is shielded from the camera's view behind the van as he exits the driver's door. The passenger door of the patrol car, where Samayoa is seated, appears to open slightly just as O'Neil's head becomes visible to the camera from behind the van. O'Neil runs back in the opposite direction the vehicles are moving, between the two of them and alongside the patrol car. When he is next to Samayoa's window, one of his arms appears to be extended away from his body in the direction he is running, but the video is pixelated and it is difficult to tell with any certainty. In the next frame, O'Neil collapses.

Samayoa's door opens further, he gets out of the patrol car, and he backs away from O'Neil towards the back of the car. A second patrol car drives into the frame from the same direction the other vehicles had come, and the van rolls slowly forward. Around seven seconds after the shooting, Talusan exits the driver's side of his patrol car and the second patrol car reaches the scene of the shooting.

### E. Dispatch Audio

The audio recording of the police dispatch radio includes a report at 10:33 AM of the carjacking of a state lottery van at 23rd Street and Arkansas Street. Walker Decl. (dkt. 148) Ex. A (audio recording). At 10:35 AM, someone asks if there is a description of the suspect, and the dispatcher responds: "one male, BMA,[5] under thirty, he's skinny, wearing a black hood, no weapon." Officers reported seeing the van near the Candlestick area, possibly caravanning with another vehicle. Talusan can be heard at 10:37 AM asking Samayoa to come with him to the car. At 10:40 AM, an officer reports seeing the van and the other vehicle driving at "safe speeds" on "Candlestick Road" towards Doublerock. After the vehicles are reported driving on Gilman Avenue, at 10:41 AM there is a report that both vehicles are pulling over, quickly corrected to say that they are "taking off on a marked unit," and police sirens are briefly audible. A police officer reports being "right behind" the vehicles as they head into Doublerock. At 10:42 AM, Talusan calls on the radio for a "408," as can also be seen and heard on Samayoa's body camera video shortly after O'Neil was shot. The remainder of the dispatch audio generally relates to rendering aid to O'Neil, attempts to locate other suspects, and crowd control near the shooting. At 10:46 AM, an officer reports detaining four suspects from the other vehicle.

### F. Polly Chow's Deposition

The victim of the carjacking, Polly Chow, is a sales representative for the state lottery, whose route included the M&W Market. Sims Opp'n Decl. (dkt. 161-1) Ex. B (Chow Dep.) at 12:6–13:1. On the day of the shooting, she parked her van on the street in front of that store at the intersection of 23rd Street and Arkansas Street in San Francisco. *Id.* at 15:10–16:22. When she left the store, she opened the side rear door of the van to put expired inventory inside, when someone approached her, asked for money, put their arms around her, and "searched [her] body." *Id.* at 18:11–17. The assailant did not punch, strike, or curse at Chow. *Id.* at 25:4–9. Chow raised her hands and put her key "on the counter of the van," telling the assailant that she had no money. *Id.* at 18:19–21. The assailant looked inside the van, took the key, and went to driver's side to try

---

[5] I.e., "Black Adult Male." *See* Sims Opp'n Decl. Ex. C (Moriyama Dep.) at 17:2–8.

to start the van. *Id.* at 18:22–24, 23:2–14. The van did not start and an alarm went off. *Id.* at 24:4–7.

Chow asked for the keys back and took out her phone to call 911. *Id.* at 24:7–10. The assailant came out from the van, took Chow's phone and threw it to the ground, and pushed Chow to the ground, causing her to scrape her knee. *Id.* at 14:10–12, 28:19–25. He did not punch or kick Chow while she was on the ground. *Id.* at 28:12–16. The assailant asked a group of people in another vehicle what he should do since Chow had no money; one of them advised the assailant to take the key and the van and run. *Id.* at 24:12–16, 26:24–27:1. Chow grabbed a lanyard for the key but it broke when the assailant pushed her away, and he was then able to start the van and drive away. *Id.* at 24:16–12. Chow did not see any weapons during the incident. *Id.* at 30:18–25.

### G. Gary Moriyama' Deposition

Gary Moriyama is an officer of the San Francisco Police Department. Sims Opp'n Decl. Ex. C (Moriyama Dep.) at 10:1–10. On the day of the shooting, he was driving an unmarked car on the freeway while assigned to an unrelated surveillance operation for the Special Investigations Division, and noticed the state lottery van and a tan SUV driving at high speed in the emergency lane at the right side of the road, which attracted his attention. *Id.* at 11:9–16. He saw that the passenger side door of the van was open and he initially suspected that the two vehicles might be chasing each other, or that they could have been involved a shooting. *Id.* at 17:19–18:9. Moriyama turned his radio to the emergency channel and heard a report of the carjacking. *Id.* at 12:6–11. He observed the vehicles abruptly change lanes to exit from Interstate 280 South to U.S. Route 101 South. *Id.* at 18:25–19:6.

Moriyama followed the vehicles onto 101 South, where he observed them "weaving in and out of lanes sporadically," and reported to dispatch the Dodge Caravan van with its door stuck open. *Id.* at 19:17–21:9. He then reported that he was taking the Candlestick exit towards Doublerock. *Id.* at 21:10–20. He searched for the vehicles after exiting the freeway and initially did not see them, but eventually located them near Gilman Playground, heading towards Doublerock. *Id.* at 22:24–23:16. At this point the vehicles were traveling more slowly and Moriyama reported that they were obeying the speed limit. *Id.* at 24:9–15. Moriyama observed a

marked patrol car attempt to pull them over. *Id.* at 24:18–23. The SUV yielded to the patrol car but the van sped away. *Id.* at 24:23–25:24.

### H. Eric Rossetter's Report

Dr. Eric Rossetter, Ph.D., was retained as an expert witness by Defendants to analyze video footage and other evidence regarding the chase and shooting. *See* Rossetter Decl. Ex. B (Rossetter Report) at 1. Rossetter determined that as the van and Talusan's patrol car approached the intersection where O'Neil was killed, the van decelerated from 37.3 miles per hour and the patrol car decelerated from 44.7 miles per hour, in an area where the speed limit was 25 miles per hour. *Id.* at 1, 15 & tbl. 2. Rossetter determined that 0.83 seconds elapsed from when the van's brake lights turned off (indicating that O'Neil exited the vehicle) to when Samayoa shot O'Neil, and that Samayoa would have had a clear view of O'Neil exiting the van from the passenger seat of the patrol car. *Id.* at 16. During that fraction of a second, the distance between Samayoa and O'Neil closed from 16.1 feet to 2.7 feet, due to both the forward movement of the patrol car towards O'Neil and O'Neil running in the opposite direction towards Samayoa. *Id.* at 23.

Rossetter also notes that Samayoa's body camera footage indicates the passenger side mirror of the patrol car was extended out in a normal position as they approached the van, but that it was folded flat against the patrol car in police photographs taken after the shooting. *Id.* at 23–24. Rossetter concluded that O'Neil made contact with the mirror before Samayoa shot him. *Id.* at 2.

### I. Steven Pomatto's Declaration

San Francisco Police Sergeant Steven Pomatto has been in charge of training recruits "in the arrest and control instruction and in physical training" since 2016. Pomatto Decl. (dkt. 161-17) ¶ 2. He has taught all recruits that criminal suspects frequently conceal firearms and other weapons in their waistbands, and states in his declaration that "[i]f a suspect grabs towards their waistband during a foot chase it is considered an indicator that the suspect has a weapon." *Id.* ¶ 3.

### J. DPA Report

In October of 2018, the Department of Police Accountability ("DPA") issued a report of its investigation of the shooting. Because Samayoa was fired after the shooting and was no longer a

police officer when the report was concluded, the DPA did not reach any conclusions as to his conduct. DPA Report (dkt. 164-1, under seal) at 1. As for Talusan, the DPA sustained certain allegations, but the report in the record does not describe in any detail the grounds for those conclusions. *See id.* at 2.

## III.    ANALYSIS OF MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court "'to scour the record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co.*,

*Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Applying that standard to the parties' cross-motions for summary judgment here, the Court draws all reasonable inferences in favor of Plaintiff for the purpose of Defendants' motion and draws all reasonable inferences in favor of Defendants for the purpose of Plaintiff's motion.

### B. Plaintiff's Claims Against Samayoa

#### 1. Fourth Amendment

Both parties seek summary judgment on Plaintiff's claim that Samayoa violated O'Neil's Fourth Amendment right to be free of unreasonable seizures.

"[A]pprehending a suspect through the use of deadly force is considered a Fourth Amendment seizure of the person . . . ." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir. 2020).

> A Fourth Amendment claim of excessive force is analyzed under the framework set forth by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). That analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively reasonable under the circumstances. *Id.* at 396. Determining whether a police officer's use of force was reasonable or excessive therefore "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. *Id.*; *see Deorle v. Rutherford*, 272 F.3d 1272, 1279–81 (9th Cir. 2001). Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly. *See, e.g.*, *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 [(9th Cir. 1997)] (citing several cases).

*Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Relevant considerations "include 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the

1    severity of the security problem at issue; the threat reasonably perceived by the officer; and

2    whether the plaintiff was actively resisting.'" *Lombardo v. City of St. Louis*, 594 U.S. __, __

3    (2021) (per curiam) (quoting *Kingsley v. Hendrickson*, 576 U. S. 389, 397 (2015)). "[I]t is

4    unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead,'"

5    absent "'probable cause to believe that the suspect poses a threat of serious physical harm, either

6    to the officer or to others.'" *Brosseau v. Haugen*, 543 U.S. 194, 197–98 (2004) (quoting

7    *Tennessee v. Garner*, 471 U.S. 1 (1985)).

8        Circumstantial evidence and "inferences are often necessary when the plaintiff's sole

9    eyewitness is dead." *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005); *see also*

10   *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014); *George v. Morris*, 736 F.3d 829,

11   834–35 & n.8 (9th Cir. 2013). Here, there is no direct evidence that O'Neil reached toward his

12   waistband in a manner that could reasonably be mistaken for reaching for a gun under the

13   circumstances of the shooting. There is circumstantial evidence tending to suggest that a

14   reasonable officer in Samayoa's position would not have believed that O'Neil posed a threat.

15       While Talusan's overall testimony as to whether he perceived O'Neil as a threat is

16   somewhat equivocal, Talusan testified that he did not believe deadly force was permissible when

17   O'Neil was running towards him, Talusan Dep. at 79:10–13, and that he did not "perceive

18   individually a threat of serious and immediate bodily harm to [himself] or another person" at the

19   time Samayoa shot O'Neil, *id.* at 86:2–6. Talusan never saw a weapon. *Id.* at 81:9–10. He

20   testified that O'Neil's hands were near his waistband, but—contrary to assertions in Defendants'

21   briefs—he did not testify that O'Neil "*grab[bed]* towards [his] waistband, *cf.* Pomatto Decl. ¶ 3

22   (emphasis added), or that Talusan ever believed O'Neil was reaching for a weapon. *See, e.g.*,

23   Talusan Dep. at 80:16–81:8.[6] Drawing all reasonable inferences in Plaintiff's favor, a jury might

24   infer that O'Neil's hands were only near his waist as part of a natural running motion, and might

25   conclude that a reasonable officer would have been able to distinguish that motion from reaching

26

27

28   [6] Defendants' assertion that O'Neil was "reaching *into* his waistband" has no evidentiary support.
     Opp'n to Pl.'s MSJ at 9 (emphasis added).

                                            14

for a weapon. *See, e.g.*, *id.* at 82:19–24,[7] 84:11–13[8]; Opp'n to Pl.'s MSJ (dkt. 161) at 10 (defense counsel's assertion that "the *natural motion* of O'Neil would place his other hand in area of his waistband" (emphasis added)); *cf. Savage v. City of Memphis*, 620 F. App'x 425, 428 (6th Cir. 2015) (affirming summary judgment based on "the undisputed fact that [the decedent carjacking suspect] held one hand in front of him at his waist as he fled"—an unusual running motion suggesting the suspect was armed).[9]

It is also relevant that O'Neil was, in fact, unarmed. According to Defendants' expert Dr. Rossetter, Samayoa would have had a view of O'Neil through the open door of the van as both vehicles turned right at the stop sign, and a clear view of him as he exited the van and ran towards Samayoa. Rossetter Report at 2. The actual lack of a weapon might support an inference that Samayoa did not see anything during that time that he could have reasonably perceived as a weapon, or that—in the absence of evidence to the contrary—it is unlikely that O'Neil would have reached for his waistband as if reaching for a weapon. *See Cruz*, 765 F.3d at 1079 ("In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband?").

Plaintiff also relies on the radio dispatcher's statement that the carjacking suspect had "no weapon," but it is not clear whether there is any evidentiary support for Samayoa having heard that. At his deposition, Talusan did not recall the dispatcher addressing whether the suspect had a weapon. A jury is not required to credit his testimony, and it is possible that Talusan simply forgot hearing that statement, or that Samayoa heard it but Talusan did not. But the statement occurred two minutes before Talusan asked Samayoa to come with him to the car, and the parties have identified no evidence indicating whether Samayoa was listening to the dispatch radio before

---

[7] "Q. Well, did you consider it sprinting just prior to him getting shot? A. I considered him running quickly towards us. Q. Okay. With his hands in the fashion that you demonstrated, correct? A. Yes."

[8] "Q. And then when you heard the shot from Defendant Samayoa, what did do you see Mr. O'Neil doing? A. Running."

[9] The *Savage* court also noted that the officer who shot the suspect "testified that he saw [the suspect] reach for the car's console before exiting," that he "looked back over his shoulder several times during the chase" in what the officer believed was "an attempt to locate the officers in order to turn and fire a weapon," and that he "stopped suddenly as if to turn." 650 F. App'x at 426–27. There is no comparable evidence in this case that O'Neil acted as if he had weapon.

Talusan approached him. That said, even if Samayoa did not hear the report that the carjacking was conducted without a weapon, nothing in the radio traffic affirmatively indicated that O'Neil was armed.

Defendants describe O'Neil running towards Samayoa as "unexpected," Opp'n to Pl.'s MSJ at 4, but it is not clear whether that is accurate. Talusan testified that he advised Samayoa that the pursuit could become a foot chase. Talusan Dep. at 75:4–9. O'Neil opened the driver's side door of the van more than four seconds before the shooting and before he turned the corner and exited the van, and Samayoa was in a position to see that the door was open. From defense expert Dr. Rossetter's frame-by-frame, three-dimensional reconstruction of the vehicles' positions and O'Neil's estimated location, it appears that once he left the van, O'Neil would have had difficulty running any direction except alongside the van towards Samayoa. *See* Rossetter Decl. Ex. C at Frames 396–421. O'Neil was blocked from running towards the front of the van by his open door, and with the patrol car still moving forward close alongside the van, O'Neil might have been hit by the car if he had run outwards from the van perpendicular to the patrol car's direction of travel. *See id*. Based on Talusan's warning, the open door, and the apparent inability for O'Neil to run any other direction, a jury might infer that a reasonable officer in Samayoa's position would expect O'Neil to run from the van in the direction he did.

Defendants characterize the facts of *Monzon* as "very similar" to this case, in that the unarmed driver of a van that was reported stolen led police officers on a high-speed chase before they shot and killed him while he was attempting to escape, in chaotic circumstances where the officers needed to make quick decisions. *See* Defs.' MSJ (dkt. 147) at 10–11; Opp'n to Pl.'s MSJ at 7. The Ninth Circuit affirmed summary judgment for the defendant officers on the basis that their use of force was reasonable. *Monzon*, 978 F.3d at 1164. In that case, however, the Ninth Circuit relied heavily on the fact that the decedent accelerated his van towards multiple officers on foot, analogizing to an earlier case where a suspect backed up a van towards police officers and the officer who shot the suspect believed another officer had been run over. *Id*. at 1159–61 (citing *Wilkinson v. Torres*, 610 F.3d 546, 552–53 (9th Cir. 2010)). Here, O'Neil had exited the van when Samayoa shot him; he did not pose the same indisputable threat as driver accelerating a

vehicle towards people on foot.  Along the same lines, while courts have found deadly force

reasonable to prevent a reckless driver from resuming flight that "would once again pose a deadly

threat for others on the road," the risks presented here by O'Neil's driving during the car chase

ended when he left the vehicle, and Defendants have not identified any reason to believe he would

have posed an imminent risk of harm to the public if allowed to escape on foot.  *Cf. Plumhoff v.*

*Rickard*, 572 U.S. 765, 777 (2014).

Defendants also contend that Samayoa's use of force was reasonable because when

"O'Neil had already run several feet directly towards the Defendant Officers after jumping out of

his van . . . any reasonable officer would consider O'Neil an immediate threat to his or her safety."

Defs.' MSJ at 12.  But whether O'Neil posed an immediate threat at that point depends almost

entirely on whether he had a weapon.  Samayoa was still in a patrol car, with the window up.

Defendants cite *Carswell v. Borough of Homestead*, 381 F.2d 235 (3d Cir. 2004), as "holding

officers acted reasonably in shooting an unarmed fleeing suspect who ran directly at a police

cruiser," Defs.' MSJ at 16, but neglect to mention that the officer in that case had exited the

vehicle and was standing two or three feet from it holding his gun, such that the suspect could

have "grapple[d] with him and seize[d] the gun," 381 F.2d at 243.  Defendants' discussion of

*Wenzel v. City of Bourbon*, 899 F.3d 598 (8th Cir. 2018), as a case involving an unarmed suspect

approaching a patrol car, Defs.' MSJ at 15, also omits that the officer was outside of the car at the

time, 899 F.3d at 600.[10]  *Cf. also Mitchell v. Schlabach*, 864 F.3d 416, 419 (6th Cir. 2017)

(affirming summary judgment based on qualified immunity where an unarmed suspect approached

an officer who was on foot in a threatening manner, while stating that the officer "was gonna have

to f- - -ing shoot him"); *Guerra v. Bellino*, 703 F. App'x 312, 315 (5th Cir. 2017) (reversing a

denial of summary judgment based on qualified immunity where an officer was on foot when a

suspect charged at him).  Under the circumstances of this case, Defendants have not explained

how O'Neil posed a significant risk of harm to Samayoa or anyone else if he was unarmed, or how

he could reasonably be perceived as presenting such a threat absent a reasonable perception that he

---

[10] The officers in *Wenzel* had also been warned that the suspect was dangerous and had told a
relative "that he 'was not going back to jail.'"  *Wenzel*, 899 F.3d at 599–600.

17

was armed.

Ultimately, the question is the same as in *Cruz*: "Did the police see [O'Neil] reach for his waistband? If they did, they were entitled to shoot; if they didn't, they weren't." 765 F.3d at 1078. The Ninth Circuit held in that case that there were genuine issues of material fact that precluded summary judgment. *Id.* at 1080. Although the defendant officers had been warned that Cruz carried a gun in his waistband and they testified that he reached for his waistband before they shot him, the Ninth Circuit found that circumstantial evidence could support a contrary conclusion—most notably the fact that Cruz did not actually have a gun in his waistband and thus would have had no reason to reach there, but also suspicious similarities to another shooting by one of the same officers, discrepancies as to which hand Cruz purportedly reached with and how he ended up tangled in a seatbelt if, as officers testified, he had already stepped out of the vehicle, and testimony by a bystander that Cruz's feet appeared to slipping on the ground when he was shot.[11] *Id.* at 1079–80. The facts in *Cruz* therefore included both stronger evidence of a threat justifying deadly force than here (including the warning that the suspect carried a gun and officers' testimony that they thought he was reaching for it), and stronger circumstantial evidence undermining that defense (including the suspiciously similar shooting and the discrepancies between the officers' story and the suspect being caught in his seatbelt). But like in that case, a jury here would not be required to conclude from this record that O'Neil reached for his waistband or that Samayoa reasonably believed O'Neil was reaching for a weapon. Absent such a belief, the shooting would be unreasonable under the Fourth Amendment.

Defendants contend that even if Samayoa is not entitled to summary judgment on the merits, he is protected by qualified immunity. That doctrine protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

[11] Defendants suggest in briefing that the issue of material fact in *Cruz* arose because the "bystander witnessed the events and was unable to see Cruz reaching for his waistband, which was the officers' stated basis for opening fire." Opp'n to Pl.'s MSJ at 14. But from the bystander's vantage point "he could only see Cruz's feet and the top of his head at the time of the shooting," and the court did not cite his inability to see whether Cruz reached for his waistband as among its reasons for denying summary judgment. *Cruz*, 765 F.3d at 1078.

18

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (cleaned up). The qualified immunity inquiry does not alter the general rule on summary judgment that factual disputes and reasonable inferences must be resolved in favor of the non-moving party. *See id.* at 657–60.

While broadly-framed rules are often insufficient to place an officer on notice that specific conduct is unconstitutional, qualified immunity does not shield an officer who uses deadly force against someone who does not present a threat. *See Adams v. Speers*, 473 F.3d 989, 994 (9th Cir. 2007) (noting that "the Supreme Court [has] reaffirmed the rule of *Tennessee v. Garner* that the shooting of an unarmed, non-dangerous suspect to prevent the suspect's flight is a violation of the Fourth Amendment and that cases would occur where such a violation was 'obvious'"); *Martin v. City of San Jose*, No. 19-cv-01227-EMC, 2020 WL 5910078, at *13–15 (N.D. Cal. Oct. 6, 2020). Viewing the facts of this case in the light most favorable to Plaintiff, a jury could conclude that O'Neil did not "reach" for his waistband, that his hands were in the vicinity of his waist only as part of a natural running motion, and that any reasonable officer in Samayoa's position would have recognized that O'Neil was merely trying to run away. If so, Samayoa would not be protected by qualified immunity. Defendants are therefore not entitled to summary judgment on Plaintiff's claim against Samayoa under the Fourth Amendment.

Plaintiff is also not entitled to summary judgment on this claim. Samayoa's inability to testify in his defense without waiving his right against self-incrimination in ongoing criminal proceedings implicates the same considerations that require close scrutiny of circumstantial evidence where a plaintiff's only witness has died.[12] The record is unclear as to what O'Neil did

---

[12] Plaintiff contends that an adverse inference should be drawn from Samayoa's invocation of his right not to testify under the Fifth Amendment. In this Court's view, whether such an inference is permissible adds little to the analysis of summary judgment motions. Plaintiff is already entitled to all reasonable inferences in her favor for the purpose of Defendants' motion, while in the context of Plaintiff's motion, applying a merely *permissible* adverse inference against Samayoa would contravene the requirement to draw all reasonable inferences in *his* favor. The Court therefore does not reach the question of whether an adverse inference is permissible at trial. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264–67 (9th Cir. 2000) (addressing the

with his hands as he ran towards Samayoa, and there is no direct evidence of what Samayoa saw, since his vantage point differed both from Talusan's and from the body camera mounted on his chest.  While the distance between Samayoa's eyes and the camera was not particularly large, Samayoa would have had a significantly better view of O'Neil's lower body over the dashboard and door of the patrol car than the body camera did.  Neither the largely-obscured footage from the body camera nor the low-resolution footage from the surveillance camera provides a clear picture of what O'Neil did with his hands, but the Court cannot say with certainty that no reasonable jury could deduce from that footage, in conjunction with Talusan's deposition testimony, that O'Neil more likely than not reached towards his waistband in a manner that a reasonable officer in Samayoa's position would perceive as a threat.

Both parties' motions for summary judgment are therefore DENIED as to this claim.

### 2.    Fourteenth Amendment

Plaintiff asserts that in killing O'Neil, Samayoa deprived her of her right to a familial relationship with her son under the Fourteenth Amendment's Due Process Clause.  SAC ¶¶ 31, 32. Defendants seek summary judgment on this claim.

For a substantive due process claim like that at issue here, "the cognizable level of executive abuse of power as that which shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  Courts have "a distinction between situations that evolve in a time frame that permits the officer to deliberate before acting and those that escalate so quickly that the officer must make a snap judgment." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  In the former, where deliberation is possible, a standard of deliberate indifference can suffice to state a claim based on the right to familial association under the Fourteenth Amendment, while in the latter, a plaintiff must show an officer's "purpose to harm . . that was unrelated to legitimate law enforcement objectives." *Id.* at 1137–40.

The Ninth Circuit's decision in *Gonzalez v. City of Anaheim*, 747 F.3d 789 (9th Cir. 2014) (en banc), is instructive.  There, after a traffic stop in which a suspect was not compliant with

standard for permitting such an inference).

instructions, an officer found himself inside a vehicle with the fleeing suspect. 747 F.3d at 792–93. When the suspect refused commands to stop the car and rebuffed the officer's efforts to do so, the officer shot and killed him. *Id.* at 793. The Ninth Circuit held that summary judgment on a Fourth Amendment claim was inappropriate because a jury could conclude from the officer's inconsistent testimony that "the car was moving at an average speed of 3 to 7 miles per hour," in which case the officer might not have reasonably perceived a threat, or might have had opportunities to provide a warning or use a lesser degree of force. *Id.* at 794–97. Turning to the plaintiffs' Fourteenth Amendment claim, however, the Ninth Circuit held as follows:

> The plaintiffs also assert on their own behalf, as Gonzalez's relatives, that they have been deprived of a familial relationship with Gonzalez in violation of their Fourteenth Amendment right to substantive due process. Such a claim requires the plaintiffs to prove that the officers' use of force "shock[ed] the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Based on the record, a reasonable jury could not so find. Where, as here, the officers did not have time to deliberate, a use of force shocks the conscience only if the officers had a "purpose to harm" the decedent for reasons unrelated to legitimate law enforcement objectives. *Id.* The plaintiffs produced no evidence that the officers had any ulterior motives for using force against Gonzalez, and the district court properly granted summary judgment on this claim. *See Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (explaining that "speculation as to . . . improper motive does not rise to the level of evidence sufficient to survive summary judgment").

*Id.* at 797–98.

In this case, Plaintiff does not contend in her briefs that she can satisfy the "purpose to harm" standard,[13] and argues only that "Samayoa had plenty of time to deliberate because all he had to do was simply get out of his car and chase after" O'Neil, or in other words, that Samayoa "was never forced to make a decision to shoot in a few seconds, because he was not supposed to shoot at all." *Id.* at 14. Plaintiff's position puts the cart before the horse. It may be true that Samayoa lacked a sufficient reason to shoot O'Neil, but the relevant consideration for this test is

---

[13] At the hearing, Plaintiff's counsel argued for the first time that there are genuine issues of fact as to whether Plaintiff can satisfy the "purpose to harm" standard, but identified "no evidence that the officers had any ulterior motives for using force" beyond the sort of "'speculation [that] does not rise to the level of evidence sufficient to survive summary judgment.'" *See Gonzalez*, 747 F.3d at 797–98 (quoting *Karam*, 352 F.3d at 1194)).

the time he had to make that determination before the situation changed, in "fast paced circumstances presenting competing public safety obligations." *See Porter*, 546 F.3d at 1139. In *Gonzalez*, the Ninth Circuit applied the "purpose to harm" test and affirmed summary judgment despite holding that a jury could find the officer had time to give a warning and resort to lesser force. 747 F.3d at 797–98.

The situation at issue here was changing quickly. Samayoa had less than a second from the time O'Neil emerged from the van to when he shot him. If he had not shot when he did, he might not have had another clear shot later. The fact that the decision to shoot may have been wrong—even clearly so—does not change that it was a choice Samayoa needed to make in a split second before circumstances changed significantly.

The district court decisions on which Plaintiff relies are distinguishable. In *Nunez v. City of San Jose*, 381 F. Supp. 3d 1192 (N.D. Cal. 2019), officers responded to a report that eighteen-year-old Anthony Nunez was suicidal and had shot himself in the head at his home. 381 F. Supp. 3d at 1196–97. A team of officers set up outside the house with guns drawn. *See id.* at 1199. Nunez emerged from the front door twice. The second time, two officers shot and killed him. *Id.* at 1199–1200. Judge Koh held that based on inconsistencies in the evidence as to whether Nunez had a gun at the time he was shot or pointed it at officers, a jury could conclude that the officers had time to deliberate, and summary judgment based on the "purpose to harm" standard was not appropriate. *Id.* at 1213–14. In *Nieto v. City and County of San Francisco*, officers confronted Alejandro Nieto while he was walking in Bernal Heights Park with a taser holstered at his waist. *Nieto*, No. 14-cv-03823 NC, 2015 WL 7180609, at *1 (N.D. Cal. Nov. 16, 2015). There was conflicting evidence as to whether Nieto drew his taser and threatened the officers, or simply did nothing in response to orders to stop before he was shot. *See id.* at *3–4. Judge Cousins held that based on witness testimony that officers shot Nieto while he was walking calmly and without giving him an opportunity to respond to commands, a jury could conclude that the officers had time to deliberate, and summary judgment based on the "purpose to harm" standard was inappropriate. *Id.* at *4–5. Viewing the facts in the light most favorable to the plaintiffs in those cases, neither involved a suspect fleeing from police, nor circumstances under which officers'

22

control over the situation was in flux.

Here, as discussed above in the context of Plaintiff's Fourth Amendment claim, a jury might conclude that Samayoa lacked reasonable grounds to consider O'Neil a threat to Samayoa as he approached or to the public if he escaped. But even viewing the record in the light most favorable to Plaintiff, Samayoa had less than a second to make that determination, and decide whether to shoot, give chase on foot, or let O'Neil run away. He "did not have time to deliberate" in making that decision, and Plaintiff has "produced no evidence that [Samayoa] had any ulterior motives for using force." *See Gonzalez*, 747 F.3d at 798. Defendants' motion for summary judgment is therefore GRANTED as to Plaintiff's Fourteenth Amendment claim against Samayoa.

### 3. Negligence

Both parties seek summary judgment as to Plaintiff's negligence claim against Samayoa. Under California law, a "plaintiff in any negligence suit must demonstrate 'a legal duty to use due care, a breach of such legal duty, and [that] the breach [is] the proximate or legal cause of the resulting injury.'" *Kesner v. Superior Court*, 1 Cal. 5th 1132, 1142 (2016) (quoting *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP*, 59 Cal. 4th 568, 573 (2014)). "Except when otherwise provided by law, public employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions," and "peace officers have a duty to act reasonably when using deadly force." *Hayes v. County of San Diego*, 57 Cal. 4th 622, 628–29 (2013).

The inquiry overlaps with the Fourth Amendment analysis above in that it turns on the reasonableness of Samayoa's use of force. Neither party suggests that the California negligence standard differs from that analysis in any way material to this case, and both parties agree that the statutory immunity of California Penal Code section 196, which incorporates Penal Code section 835a(c)(1)(A)'s authorization to use deadly force if the officer reasonably believes it necessary to "defendant against an imminent threat of death or serious bodily injury to the officer or to another person," is "the same as that governing the reasonableness of deadly force under the Fourth Amendment." Defs.' MSJ at 25–26; *see* Opp'n to Defs.' MSJ (dkt. 163) at 15 (agreeing with Defendants' characterization). For the same reasons neither party is entitled to summary judgment

on the Fourth Amendment claim against Samayoa as discussed above, neither party is entitled to summary judgment on the question of whether his use of force was unreasonable for the purpose of Plaintiff's negligence claim or immunity under section 196.

Defendants also contend that they are immune under section 820.6 of the California Government Code, which protects a public employee who "acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable" to the same extent as if "the enactment been constitutional, valid and applicable," Cal. Gov't Code § 820.6, "because the officers at the very least acted without malice and under the good faith belief that Penal Code section[s] 196 and 835a authorized their actions." Defs.' Mot. at 26. Defendants do not argue that this test is any broader than the federal qualified immunity doctrine. *See id.* Because a jury might conclude that Samayoa lacked sufficient basis for a good faith belief that O'Neil posed an imminent threat, as discussed above in the context of qualified immunity, he is not entitled to summary judgment based on section 820.6.

Defendants also argued in their motion that Government Code section 821.6 immunized their conduct here, but in response to authority cited in Plaintiff's opposition brief holding section 821.6 inapplicable to conduct during arrests, Defendants withdrew that argument in their reply. Reply re Defs.' MSJ (dkt. 165) at 10 n.3; *see Blankenhorn v. City of Orange*, 485 F.3d 463, 488 (9th Cir. 2007).

Both parties' motions for summary judgment are DENIED as to Plaintiff's negligence claim against Samayoa.

### 4. Battery

Defendants also seek summary judgment as to Plaintiff's claim for battery based solely on the same state immunity statutes discussed above in the context of Plaintiff's negligence claim. *See* Defs.' MSJ at 25–26. Because there are genuine disputes of material fact regarding the reasonableness of Samayoa's use of force and whether he had a good faith belief that O'Neil posed a threat, Defendants' motion is DENIED as to Plaintiff's battery claim against Samayoa.

### 5. Bane Act

Defendants seek summary judgment as to Plaintiff's claim under section 52.1 of the

United States District Court
Northern District of California

California Civil Code, also known as the Bane Act. That statute creates a right of action against any person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or . . . of this state." Cal. Civ. Code § 52.1(a) (defining the conduct prohibited); *see also id.* § 52.1(b) (creating private right of action). To prevail on a Bane Act claim, a plaintiff must demonstrate: (1) an act of interference with a legal right by (2) intimidation, threats, or coercion. *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998). A Bane Act claim "requires a 'specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).[14]

Defendants contend that Samayoa did not interfere with any legal right because his use of deadly force was reasonable, and thus did not violate the Fourth Amendment. As discussed above, there is a genuine dispute of material fact as to that issue, and Defendants are not entitled to summary judgment on it.

Defendants also argue that Plaintiff cannot establish specific intent. "[A] mere intention to use force that the jury ultimately finds unreasonable—that is, general criminal intent—is insufficient. Rather, the jury must find that the defendants intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *Reese*, 888 F.3d at 1045 (cleaned up) (applying the "*Screws* specific intent standard" for violations of 18 U.S.C. § 242, also endorsed by the *Cornell* court in this context). That standard can be satisfied by recklessness:

> The application of the *Screws* specific intent standard here is straightforward. As explained in [a prior California appellate decision], this test essentially sets forth two requirements for a finding of specific intent. The first is a purely legal determination. Is the right

---

[14] Defendants briefly argue "that a plaintiff must prove threats, intimidation, and coercion separate and apart from the force that [a] plaintiff claims violated his rights" based on California appellate court decisions predating *Cornell* and *Reese*, Defs.' MSJ at 28, but the Ninth Circuit squarely rejected that view in *Reese*, 888 F.3d at 1043, and the Ninth Circuit's interpretation of state law is "binding in the absence of any *subsequent* indication from the California courts that [its] interpretation was incorrect." *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983) (emphasis added).

United States District Court
Northern District of California

> at issue clearly delineated and plainly applicable under the circumstances of the case? If the trial judge concludes that it is, then the jury must make the second, factual, determination. Did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right? If both requirements are met, even if the defendant did not in fact recognize the unlawfulness of his act, he will be adjudged as a matter of law to have acted with the requisite specific intent— i.e., in reckless disregard of constitutional or statutory prohibitions or guarantees.

*Cornell*, 17 Cal. App. 5th at 803 (cleaned up) (footnote omitted); *see also Reese*, 888 F.3d at 1045 ("But it is not necessary for the defendants to have been thinking in constitutional *or legal terms* at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." (citation omitted)).  The Supreme Court decision from which the test is derived similarly recognized that recklessness could suffice: "When they act willfully in the sense in which we use the word, they act in open defiance *or in reckless disregard* of a constitutional requirement which has been made specific and definite."  *Screws v. United States*, 325 U.S. 91, 105 (1945) (emphasis added).

This is not a case where the *degree* of force is subject to dispute, such that a jury must weigh uncertain gradations of force against the circumstances that prompted it.  Samayoa shot O'Neil at point-blank range.  A jury could reasonably conclude that he intended to kill him.  It is well established that "the shooting of an unarmed, non-dangerous suspect to prevent the suspect's flight is a violation of the Fourth Amendment," and that in at least some circumstances such a violation may be "obvious."  *Adams*, 473 F.3d at 994.  If Samayoa did not perceive a threat from O'Neil, a jury could conclude that he acted "in reckless disregard of a constitutional requirement which has been made specific and definite," *see Screws*, with an intent to deprive O'Neil of his life, which in these circumstances is "the interest[] protected by that right," *see Cornell*, 17 Cal. App. 5th at 803 (cleaned up).

Given the muddled and limited evidence of what O'Neil did in the moments before he was shot and what Samayoa saw, a jury might reasonably conclude that Samayoa perceived no threat and acted out of some other motive, such as simply stopping a fleeing suspect.  If so, the jury could infer that he acted with reckless disregard sufficient for Plaintiff to prevail on her Bane Act claim.  A jury might also determine that Samayoa reasonably—or even unreasonably—perceived

26

a threat, in which case he would not satisfy the specific intent requirement for this statute. But Defendants are not entitled to summary judgment on this issue.

Defendants cite one case to the contrary: *Losee v. City of Chico*, 738 F. App'x 398 (9th Cir. 2018). There, viewing the facts in the light most favorable to the plaintiff on summary judgment, an officer began firing as the decedent's vehicle backed up too slowly to pose a danger, and continued firing as the car drove away from officers in a manner that, according to the Ninth Circuit, did not present any immediate threat of harm. *Id.* at 400–01. The panel held that the district court erred in granting summary judgment in favor of that officer based on qualified immunity because a jury could conclude that the shooting was objectively unreasonable. As to the Bane Act, though, the Ninth Circuit affirmed summary judgment:

> The district court did not err, however, in granting summary judgment to Sergeant Zuschin on Losee's Bane Act claim. Liability under the Bane Act requires an officer to have had "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & Cty. of S.F.*, 17 Cal. App. 5th 766, 225 Cal. Rptr. 3d 356, 384 (2017)). Evidence simply showing that an officer's conduct amounts to a constitutional violation under an "objectively reasonable" standard is insufficient to satisfy the additional intent requirement under the Bane Act. *See id.* at 1045. Rather, Losee must show that Sergeant Zuschin "intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances." *See id.* (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). Losee proffered no such evidence.

*Id.* at 401.

The decision in *Losee* is unpublished and thus not binding on this Court, and it did not address *Reese*'s holding that "a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights." *See Reese*, 888 F.3d at 1045. Because there is evidence here from which a jury could determine that Samayoa acted with such reckless disregard, *Losee* does not alter this Court's conclusion that Plaintiff could satisfy the Bane Act's specific intent standard.[15]

---

[15] Although there is perhaps some superficial tension between this holding as to the Bane Act and the Court's holding above that Plaintiff cannot meet the intent requirement of the Fourteenth Amendment, the Court is aware of no authority suggesting that reckless disregard of constitutional rights is sufficient to support a claim under the Fourteenth Amendment, or that a Bane Act claim

Defendants' motion for summary judgment is therefore DENIED as to Plaintiff's Bane Act claim.

## C.  Plaintiff's Claims Against the City

### 1.  *Monell* Claim

Plaintiff's operative second amended complaint includes a claim under § 1983 against the City based on the doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), asserting that the alleged violation of O'Neil's constitutional rights stemmed from a custom or policy of the City.  *See* SAC ¶¶ 33–42.

Under *Monell*, a municipality cannot be held liable under § 1983 for constitutional injuries inflicted by its employees on a theory of respondeat superior.  *Monell*, 436 U.S. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  A plaintiff seeking to establish municipal liability under § 1983 may do so in one of three ways: (1) the plaintiff may demonstrate that a municipal employee committed the alleged constitutional violation "pursuant to a formal government policy or longstanding practice or custom which constitutes the standard operating procedures of the local governmental entity"; (2) the plaintiff may demonstrate that the individual who committed the constitutional violation was an official with "final policy-making authority and that the challenged action itself thus constituted an act of official government policy"; or (3) the plaintiff may demonstrate that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).

Defendants argue that Plaintiff lacks evidence to support this theory of liability.  Defs.' MSJ at 19–23.  Plaintiff does not oppose Defendants' motion as to this claim.  Opp'n to Defs.' MSJ at 2 n.1.  Defendants' motion is therefore GRANTED as to Plaintiff's *Monell* claim.

requires either time to deliberate or evidence of an ulterior motive unrelated to law enforcement.

## 2.    State Law Claims

"Except as otherwise provided by statute . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov't Code § 815.  Defendants move for summary judgment on Plaintiff's state law claims against the City on the basis that "Plaintiff's complaint does not allege a specific statutory basis for liability." Defs.' MSJ at 26–27.  As Plaintiff notes in her opposition, her complaint specifically cites section 815.2 of the Government Code, SAC ¶¶ 49, 57, which provides that a "public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't Code § 815.2(a).  Defendants do not renew this argument in their reply.

The City can be held liable under state law to the same extent as Samayoa.  Because Defendants are not entitled to summary judgment on Plaintiff's state law claims against Samayoa for the reasons discussed above, Defendants' motion for summary judgment as to Plaintiff's state law claims against the City is DENIED.

### D.    Plaintiff's Claims Against Talusan

Plaintiff asserts the same claims against Talusan as against Samayoa, except that in her opposition brief, she concedes that summary judgment is appropriate as to her Fourteenth Amendment claim against Talusan.  *See* Opp'n to Defs.' MSJ at 2 n.1.  Defendants seek summary judgment as to all claims against Talusan.

Aside from recitations of legal standards, Plaintiff's arguments as to Talusan's responsibility are, in full, as follows:

> Defendants make the argument that summary judgment should be granted against Plaintiff's claim as to Defendant Talusan because he did not actually shoot Keita. While officers are not integral participants simply by the virtue of being present at the scene of an alleged unlawful act (*Jones*, 297 F.3d at 936), they are integral participants if they stand watch while the excessive force occurs, are aware of it and do not object (*Boyd*, 374 F.3d 780). See also *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) (recognizing that an officer who stands watch at the door is an integral participant); *James*

*ex rel. James v. Sadler*, 909 F.2d 834 (5th Cir. 1990) (recognizing officers that are armed back up during a search are also integral participants). Here, Defendant Talusan testified that he was trained and required to intervene if he saw another officer using excessive force. (Buelna Decl., Ex. 1 – Talusan Depo, pp. 28–30).

As for Defendant Talusan's assertion he did not see Samayoa reach for his gun, the jury need not believe his own self-serving testimony that he somehow did not notice Defendant Samayoa had drawn a gun well before the car had stopped. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1078–79 (9th Cir. 2014) (holding that despite officers' testimony that the suspect was reaching for a gun, the jury need not believe that narrative, even without contradictory video evidence, because "if the suspect *doesn't* reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door"). Accordingly, the jury could reject Defendant Talusan's testimony and believe that Defendant Talusan saw Defendant Samayoa drawing and pointing his gun at Keita – and yet did nothing to intervene.

Indeed, his own Department found Defendant Talusan failed to adequately supervise his trainee and demoted him from patrol and being a field training officer to inspecting commercial trucks for compliance. (Buelna Decl., Ex. 1 – Talusan Depo, p. 98).

For the aforementioned reasons, the Court should DENY Defendant Talusan's Motion.

[. . .]

Defendants cite no case law to support their position that Defendant Talusan is entitled to qualified immunity for failing to intervene when he witnessed his trainee's excessive and deadly force. Defendants' failed to include a cite because it has been clearly established for decades that officers must intervene when they witness excessive force and do not object (*Boyd*, 374 F.3d 780); *see also Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) (recognizing that an officer who stands watch at the door is an integral participant); *James ex rel. James v. Sadler*, 909 F.2d 834 (5th Cir. 1990) (recognizing officers that are armed back up during a search are also integral participants). Here, Defendant Talusan testified that he was trained that he must intervene when he sees excessive force and knows that he may be held criminally and civilly liable if he does not. Therefore, it is unquestionable that Defendant Talusan is not entitled to qualified immunity on this issue.

Opp'n to Defs.' MSJ at 4–5, 13. The opposition brief includes no particular argument with respect to Talusan's liability on state law claims.

"An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (citing *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996)). "Integral participation does not require

30

that each officer's actions themselves rise to the level of a constitutional violation . . . [b]ut it does require some fundamental involvement in the conduct that allegedly caused the violation." *Id*. (citations and quotation marks omitted). Thus, "[o]fficers are fundamentally involved in the alleged violation when they provide affirmative physical support at the scene of the alleged violation and when they are aware of the plan to commit the alleged violation or have reason to know of such a plan, but do not object," *Monteilh v. County of Los Angeles*, 820 F. Supp. 2d 1081, 1089–90 (C.D. Cal. 2011). "Additionally, officers may be integral participants even if they have no knowledge of a plan to commit the alleged violation if their physical participation in the alleged violation was part of a closely related series of physical acts leading to the violation." *Id*. (citing *Blankenhorn*, 485 F.3d at 481 n.12). "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citation and internal quotation marks omitted).

The only basis that Plaintiff has asserted for Talusan's liability is his failure to intervene to prevent Samayoa from shooting O'Neil. Opp'n to Defs.' MSJ at 4–5. "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham*, 229 F.3d at 1289.

Talusan denies having seen Samayoa draw his gun before he fired it, and there is no evidence contradicting that denial. Assuming for the sake of argument that a jury might nevertheless disbelieve that testimony, Plaintiff has offered no authority for the proposition that Samayoa merely drawing his gun would have given rise to a duty to intervene. At the time, the officers were involved in a high speed chase that could itself have potentially justified the use of deadly force if O'Neil had remained behind the wheel of the van, *see, e.g.*, *Plumhoff*, 572 U.S. at 777, and even if the jury infers—contrary to his testimony—that Talusan heard the report that the suspect did not use a weapon for the carjacking, he would not know with any certainty that O'Neil had no weapon that he might have drawn when he emerged from the van. Accordingly, Plaintiff has identified no evidence to show that O'Neil had a duty to intervene when Samayoa's gun was merely drawn. Talusan is at the very least entitled to qualified immunity on that theory, if not also summary judgment for failure to show any violation.

Once O'Neil left the van, there was less than a second before Samayoa shot him. Talusan testified that he initially considered O'Neil at least a potential threat, as someone who was "fleeing from the police" and "jumping out of a vehicle who may or may not have a weapon." Talusan Dep. at 78:13–19. Plaintiff has not offered any basis to disbelieve that testimony or conclude that belief was unreasonable, such that Talusan would be required to intervene to prevent Samayoa from shooting, when Talusan did not know either whether Samayoa would shoot or if O'Neil might take action that would justify deadly force. Even if the jury can infer that Talusan reached a firm conclusion that O'Neil was unarmed at some point after he jumped from the van and into Talusan's view, Talusan at that time would have had significantly less than one second to intervene before Samayoa fired.

The facts here do not resemble cases where courts have allowed claims to proceed based on a theory of integral participation or failure to intervene. *See, e.g.*, *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (finding a theory integral participation in the use of a flash-bang viable where "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed"). Instead, more analogous cases have held that officers were not liable where they had no reasonable opportunity to intervene in a colleague's improper use of force, even when they were present at the scene. *See Cunningham*, 229 F.3d at 1290 ("Moreover, the undisputed evidence shows that the non-shooting officers who were present at the shootouts had no 'realistic opportunity' to intercede."); *Garner v. City & Cty. of San Francisco*, No. 14-cv-05172-EDL, 2016 WL 10859785, at *3 (N.D. Cal. Feb. 23, 2016) (holding, where a defendant officer (Sadiki) drove a police car to follow a suspect and questioned him whether a bicycle was stolen, the plaintiff failed to present evidence that Sadiki "knew or reasonably should have known" that another officer (Harris) would use arguably excessive force, and "given the quick sequence of events, there is no evidence indicating that Defendant Sadiki could have interceded to prevent Defendant Harris from using force"); *Mendez v. Montour*, No. 12-cv-04170-WHO, 2014 WL 1218665, at *3 (N.D. Cal. Mar. 21, 2014) (holding, where a first officer (Anderson) was conducting an arrest without use of force beyond applying handcuffs to a compliant suspect (Mendez), Anderson could not be held liable

32

for the use of force by second officer (Montour) because "there is no evidence that Anderson authorized, knew in advance, encouraged, or otherwise helped Montour take down Mendez or slam Mendez into the patrol car," or "to suggest that Anderson had a realistic opportunity to [intervene], given the way the undisputed events unfolded and the time frame").

The DPA's findings of neglect of duty by Talusan do not alter the analysis. Plaintiff has cited no authority suggesting that the DPA's findings are entitled to deference in this civil action. The short report in evidence states only the conclusions, without explanation for how the DPA reached them or—with the exception of failure to activate a body camera—what *particular* acts or omissions by Talusan supported those conclusions. Absent some explanation for the basis for the DPA's decision, the Court cannot say whether Talusan's purported failures cited therein contributed in any way to O'Neil's death. It is equally possible that the DPA based its conclusion on Talusan's conduct having created risks to officers, risk of O'Neil escaping, or some other consideration. At the very least, the DPA's report does not establish any constitutional violation.

Defendants' motion for summary judgment is therefore GRANTED as to Plaintiff's federal claims against Talusan.

Plaintiff has offered no other argument as to why her state law claims should proceed against Talusan. In the absence of argument or evidence to the contrary, the Court concludes that even drawing all inferences in Plaintiff's favor, Talusan's conduct in pursuing O'Neil is entitled to immunity under sections 193, 835a, and 820.6 as a good faith effort to apprehend a suspect using reasonable force, without reaching the question of whether Plaintiff could satisfy the elements of a negligence or battery claim against Talusan. The same immunities apply to Plaintiff's claim against Talusan under the Bane Act, and regardless, Plaintiff has not presented evidence from which a reasonable jury could find that Talusan met that law's standard for specific intent, even under the recklessness test discussed above in the context of that claim against Samayoa. Defendants' motion for summary judgment is therefore GRANTED as to Plaintiff's state law claims against Talusan.

## IV. ANALYSIS OF MOTION TO EXCLUDE EXPERT TESTIMONY

### A. Overview of Pickett's Reports

Defendants' expert witness Michael Pickett is a former parole officer, correctional officer, and prison administrator. Mot. to Exclude (dkt. 140) Ex. 2 (1st Pickett Report) at 1. Since retiring from the California Department of Corrections and Rehabilitation, he has worked as a consultant and for a private company conducting "security reviews of the operation of jails and private correctional facilities which hold undocumented immigrants pending their deportation proceedings." *Id.* His expertise is primarily in the administration of correctional facilities. *See id.* at 1–2.

Pickett reviewed documents regarding O'Neil's prior arrests, periods of detention, and parole, including arrests in 1994 for narcotics possession, petty theft, and a concealed firearm; drug-related arrests in 1997, 1998, 1999, and 2000; an arrest for robbery in 2000; an arrest for vehicle theft, the timing of which is unclear except that O'Neil was released from jail in August of 2017; various prison rule violation reports, including for fighting and participation in riots; and a number of parole violations. *Id.* at 2–6. In a summary of those documents, Pickett characterizes O'Neil as "largely a conforming inmate during his initial prison commitment"; "non-conforming to say the least" during his first term of parole after being released; "totally non-conforming" during a second prison commitment except as to its "last several years," during which "O'Neil appears to have changed his behavior and became a more conforming inmate" such that "virtually all the behavior credits O'Neil lost as a result of being found guilty of [earlier] serious rule violation reports were restored"; and "less than conforming" during the term of parole following his most recent release, which was ongoing at the time of his death. *Id.* at 6–7. Pickett also notes that O'Neil's records do not indicate any involvement with prison or street gangs, and that Plaintiff visited O'Neil in prison eight times in 2006, five times in 2007, one time in 2008, five times in 2009, and not at all from 2013 to 2015 while O'Neil was incarcerated at a state prison in Vacaville. *Id.* at 6.

In a report dated September 22, 2019, which is attached to Plaintiff's motion to exclude, Pickett's full opinion is as follows:

I have carefully reviewed all the case material concerning O'Neil's two prison commitments and parole periods and other documentation related to his criminal behavior. Based on this review it is my opinion that Keita O'Neil was a career criminal with a long history of narcotic, weapons and violent behavior, both in the community and inside state prison. This behavior is documented in arrest reports and in his CDCR central file. O'Neil's involvement in the December 17, 2017 incident which led to his death was a continuation of his violent criminal behavior. During this incident O'Neil overpowered a state lottery employee using physical force and stole the employee's lottery vehicle. As a result of O'Neil's actions, the victim suffered minor injuries.

It is my opinion that as O'Neil aged and served longer prison terms his behavior reflected a general disregard for CDCR rules and the authority of prison officials. This disregard for rules and laws also is reflected in his behavior on parole and his inability to remain arrest free and stop using narcotics while in the community on parole. There is considerable documentation that O'Neil repeatedly refused to participate in education and narcotic self-help programs both in prison and on parole. Additionally, parole records reflect that O'Neil did not participate in any gainful employment during his parole periods.

*Id.* at 7.

A similar but slightly longer report dated February 9, 2021 is submitted with Defendants' opposition to the motion to exclude. *See* Stevens Decl. (dkt. 159-1) Ex. A (2d Pickett Report). Neither party addresses the discrepancy between these two reports. The opinion section of the February report includes minor, non-material additions to the two paragraphs in the September report, and adds the following new conclusions:

At the time of his death O'Neil had approximately one year left on his sixteen-year prison sentence. Had the December 1, 2017 incident ended differently and O'Neil was instead arrested he would have undoubtedly been returned to prison for the remaining period of his sixteen-year sentence as a parole violator following his being a parole [sic] at large, having been convicted of Receiving Stolen Property, and theft of the lottery vehicle and injury of the lottery official. It is my opinion that there was also a high probability that O'Neil would have been prosecuted by San Francisco County for the December 1, 2017 incident and if found guilty could have been sentenced to a third state prison commitment.

Had the December 1, 2017 incident not happened and at some point O'Neil had been arrested based on his being a parolee at large it is my opinion he would have also been returned to prison to complete his sixteen year prison term on the basis of having been found guilty of receiving stolen property (8/12/2017 incident) and the fact that he had absconded parole supervision and a CDCR warrant for his arrest had been issued. It is my opinion that in both of the aforementioned

35

scenarios O'Neil's criminal behavior while on parole would have resulted in the Parole Board returning O'Neil to state prison a parole violator.

*Id.* at 8–9.

At his deposition, Pickett explained the scope of his retention in this case as follows:

> Q. Okay. So when you were initially engaged by the San Francisco City Attorney's office to review documents and materials in this case, you were asked to review essentially his -- how he was behaving. And I think the term you used was adjusting to prison commitment as well as on parole; is that true?
>
> A. That's correct.
>
> Q. Okay. And do you intend to offer any other opinions other than those two opinions as it relates to how he adjusted to his time in custody as well as how he adjusted to his time on parole?
>
> A. I don't believe so. I mean, that's what I was asked to do and to provide an opinion, you know, about how he was -- how he, you know, adjusted to both being in prison and being on parole.

Mot. to Exclude Ex. 1 (Pickett Dep.) at 10:18–11:7.

As stated on Pickett's resume, he served as a parole officer from 1972 to 1977. Stevens Decl. Ex. 2 at 6.[16] In 1974 and 1975, he was an "executive officer" for the Women's Parole Board. *Id.* None of his more recent experience relates specifically to parole. *See id.* at 2–6. Pickett worked as a special agent or senior special agent for the Law Enforcement and Investigations Unit of the Department of Corrections from 1977 to 1985. *Id.* at 6. His experience since then has been in prison administration, consulting related to administration, and offering opinions on use of force by correctional officers (not by police officers outside of the corrections context). *Id.* at 2–6; *see* Mot. to Exclude Ex. 1 (Pickett Dep.) at 11:8–12:14.

### B.   The Parties' Arguments

Plaintiff contends that "Pickett's opinions that Keita O'Neil was a career criminal both in and outside of the prison system and his speculative opinion that O'Neil's behavior reflected an inability to follow rules or to be rehabilitated are widely outside the scope of Pickett's qualifications," because Pickett's expertise lies in "how prison systems operate, the use of force by

---

[16] Citations to this exhibit use the page numbers assigned by the Court's ECF filing system because the exhibit includes no internal page numbers.

correctional officers and providing medical services in a prison setting," and "he is not a trained or licensed psychologist, sociologist or mental health professional." Mot to Exclude at 2.

Defendants contend that Pickett's experience in the parole and correctional systems qualify him to offer an opinion on the likely consequences O'Neil would have faced if apprehended, which Defendants argue is relevant primarily to damages and also potentially to O'Neil's state of mind at the time of the shooting. *See generally* Opp'n to Mot. to Exclude (dkt. 159).

## C.    Legal Standard for Expert Testimony

Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This rule embodies a "relaxation of the usual requirement of firsthand knowledge," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993), and requires that certain criteria be met before expert testimony is admissible. The rule sets forth four elements, allowing such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness." *Id.*

The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science," and grants the court "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)). Evidence should be excluded as unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005).

The relevance prong looks to whether the evidence "fits" the issues to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Daubert*, 509 U.S. at 591. "Where an 'expert report' amounts to written advocacy . . . akin to a supplemental brief, a motion to strike is appropriate because this evidence is not useful . . . ." *Williams v. Lockheed Martin Corp.*, No. 09CV1669 WQH, 2011 WL 2200631, at *15 (S.D. Cal. June 2, 2011) (citation omitted; first ellipsis in original). Moreover, "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law[;] . . . instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citations and internal quotation marks omitted). An expert nevertheless may, in appropriate circumstances, rely on the expert's understanding of the law and refer to the law in expressing an opinion regarding professional norms. *Id.* at 1016–17.

### D.    Pickett's Opinions Are Largely Inadmissible

The parties appear to agree that Pickett's opinions are relevant, if at all, primarily to damages. *See* Opp'n to Mot. to Exclude at 3 ("Pickett's testimony primarily relates to Plaintiff's damages claim."). Defendants briefly argue in their opposition to Plaintiff's *Daubert* motion that Pickett's opinions could "also serve to inform the jury of O'Neil's state of mind on the date of the incident, as he likely would have been aware that his parole would be revoked if arrested, making him more likely to take desperate measures to avoid arrest." Opp'n to Mot. to Exclude at 3. Defendants do not explain, however, how O'Neil's purported subjective willingness "to take desperate measures" would be relevant to the merits of the case. There is no evidence that Samayoa was aware of O'Neil's criminal history or parole status at the time of the shooting, so that could not have informed Samayoa's state of mind when he shot O'Neil. Nor is it clear why desperation would support an inference that O'Neil reached towards his waistband for a non-existent weapon. *See Cruz*, 765 F.3d at 1079 ("But for him to make such a gesture when *no* gun is there makes no sense whatsoever."). While it is possible that O'Neil moved his hand in a way that Samayoa reasonably but incorrectly perceived as reaching for a weapon, O'Neil's purported

38

1    desperation provides little if any support for such an inference. Neither party relies on Pickett's

2    opinions with respect to their motions for summary judgment.

3        For damages, though, Plaintiff does not dispute that a likelihood that O'Neil would have

4    served a long prison term if Samayoa had not killed him could be relevant. Plaintiff instead

5    contends that Pickett is not qualified to offer such an opinion.

6        The precise purpose for which Pickett was retained is less than clear. Pickett stated at his

7    deposition that he intended to offer opinions only as to how O'Neil "adjusted to both being in

8    prison and being on parole." Mot. to Exclude Ex. 1 (Pickett Dep.) at 10:25–11:7. Defendants

9    assert in their opposition brief that "Pickett's primary opinion, based on his experience with parole

10   boards and review of Keita O'Neil's records, is that prior to the carjacking, Keita O'Neil was

11   already in violation of his parole and would have been sent back to prison to complete his 16-year

12   prison term even if he was not involved in the carjacking," and that "had Keita O'Neil been

13   arrested that day, the parole board similarly would have rescinded his parole," Opp'n to Mot. to

14   Exclude at 3—a very different question from how O'Neil was "adjusting." It is not clear whether

15   certain comments in Pickett's report, such as his characterization of O'Neil as a "career criminal,"

16   fall within either of those versions of his opinion or constitute mere editorializing.

17       Regardless, Pickett's expertise does not lie in any of these areas. Defendants cite no cases

18   allowing a parole officer to testify to the likely consequences of a purported parole violation, much

19   less a witness who has not worked in parole in more than forty years. There is no indication that

20   Pickett has done any work related to parole, whether in his administrative roles with the

21   Department of Corrections and Rehabilitation or in his subsequent work in the private sector, since

22   he last served as a parole officer in 1978. Nor is it clear why Pickett is qualified to opine on the

23   "adjustments" made by an individual inmate, when the vast majority of his work since the mid-

24   1980s has been in the administration of large prison systems, working on matters like staffing and

25   security audits. Pickett is also plainly unqualified to offer any expert opinion as to what transpired

26   on the day of the shooting—it is not clear whether he intended to do so, but descriptions of those

27   events appear in the "opinion" sections of his reports. Pickett has not identified any particular

28   "method" he used to reach any of the categories of opinions addressed in this paragraph, and

39

relevant expertise is not apparent from his past work experience. Plaintiff's motion is therefore GRANTED as to the bulk of Pickett's opinions offered in this case.[17]

One area of Pickett's reports that likely falls within his expertise is understanding the records in O'Neil's correctional file. The parties dispute whether the jury would be capable of understanding those documents without expert assistance. With none of those files included in the present record, the Court cannot say with certainty. It is conceivable that the correctional records contain jargon that a layperson would have difficulty understanding, and that testimony by Pickett resembling, for example, the portions of his reports captioned "Review of Prison Terms and Parole Periods of Keita O'Neil" might be of service to the jury—assuming the Court determines that such records are admissible, a question not presented on the current motion. Any such testimony would not include Pickett's personal characterizations of O'Neil as, for example, a "career criminal."

If Defendants intend to offer that sort of limited opinion evidence regarding the basic meaning of correctional files, the parties may address its propriety on motions in limine, to be resolved at the pretrial conference.

## V.     ANALYSIS OF ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

A party seeking to overcome the presumption of public access to documents filed in judicial proceedings generally must establish "compelling reasons" to file documents under seal. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).

Defendants move to seal the computer-aided dispatch ("CAD") log and dispatch audio recording from the day of the shooting, citing, among other justifications, privacy interests of individual officers and other parties, potential prejudice to Samayoa's criminal trial, and California Penal Code section 832.7's exemption from otherwise-required disclosure when criminal proceedings are pending. Dkts. 153, 160. The state law doctrines on which Defendants rely do not clearly prohibit disclosure in the context of this federal court action. Even if they purported to do so, it is not clear that—absent some showing of actual likely harm or other compelling reasons

---

[17] The Court does not question Pickett's qualification to offer expert opinions on prison administration, but such matters are not at issue in this case, and he has offered no such opinions.

40

1    to seal—they could overcome the public's right of access to judicial proceedings, which is rooted

2    in the First Amendment to the United States Constitution.  The only case Defendants cite applying

3    the state law doctrines on which they rely did so in the context of crafting a protective order

4    limiting disclosure by the parties, which is subject to a less stringent standard of "good cause,"

5    rather than the "compelling reasons" required to maintain materials under seal here.  *See Soto v.*

6    *City of Concord*, 162 F.R.D. 603, 613 (N.D. Cal. 1995).  As for more practical reasons to maintain

7    these materials under seal, Defendants' generalized concerns about privacy and potential prejudice

8    at trial are largely untethered to the actual contents of the dispatch materials—particularly with

9    respect to the privacy interests of Defendants Samayoa and Talusan, whose involvement in the

10   events at issue has been thoroughly documented elsewhere in the public record.

11          The Court is therefore not persuaded that compelling reasons require sealing the written

12   CAD log in its entirety.  The motions to seal that document are GRANTED in part and DENIED

13   in part.  Defendants shall file a public version of that document no later than July 19, 2021 with

14   narrowly-tailored redactions of personally identifiable information of non-parties.[18]  *See* Civ. L.R.

15   79-5(f)(3).  If Defendants' redactions appear excessive, the Court reserves the right to order

16   Defendants to show cause why further disclosure should not be required.  Because redaction of the

17   dispatch audio recording would be impractical, Defendants' motions are GRANTED as to that

18   exhibit.

19          Plaintiff filed two administrative motions to file various materials under seal, both based

20   solely on Defendants' designations of confidentiality.  *See* dkts. 146, 164.  The documents at issue

21   are portions of Plaintiff's motion for summary judgment and opposition brief, the DPA report (or

22   the first two pages thereof; it is not clear whether the full report included additional pages), body-

23   worn camera footage of another police officer who responded to the scene after Samayoa shot

24   O'Neil, and excerpts of the CAD log.  Although Plaintiff moves to seal the documents based on

25

26   _____
     [18] Defendants' concerns about the burden of redacting this twenty-two page document are not
27   sufficient to compel a different outcome.  This Court's local rules require narrowly-tailored
     requests to seal and specifically contemplate redactions, which parties routinely provide.  *See* Civ.
28   L.R. 79-5(d)(1)(B), (C).  The Court is confident that the San Francisco City Attorney's Office is
     capable of redacting this document as needed.

Defendants' designations, Plaintiff asserts that the materials are not in fact confidential and the motions should be denied.

Defendants did not file a timely responsive declaration to either of those motion as required by Civil Local Rule 79-5(e)(2). At the hearing, defense counsel characterized that failure as an oversight, and the Court allowed Defendants to file a declaration addressing any such material for which they intended to pursue sealing no later than July 6, 2021. Defense counsel filed a declaration on that date addressing only the DPA report submitted with Plaintiff's opposition brief. *See* Sims Responsive Sealing Decl. (dkt. 175). The Court is satisfied that potential for the DPA report to prejudice the jury pool for Samayoa's criminal trial constitutes a compelling reason to maintain that document under seal and that the entire substantive portion of the document has such potential, and therefore GRANTS Plaintiff's motion to file the DPA report under seal, without requiring redactions.

The Court notes, however, that Defendants have not addressed whether Plaintiff's general description of the DPA report in her briefs warrants sealing, and therefore DENIES Plaintiff's motion to file such portions of her briefs under seal. The Court also DENIES Plaintiff's motions to file Officer Hawkins's body camera footage under seal based on Defendants' failure to address that exhibit. Plaintiffs shall file those materials unredacted in the public record no earlier than July 16, 2021 and no later than July 22, 2021. *See* Civ. L.R. 79-5(e)(2).

As for the CAD excerpts, Plaintiff's motion is GRANTED in part and DENIED in part for the same reasons discussed above with respect to Defendants' motions to seal. Since Defendants will be filing a more complete redacted version of the CAD log, Plaintiff need not file a public version of her exhibit.

## VI. CONCLUSION

For the reasons discussed above, Plaintiff's motion for partial summary judgment is DENIED. Defendants' motion for summary judgment is GRANTED as to Plaintiff's Fourteenth Amendment claim against Samayoa, Plaintiff's federal claims against the City, and all claims against Talusan. Defendants' motion is DENIED as to Plaintiff's Fourth Amendment and state law claims against Samayoa and Plaintiff's state law claims against the City. Plaintiff's motion to

exclude the opinions of Michael Pickett is GRANTED in large part, with the question of whether Pickett may testify to help the jury understand correctional files reserved for adjudication, if necessary, on motions in limine.

The parties' administrative motions to file under seal are GRANTED in part and DENIED in part. Defendants shall file a redacted public version of the CAD log no later than July 19, 2021. Plaintiffs shall file unredacted versions of her briefs and Officer Hawkins's body camera footage in the public record no earlier than July 16, 2021 and no later than July 22, 2021.

**IT IS SO ORDERED.**

Dated: July 12, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge